IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| Cintas Corporation, Cintas Corporation No. 2, Cintas Corporation No. 3 and Cintas Holdings LLC,<br><br>Plaintiffs,<br>v.<br><br>UNITE HERE, Change to Win, International Brotherhood of Teamsters, Bruce Raynor, Ahmer Qadeer, Keith Mestrich, Elizabeth Gres, Peter Demay, Katie Unger, Stefan Antonowicz, And Does 1 Through 100,<br><br>Defendants. | Case No.: 08 cv 2185 (WHP) |

**MEMORANDUM OF LAW IN SUPPORT OF ALL DEFENDANTS' JOINT RULE 12(b)(6) MOTION TO DISMISS**

Irwin Rochman (SDNY Bar No. SS7573)
Tesser, Ryan & Rochman, LLP
509 Madison Avenue
New York, New York 10022
Phone: (212) 754-9000
Fax: (212) 754-5906

Attorney for Defendants UNITE HERE, Bruce Raynor, Ahmer Qadeer, Keith Mestrich, Elizabeth Gres, Peter DeMay, Katie Unger and Stefan Antonowitz

Robert M. Weinberg *(pro hac vice)*
Andrew D. Roth *(pro hac vice)*
Leon Dayan *(pro hac vice)*
Bredhoff & Kaiser, PLLC
805 Fifteenth Street, N.W., Suite 1000
Washington, DC 20005
Phone: (202) 842-2600
Fax: (202) 842-1888

Attorneys for Defendants International Brotherhood of Teamsters and Change to Win

TABLE OF CONTENTS

TABLE OF AUTHORITIES ........ ii

INTRODUCTION ........ 1

ARGUMENT ........ 2

I. EACH OF THE RICO COUNTS IN CINTAS' COMPLAINT (Counts One-Four) FAILS TO STATE A CLAIM ON WHICH RELIEF CAN BE GRANTED. ........ 2

A. Cintas' Hobbs Act Claim Does Not Meet The Act's "Wrongful[ness]" Requirement Or Its Separate "Obtaining of Property" Requirement. ........ 5

B. Cintas' Hobbs Act Claim Also Fails On Independent First Amendment And Federal Labor Law Grounds. ........ 14

C. Cintas' Travel Act and "State Law Extortion" Allegations Cannot Salvage Its Rico Claims. ........ 22

II. EACH OF THE LANHAM ACT COUNTS (Counts Six Through Nine) FAILS TO STATE A CLAIM ON WHICH RELIEF MAY BE GRANTED ........ 23

A. Counts Six, Seven and Eight Fail to Allege that UNITE HERE Made "Commercial Use" of Cintas' Trademark ........ 24

B. Counts Six and Eight Fail to Allege the Requisite "Likelihood of Confusion" ........ 32

C. Count Seven Fails to Allege Facts Establishing Dilution of the Association Between the Term "Cintas" and the Services Cintas Provides. ........ 35

D. Count Nine Should Be Dismissed, Because UNITE HERE's Use of "Cintas Exposed" as a Domain Name Does Not Constitute "Cybersquatting" ........ 36

III. THE COURT SHOULD DECLINE TO EXERCISE ITS SUPPLEMENTAL JURISDICTION OVER CINTAS' PENDENT STATE LAW CLAIMS (Counts Five, Ten-Fourteen) ........ 39

CONCLUSION ........ 40

## TABLE OF AUTHORITIES

### CASES

*A. Terzi Productions v. Theatrical Protective Union*, 2 F. Supp. 2d 485 (S.D.N.Y. 1998)....................6

*Bally Total Fitness v. Faber*, 29 F. Supp. 2d 1161 (C.D. Cal. 1998) ....................36, 37

*Bell Atlantic Corp. v. Twombly*, 127 S. Ct. 1955 (2007) ....................35

*Beverly Hills Foodland v. UFCW, Local 655*, 39 F.3d 191 (8th Cir. 1994)....................16

*Bihari v. Gross*, 119 F. Supp. 2d 309 (S.D.N.Y. 2000) ....................26

*Bosley Med. Inst., Inc. v. Kremer*, 403 F.3d 672 (9th Cir. 2005).................... *passim*

*Brokerage Concepts, Inc. v. U.S. Healthcare, Inc.*, 140 F.3d 494 (3d Cir. 1998) ....................8

*Brookfield Communications, Inc. v. West Coast Entm't Corp.*, 174 F.3d 1036 (9th Cir. 1999) ....................34

*Cellco P'ship v. Communications Workers of Am.*, 2003 U.S. Dist. LEXIS 26823 (D.N.J.) ....................29, 30

*Clearing House Ass'n v. Cuomo*, 510 F.3d 105 (2d Cir. 2007) ....................17

*D.R.S. Trading Co. v. Fisher*, 2002 WL 1482764 (S.D.N.Y.)....................40

*DeBartolo Corp. v. Florida Gulf Coast Bldg. & Constr. Trades Council*, 485 U.S. 568 (1988)....................17, 18

*EPA v. Port Auth.*, 162 F. Supp. 2d 173 (S.D.N.Y. 2001), *aff'd*, 23 Fed. Appx. 81 (2d Cir. 2001)....................40

*Eastern R.R. Presidents Conference v. Noerr Motor Freight*, 365 U.S. 127 (1961)........17, 18, 21

*Entrepreneur Media, Inc. v. Smith*, 279 F.3d 1135 (9th Cir. 2002)....................34

*Famous Horse, Inc. v. Fifth Avenue Photo, Inc.*, 2008 WL 2156727 (S.D.N.Y. May 19, 2008)....................32

*First Capital Asset Mgmt. v. Satinwood, Inc.*, 385 F.3d 159 (2d Cir. 2004) ....................40

*Ford Motor Co. v. 2600 Enterprises*, 177 F. Supp. 2d 661 (E.D. Mich. 2001)....................26

*Fur Information and Fashion Council, Inc. v. E.F. Timme and Son, Inc.*, 501 F.2d 1048, 1051-52 (2d Cir. 1974) ....................27

*Gmurzynska v. Hutton*, 355 F.3d 206 (2d Cir. 2004)....................28

*HERE, Local 2 v. Marriott Corp.*, 961 F.2d 1464 (9th Cir. 1992) ....................4, 5

*HERE, Local 57 v. Sage Hosp. Res.*, 390 F.3d 206 (3d Cir. 2004) ....................5, 13, 20

*HERE, Local 217 v. J.P. Morgan Hotel*, 996 F.2d 561 (2d Cir. 1993) ....................5, 6, 8, 13

*I. Meyer Pincus & Assocs. v. Oppenheimer & Co., Inc.*, 936 F.2d 759 (2d Cir.1991)....................23, 24

*Kolari v. New York-Presbyterian Hosp.*, 455 F.3d 118 (2d Cir. 2006) ....................40

*Lamparello v. Falwell*, 420 F.3d 309 (4th Cir. 2005)....................37

*Linn v. Plant Guard Workers*, 383 U.S. 53 (1966) ....................21

*Louis Vuitton v. Dooney & Bourke*, 454 F.3d 108 (2d Cir. 2006) ....................32

*Machinists v. Wisconsin Empl. Rel. Comm'n*, 427 U.S. 132 (1976) ....................18, 19, 20

*Mattel, Inc. v. MCA Records*, 296 F.3d 894 (9th Cir. 2002)....................36

*Matusovsky v. Merrill Lynch*, 186 F. Supp. 2d 397 (S.D.N.Y. 2002)....................35

*Metropolitan Opera Ass'n v. Local 100, HERE*, 239 F.3d 172 (2d Cir. 2001)....................4, 14, 15

*Moseley v. V Secret Catalogue, Inc.*, 537 U.S. 418 (2003) ....................35

*NAACP v. Claiborne Hardware Co.*, 458 U.S. 886 (1982) ....................15

*NLRB v. Drivers*, 362 U.S. 274 (1960) ....................17

*NLRB v. Fruit Packers*, 377 U.S. 58 (1964) ....................17

*OBH, Inc. v. Spotlight Magazine, Inc.*, 86 F. Supp. 2d 176 (W.D.N.Y. 2000)....................31, 32

*Organization for a Better Austin v. Keefe*, 402 U.S. 415 (1971) ....................15

*Planned Parenthood v. Bucci*, 1997 WL 133313 (S.D.N.Y.), *aff'd mem.*,152 F.3d 920 (2d Cir. 1998)....................32

*Savin Corp. v. Savin Group*, 391 F.3d 439 (2d Cir. 2004) ....................35

*Scheidler v. NOW, Inc.*, 537 U.S. 393 (2003)........................................................................ *passim*

*Smithers Found. v. St. Lukes Roosevelt Hosp. Ctr*, 2001 WL 761076 (S.D.N.Y.)........................30

*Sodexho v. HERE Local 217*, 989 F. Supp. 169 (D. Conn. 1997) ................................................29

*Sunlight Saunas, Inc. v. Sundance Sauna, Inc.*,
427 F. Supp. 2d 1032 (D. Kan. 2006)..........................................................................................37

*Taubman v. Webfeats*, 319 F.3d 770 (6th Cir. 2003)......................................................................37

*Teamsters Union v. Morton*, 377 U.S. 252 (1964)..........................................................................19

*Thornhill v. Alabama*, 310 U.S. 88 (1940) ..................................................................................14, 15

*Tojzan v. New York Presbyterian Hosp.*, 2003 WL 1738993 (S.D.N.Y.) ....................................40

*United States v. Clemente*, 640 F.2d 1069 (2d Cir. 1981) ..........................................................7, 8

*United States v. DeLaurentis*, 491 F.2d 208 (2d Cir. 1974) ..........................................................20

*United States v. Enmons*, 410 U.S. 396 (1973)..............................................................5, 6, 7, 8

*United States v. Gotti*, 459 F.3d 296 (2d Cir. 2006) ..............................................9, 10, 11, 13

*United States v. Nardello*, 393 U.S. 286 (1969) ..............................................................................22

*United States v. Tropiano*, 418 F.2d 1069 (2d Cir. 1969) ............................................................10

*United We Stand Am., Inc. v. United We Stand Am. N.Y. Inc.*,
128 F.3d 86 (2d Cir. 1996).............................................................................................................30

*Utah Lighthouse Ministry v. Foundation for Apologetic Information*, 2008 U.S.
App. LEXIS 11523 (10th Cir. May 29, 2008) ..........................................................26, 31, 38

*Viacom Int'l v. Icahn*, 747 F. Supp. 205 (S.D.N.Y. 1990), *aff'd on other grounds*,
946 F.2d 998 (2d Cir. 1991)...............................................................................................................8

*WHS Entm't Ventures v. United Paperworkers Int'l Union*,
997 F. Supp. 946 (M.D. Tenn. 1998)....................................................................................29, 33

*Whitely v. Comsat Corp.*, 2001 WL 1135946 (S.D.N.Y.) ................................................................40

*Wojnarowicz v. American Family Association*, 745 F. Supp. 130 (S.D.N.Y. 1990) .....................27

## STATUTES AND LEGISLATIVE MATERIAL

15 U.S.C. § 1114(a) ....................23

15 U.S.C. § 1125(a)(1) ....................23

15 U.S.C. § 1125(c) ....................23, 36

15 U.S.C. § 1125(d) ....................23

18 U.S.C. § 1951 ....................5

18 U.S.C. § 1961(1) ....................2

18 U.S.C. §§ 1961 *et seq*....................2

18 U.S.C. § 1962....................2

28 U.S.C. § 1367(c)(3)....................39

29 U.S.C. § 186....................13, 20

S. 1883, 101st Cong., 1st Sess., 135 Cong. Rec. 1207, 1217 (April 13, 1989) ....................28

**INTRODUCTION**

The principal allegation made by Plaintiffs Cintas Corporation and its three related corporate entities (collectively "Cintas") in this lawsuit is that Defendants are committing the felony crime of "attempted extortion"—and thus violating the federal RICO statute—by the following course of conduct: engaging in a negative publicity and boycott campaign, comprised of disparaging commentary on Cintas and free speech appeals to independent third parties not to deal with Cintas, that puts pressure on Cintas, through fear of economic loss, to enter into a lawful card check and neutrality agreement with Defendants UNITE HERE and the Teamsters. And, Cintas further alleges that Defendant UNITE HERE, by using an Internet website titled "CintasExposed.org" as one means of disseminating its anti-Cintas message and making its boycott appeals to independent third parties, also is violating the federal Lanham Act.

As we show in this Memorandum, Cintas' RICO and Lanham Act claims fail as a matter of law both on pure statutory interpretation grounds, and on the independent ground that the First Amendment and the federal labor laws stand as bars to those claims. At bottom, this RICO/Lanham Act lawsuit by Cintas is an effort to gain the upper hand in a longstanding labor dispute between the parties by negating Defendants' right under the First Amendment and the federal labor laws to further their interests in that labor dispute by engaging in a negative publicity and boycott campaign against Cintas. That, we submit, is a misuse of RICO and the Lanham Act, which calls for a dismissal of Cintas' federal claims under Rule 12(b)(6) and a refusal to exercise supplemental jurisdiction over Cintas' pendent state law claims.

## ARGUMENT

### I. EACH OF THE RICO COUNTS IN CINTAS' COMPLAINT (Counts One-Four) FAILS TO STATE A CLAIM ON WHICH RELIEF CAN BE GRANTED.

An essential element of any claim under the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1961 *et seq.*, is that the defendant has engaged, or conspired to engage, in a "pattern of racketeering activity," *see* 18 U.S.C. § 1962. In this regard, "'racketeering activity' means" the felony crimes enumerated in RICO, *see* 18 U.S.C. § 1961(1)—commonly referred to as RICO "predicate acts."

As we show, taking the factual allegations in Cintas' Complaint as true for purposes of this Rule 12(b)(6) motion, those factual allegations do *not* as a matter of law make out a claim that Defendants have committed even a single RICO predicate act—much less the required "pattern" of RICO predicate acts. Accordingly, Cintas' four putative RICO claims against Defendants, *see* Cplt. ¶¶ 263-77, fail at the most basic level and should be dismissed.

All four of Cintas' RICO claims rest on the allegation that Defendants are committing the RICO predicate act of "attempted extortion under the Hobbs Act[ ]," Cplt. ¶¶ 265, 268, 271, 276, by engaging in a "negative public relations campaign against Cintas," *id.* ¶ 232—which includes as "a key component" free speech appeals to independent third parties to boycott Cintas products and services, *id.* ¶¶ 98-99—with the ultimate objective of putting Cintas in such "fear of economic loss" as to apply "pressure" on Cintas to "enter into a card check and neutrality agreement with Defendants UNITE HERE and the Teamsters," *id.* ¶ 8-9, 97.[1] Or, as Cintas' counsel put it at the May 27 pre-motion conference, "our allegation is that there was a fear of

---

[1] In addition, Cintas alleges that—*by this same conduct*—Defendants also are committing the RICO predicate acts of (i) using the facilities of interstate commerce to commit extortion in violation of the Travel Act; and (ii) "extortion and attempted extortion" under Ohio law. *See* Cplt. ¶¶ 265, 268, 271, 276. As we show *infra* pp. 22-23, under *Scheidler v. NOW, Inc.*, 537 U.S. 393 (2003), these additional allegations cannot salvage Cintas' RICO claims.

economic injury or loss associated with the defendant's conduct . . ., [a]nd quite simply . . . defendants . . . are attempting to quite directly and frankly force Cintas into agreeing to what's referred to as card check neutrality." Transcript at 16. There is no allegation in this case that Defendants engaged in any force or violence or threats of force or violence.

To be specific, the "extortionate" *means* alleged by Cintas is Defendants' conduct of a negative publicity and boycott campaign consisting primarily of: (i) "almost daily publication of misleading, negative *and/or* damaging information about Cintas to countless third parties," Cplt. ¶ 93 (emphasis added); (ii) "reaching out" to Cintas' customers "in an attempt to convince them that they are 'getting ripped off disproportionately' by Cintas," *id.* ¶ 98; (iii) "communicat[ing] disparaging information about Cintas to Cintas's stakeholders by mailing and faxing letters and flyers containing misleading *and/or* negative statements about Cintas, distributing newsletters, posting press releases, creating web pages and sending anti-Cintas letters to investors and stock analysts," *id.* ¶ 102 (emphasis added); (iv) "us[ing] the Internet to publish and circulate misleading, disparaging *and/or* negative information about Cintas and its business practices to, among others, Cintas's employees, customers, shareholders, and the general public," *id.* ¶ 110 (emphasis added), including the use of a "Cintas Exposed website . . . specifically designed to encourage consumers and other companies not to conduct business with Cintas," *id.* ¶ 112; (v) "attend[ing] NASCAR races to distribute anti-Cintas literature and to encourage NASCAR fans to 'tell us why you think NASCAR should give Cintas the boot,'" *id.* ¶ 147; and (vi) maintaining "yet another anti-Cintas website" that "disseminate[s] negative information about Cintas to NASCAR fans" in "support [of]" Defendant UNITE HERE's "assertion that 'Cintas doesn't deserve such a profitable partnership with NASCAR,'" *id.* ¶¶ 148-49.

Given Cintas' allegations, we note at the outset (and discuss more fully *infra* pp. 14-18) that under controlling Second Circuit case law, union "campaign[s] of public criticism" and associated "boycott" activities of this kind—directed at a business for the purpose of exerting "pressure" on that business to take action to "resolve [a labor] dispute" in a lawful manner—"are constitutionally protected." *See Metropolitan Opera Ass'n v. Local 100, HERE*, 239 F.3d 172, 174-75, 177-78 (2d Cir. 2001).

To be equally specific about Defendants' alleged "extortionate" *objective*, a "card check and neutrality agreement" (an example of which is attached to Cintas' Complaint as Exhibit 9) sets out the essentials of a "process"—separate from "the traditional NLRB election process"—to govern an employer's response to a union's effort "to organize [the employer's] workers" and to become the workers' legally-recognized exclusive bargaining representative. *Metropolitan Opera*, 239 F.3d at 174. The employer makes two commitments in such an agreement: (1) "to remain neutral by not hiring 'union busters' or speaking against the [u]nion"; and (2) to determine the position of its employees on union representation through a "card-check" procedure—in lieu of insisting on an NLRB election procedure—and to accord legal recognition to the union as the employees' exclusive bargaining representative if in the "card-check" procedure an employee majority "vot[es] in favor of unionization." *Id.*[2]

Given Cintas' allegations, we also note at the outset (and discuss more fully *infra* pp. 5-8) that under controlling Second Circuit case law, a card check and neutrality agreement is "a valid contract governing representation . . . [that] make[s] the union recognition process less

---

[2] To be precise, "[i]n a card check procedure, employees are given cards asking them to designate the union as their bargaining representative. If a majority of the employees sign and return the cards, the union becomes the employees' exclusive bargaining representative. . . . Typically, the cards are distributed and collected by the union without the employer's assistance. They are then "checked" for authenticity by a neutral party." *HERE, Local 2 v. Marriott Corp.*, 961 F.2d 1464, 1466 n.1 (9th Cir. 1992) (internal citation omitted).

burdensome for both [parties] . . . [by] resolv[ing] peacefully those tensions inevitably flowing from a union organizing effort." *HERE, Local 217 v. J.P. Morgan Hotel*, 996 F.2d 561, 566 (2d Cir. 1993); *accord e.g. HERE, Local 57 v. Sage Hosp. Res.*, 390 F.3d 206, 218-19 (3d Cir. 2004); *Marriott Corp.*, 961 F.2d at 1467-70.

**A. Cintas' Hobbs Act Claim Does Not Meet The Act's "Wrongful[ness]" Requirement Or Its Separate "Obtaining of Property" Requirement.**

The Hobbs Act makes it a federal crime to interfere with commerce through "extortion" or attempted "extortion," and defines "extortion" as "*the obtaining of property from another*, with his consent, induced by *wrongful* use of actual or threatened force, violence, or fear . . . ." 18 U.S.C. § 1951 (emphasis added).

Given that, as noted above, Cintas' Hobbs Act "attempted extortion" claim rests on the allegation that Defendants are using *means* that are constitutionally protected to achieve an *objective* that is lawful under the federal labor laws, it is not at all surprising that under controlling Supreme Court and Second Circuit case law, Cintas' Hobbs Act claim fails on two separate statutory grounds: (1) it does not meet the Act's "wrongful[ness]" requirement; and (2) it does not meet the Act's "obtaining of property" requirement.

1. The "Wrongful[ness]" Requirement. In *United States v. Enmons*, 410 U.S. 396 (1973), the Supreme Court interpreted the word "wrongful" in the Hobbs Act phrase "wrongful use of actual or threatened force, violence, or fear" as "limit[ing] the statute's coverage to those instances where the obtaining of the property would itself be 'wrongful' because the alleged extortionist has no lawful claim to the property." 410 U.S. at 400. On this basis, the *Enmons* Court concluded that the Hobbs Act "does *not* apply to the use of force to achieve legitimate labor ends." *Id.* at 401 (emphasis added).

While *Enmons* involved the use of "force"—in that case, violence—"to achieve [the] legitimate labor end[ ]" of negotiating a collective bargaining agreement providing "higher wages in return for genuine services," *id.* at 400, the *Enmons* Court went on to add that the Hobbs Act was patterned on New York extortion law, under which—no matter how "militant" the means used—"'an accused would *not* be guilty of extortion for attempting to achieve legitimate labor goals,'" broadly defined to include "'the legitimate labor objective *of organization*.'" 410 U.S. at 406 n.16 (emphasis added) (citations omitted). That being so, *Enmons* repeatedly and unqualifiedly states that on a proper interpretation of the word "wrongful" as used in the Hobbs Act, the Act does *not* reach the use of force to achieve "legitimate union objectives," *id.* at 400, or "legitimate labor ends," *id.* at 401, and does *not* encroach in any way on "the legitimate activities of labor unions," *id.* at 406 n.16.

A card check and neutrality agreement is lawful under the Second Circuit's controlling decision in *J.P. Morgan Hotel*, 996 F.2d at 566—and thus is a "legitimate labor end[ ]," *Enmons*, 537 U.S. at 401. Under *Enmons*, then, an allegation that a labor union is using *force* to achieve a lawful card check and neutrality agreement—if such an allegation were made—would fail to state a Hobbs Act claim.[3] Here, there is *no* allegation that Defendants are using *force* to achieve a lawful card check and neutrality agreement. Rather, Cintas' allegation is that Defendants are

[3] *A. Terzi Productions v. Theatrical Protective Union*, 2 F. Supp. 2d 485 (S.D.N.Y. 1998), in *dictum*, finds merit in the view that *Enmons*' interpretation of the "wrongful[ness]" requirement only applies to the use of *force* to achieve the legitimate labor objective of a lawful collective bargaining agreement, and does not apply to the use of *force* to achieve other legitimate labor objectives. *See id.* at 505-06, 508. (*A. Terzi Productions'* holding is that the defendant union violated the Hobbs Act by making wrongful use of *force* to achieve an *unlawful* labor objective: recognition of the union and a collective bargaining agreement where the union did not represent the employees, *see id.* at 506-08.) As we have shown in text, the *Enmons* decision, in its terms and its rationale, cuts exactly the opposite way from the *dictum* in *A. Terzi Productions.* But we do not pursue this matter any more deeply here, because as we go on to show in text, Cintas' Hobbs Act claim in this "use of fear of economic loss" case fails without regard to *Enmons*' scope of application in "use of force" cases.

using "*fear of economic loss*," Cplt. ¶ 8 (emphasis added), to achieve such a lawful agreement. And, under *Enmons* and the Second Circuit's reading of *Enmons* in *United States v. Clemente*, 640 F.2d 1069 (2d Cir. 1981), it is clear beyond any question that the use of "*fear of economic loss*" to achieve a lawful card check and neutrality agreement is *not* "wrongful" under the Hobbs Act, and that Cintas' allegation thus fails to state a Hobbs Act claim.

The issue presented to the Second Circuit in *Clemente* was the applicability of the Hobbs Act to cases involving the allegation that the defendant used "fear of economic loss" to obtain property. 640 F.2d at 1076-78. In addressing this issue, the *Clemente* Court began by stating the general principle, drawn from *Enmons*' "teach[ings]," that the applicability of the Hobbs Act

> depends on whether the statutorily identified means ("actual or threatened force, violence, or fear") have been put to "*wrongful* use", *i.e.*, have been employed to obtain property to which "the alleged extortionist has no lawful claim." [*Id.* at 1076 (quoting *Enmons*, 410 U.S. at 400 (emphasis added).]

In other words, said the *Clemente* Court, the applicability of the Hobbs Act turns, in the first instance, on whether "the *wrongfulness* element of the crime of extortion" has been met. *Id.* at 1077 (emphasis added). And, the *Clemente* Court added that in determining whether "the wrongfulness element" has been met, it is improper to assess wrongfulness "in a vacuum, independent of" *the means* used by the defendant to obtain the alleged extortion victim's property. *Id.* That is so because "[i]t is obvious that the use of fear of financial injury is not inherently wrongful." *Id.*

Given these considerations, the *Clemente* Court squarely held that in a Hobbs Act case involving the allegation that the defendant used "fear of economic loss"—and not "force"—to obtain property, the Act's wrongfulness element is satisfied *only* when such fear is used "to achieve *a wrongful purpose*," and *not* when it is used "'to obtain *legitimate* economic ends.'" *Id.* (emphasis added) (quoting the trial court's jury instruction with approval).

The Third Circuit, in a decision expressly "adopt[ing]" the "position" taken by the Second Circuit in *Clemente*, put the point this way:

> Unlike the use or threatened use of force or violence, the use of economic fear in business negotiations between private parties is not "inherently" wrongful. Indeed, the fear of economic loss is a driving force of our economy that plays an important role in many legitimate business transactions. This economic reality leads us to conclude that the reach of the Hobbs Act is limited in cases, such as this one, which involve the use of economic fear in a transaction between two private parties. The limitation we apply is that set forth in *Enmons*: that a defendant is not guilty of extortion if he has a lawful claim to the property obtained.

*Brokerage Concepts, Inc. v. U.S. Healthcare, Inc.*, 140 F.3d 494, 523, 524 (3d Cir. 1998); *see also e.g. Viacom Int'l v. Icahn*, 747 F. Supp. 205, 211, 213 (S.D.N.Y. 1990) (the defendant's use of "greenmail" tactics to induce the plaintiff to part with valuable consideration out of economic fear of a takeover attempt does *not* constitute Hobbs Act "extortion," because "in an extortion scenario the alleged victim has a pre-existing entitlement to pursue his business interests free of the [economic] fear" being generated by the defendant, and a business "does not have a pre-existing right to be free from the problems and fears of a takeover threat"), *aff'd on other grounds*, 946 F.2d 998 (2d Cir. 1991).

The alleged purpose of Defendants' "attempted extortion under the Hobbs Act[ ]" in this case is *not* "a wrongful purpose" under the law, but rather the wholly "legitimate" purpose, *Clemente*, 640 F.2d at 1077, of "achiev[ing] [the] legitimate labor end[ ]," *Enmons*, 410 U.S. at 401, of a card check and neutrality agreement lawful under *J.P. Morgan Hotel*, 996 F.2d at 566. That being so, Cintas' claim that Defendants are committing the RICO predicate act of Hobbs Act "attempted extortion" by using fear of economic loss to pressure Cintas to enter into a lawful card check and neutrality agreement, fails at its inception under *Enmons* and *Clemente*.

2. The "Obtaining of Property" Requirement. Cintas' Hobbs Act "attempted extortion" claim fails on a separate and independent statutory ground as well: on a straightforward application of the Supreme Court's decision in *Scheidler v. NOW, Inc.*, 537 U.S. 393 (2003), and the Second Circuit's reading of *Scheidler* in *United States v. Gotti*, 459 F.3d 296 (2d Cir. 2006), that claim does *not* meet the Hobbs Act's "obtaining of property" requirement.

(a) In *Scheidler*, the defendant abortion protestors used force to "interfere[ ] with, and in some instances completely disrupt[ ], the ability of the [plaintiff abortion] clinics to function." 537 U.S. at 401. The clinics argued that this conduct amounted to RICO Hobbs Act extortion on the following legal theory: by using force to deprive the clinics of the clinics' right to exclusive control of their businesses and of how to use their business assets, the defendants had "obtained" the clinics' asserted "intangible" property right "to exercise exclusive control over the use of [the clinics'] business assets." *Id.* at 401-02.

The Supreme Court *squarely rejected* this legal theory. The Court—after assuming without deciding that "something as intangible" as the right "to exercise exclusive control over the use of a party's business assets" could qualify as "property" under the Hobbs Act, *id.* at 402—then stated: "Whatever the outer boundaries ['of extortion liability under the Hobbs Act'] may be, the effort to characterize [defendants'] actions here as an 'obtaining of property from' [plaintiffs] *is well beyond them*." *Id.* (emphasis added). The Court elaborated, in the decisive paragraph of its opinion:

> There is no dispute in these cases that [defendants] interfered with, disrupted, and in some instances completely deprived [plaintiffs] of their ability to exercise their property rights. . . . But . . . their acts of interference and disruption . . . did not constitute extortion because [defendants] did not "obtain" respondents' property. [Defendants] may have deprived or sought to deprive [plaintiffs] of their alleged property right of exclusive control of their business assets, *but they did not acquire any such property*. [Defendants]

> neither pursued nor received "something of value from" [plaintiffs] that they could *exercise, transfer, or sell*." [*Id.* at 404-05 (emphasis added) (citation omitted).]

"To conclude that such actions constituted extortion," the Court held, "would effectively discard the statutory requirement that property *must be obtained from another*, replacing it instead with the notion that merely interfering with or depriving someone of property is sufficient to constitute extortion." *Id.* at 405 (emphasis added).

In *Gotti*, the Second Circuit made two points about *Scheidler*: First, *Scheidler* "did not overturn [*United States v. Tropiano*, 418 F.2d 1069 (2d Cir. 1969)'s] broad interpretation of the Hobbs Act's reference to 'property,' nor otherwise suggest that only tangible property rights can be extorted under the Hobbs Act." 459 F.3d at 323. Second, *Scheidler* "tighten[ed] the 'obtaining' requirement of the Hobbs Act" by holding that that requirement entails "*both* a deprivation *and* an acquisition of property." *Id.* (emphasis added). In the latter regard, said the *Gotti* Court, the *Scheidler* Court's "explanation" as to "why the [defendant] anti-abortion protestors could not be viewed as having acquired [the plaintiff abortion clinics'] property," *id.*, leads to the conclusion that the "obtaining of property" requirement test is whether the alleged extortionists are "seeking simply to deprive someone of a right," or are seeking in addition to "do[ ] [something] affirmative with that right themselves," *id.* at 323-24.

*Gotti* therefore "hold[s]" that "in evaluating an extortion count's conformity with" *Scheidler*—"*i.e.*, whether it adequately alleges the 'obtaining of property' for purposes of the Hobbs Act's definition of extortion—the key inquiry is whether the defendant is (1) alleged to have carried out (or, in the case of attempted extortion, attempted to carry out) the deprivation of a property right from another, with (2) the intent to exercise, sell, transfer, or take some other analogous action with respect to that right." *Id.* at 324.

The Government's proof in support of the extortion and attempted extortion counts upheld in *Gotti* clearly satisfied this legal standard. For example, on "[t]he ILA Counts," the defendants seized and "exercised" control over the internal affairs of the International Longshoreman's Association ("ILA"), "first by using force to determine 'who filled various International Executive Officer and other ILA positions' in order to 'ensure that organized crime associates would be placed in these positions,' and then by directing the activities of those office-holders." *Id.* at 302. On "[t]he Alayev Counts," the defendants seized and exercised physical control over part of a restaurant's operations, by "install[ing]" gambling machines in the restaurant against the owner's will, "collect[ing] money from th[ose] machines" which the defendants kept for themselves, and eventually forcing a sale of the restaurant from which one of the defendants "ended up taking a portion of" the proceeds. *Id.* at 313-14. And, on "[t]he Seagal Counts," the defendants through threats of force sought to have an actor pay them money and provide them his acting services. *Id.* at 314-15.

(b) Cintas' Complaint alleges that the "extortion[ate]" objective of Defendants' negative publicity and boycott campaign is to pressure Cintas to "enter into a card check and neutrality agreement." Cplt. ¶ 9. Given "*Tropiano*'s broad interpretation of the Hobbs Act's reference to 'property,'" *Gotti*, 459 F.3d at 323, we assume for purposes of analysis that the intangible employer rights affected by a card check and neutrality agreement qualify as "property" under the Hobbs Act. Granting Cintas that much for present purposes, it is plain that Defendants are *not* seeking to *obtain* any such property from Cintas, and that Cintas' "attempted extortion" claim fails on that basis.

Here, as in *Scheidler*, the sum and substance of the plaintiff's allegation is that the defendants are using coercive pressure "to dictate and restrict [the plaintiff's business] actions

and decisions." *Scheidler*, 537 U.S. at 406. And, *Scheidler* squarely holds that coercive conduct by a defendant "to restrict another's freedom of action" is *not* "extortion." *Id.* at 405.

Specifically, Cintas' allegation is that Defendants are using fear of economic loss "to dictate and restrict [Cintas'] actions and decisions," *id.* at 406, respecting whether (1) to exercise its employer right to oppose unionization, rather than be neutral on unionization; and (2) to exercise its employer right to refuse to agree to a card check procedure and to insist on an alternative NLRB election procedure for determining a union claim of majority status. For Hobbs Act "obtaining of property" purposes, that allegation is no different in kind from the plaintiff abortion clinics' complaint in *Scheidler* that the defendant anti-abortion protestors used force "to dictate and restrict the [clinics'] actions and decisions" respecting whether to exercise their right to continue performing abortions, rather than to cease performing abortions.

Here, as in *Scheidler*, on plaintiff's allegations it fairly can be said that the defendants are seeking to *deprive* the plaintiff of its "alleged property right[s]," 537 U.S. at 405, *i.e.*, to deprive Cintas of (1) its employer right to oppose, rather than be neutral on, unionization; and (2) its employer right to refuse to agree to a card check procedure, and to insist instead on an NLRB election procedure, for determining a union claim of majority status. And here, as in *Scheidler*, it fairly can be said that the defendants seek a benefit that may ultimately result from that deprivation. Given the employer's control over his employees' working lives, an employer campaign against unionization and, as part of such a campaign, an employer refusal to agree to a card check procedure and to insist on a union-employer contest through an NLRB election procedure, stand as major obstacles to the exercise by employees of their right to form and join a union that is engaged in an organizing campaign.

But here, as in *Scheidler*, it *cannot* fairly be said that the defendants are seeking to "*acquire* any such property," 537 U.S. at 405 (emphasis added), *i.e.*, that the defendants are seeking to "deprive[ ] [the plaintiff] of [its asserted intangible] property right[s] . . . with . . . the intent to exercise, sell, transfer, or take some other analogous action with respect to th[ose] right[s]." *Gotti*, 459 F.3d at 324. The Defendant unions in this case quite obviously are not seeking to acquire and exercise for themselves Cintas' right to oppose unionization, or Cintas' right to refuse a card check procedure and to insist on an NLRB election procedure. And, neither the Defendant unions nor Cintas would acquire any property right (intangible or otherwise) from the other. As the Second Circuit explained in *J.P. Morgan Hotel*, *supra*, through a card check and neutrality agreement, each party

> *g*[*i*]*ve*[*s*] *up* rights under the [National Labor Relations] Act . . . in an effort to make the union recognition process less burdensome for both . . . [and] to resolve peacefully those tensions inevitably flowing from a union organizing effort. [996 F.2d at 566 (emphasis added); *see also* Cplt., Exh. 9.]

In this regard, a card check and neutrality agreement is the exact analogue to an agreement between two parties to determine a breach of contract claim, or any other legal claim, through arbitration rather than through judicial or administrative proceedings. As the Third Circuit aptly put the point in *Sage Hospitality*, *supra*:

> The fact that a [Card Check and] Neutrality Agreement—*like any other labor arbitration agreement*—benefits both parties with efficiency and cost saving does not transform it into a payment or delivery of some benefit. Furthermore, any benefit to the union inherent in a more efficient resolution of recognition disputes does not constitute a 'thing of value' within the meaning of the statute [, 29 U.S.C. § 186, enacted by Congress "to address bribery, *extortion* and other corrupt practices" in labor-management relations]. [390 F.3d at 219 (emphasis added).]

The critical point is that a card check and neutrality agreement is *not* an employer grant to the union of the status of an exclusive bargaining representative; rather, it is an agreement for a

*process* by which *the employees* will determine for themselves whether to grant the union that status. *Supra* p. 4.

In short, Cintas' allegation that Defendants are seeking to pressure Cintas to enter into a card check and neutrality agreement does *not*, under the legal standard established in *Scheidler* and fleshed out in *Gotti*, constitute a legally sufficient allegation that Defendants are seeking to "obtain" Cintas' asserted intangible property rights within the meaning of the Hobbs Act.

**B. Cintas' Hobbs Act Claim Also Fails On Independent First Amendment And Federal Labor Law Grounds.**

As we have shown, Cintas' Hobbs Act "attempted extortion" claim fails on pure statutory interpretation grounds. As we now show, Cintas' claim also fails on the further ground that the First Amendment and the federal labor laws stand as bars to that claim.

1. The First Amendment. Cintas' RICO claim is that the Hobbs Act makes it the felony crime of "attempted extortion" for a union to engage in a negative publicity and boycott campaign—comprised of disparaging commentary on an employer and free speech appeals to independent third parties not to deal with the employer—that puts pressure on the employer, through fear of economic loss, to enter into a lawful card check and neutrality agreement with the union. The First Amendment stands as a bar to that RICO Hobbs Act claim, as the pertinent Supreme Court case law and the Second Circuit's decision in *Metropolitan Opera*, *supra*, 239 F.3d 172, applying that case law make abundantly clear.

It is settled law that labor unions—in common with, for example, civil rights, environmental and anti-abortion organizations—have a First Amendment right to publicize their objections to a company's business practices, and to urge independent third parties to boycott that company, as a means of pressuring the company to make lawful changes in its business practices. As *Thornhill v. Alabama*, 310 U.S. 88, 102 (1940) states, "the dissemination of

information concerning the facts of a labor dispute must be regarded as within the area of free discussion that is guaranteed by the Constitution." And, that is so where the information is intended to and "may persuade some of those reached to refrain from entering into advantageous relations with the business establishment which is the scene of the dispute." *Id.* at 104.

The Second Circuit's decision in *Metropolitan Opera*, *supra*, 239 F.3d 172, could not be clearer in this regard. In that case, the defendant Union was seeking a lawful card check and neutrality agreement from Restaurant Associates, a food services vendor. In that connection, the Union initiated "a campaign of public criticism" and associated "boycott" activities directed at the Metropolitan Opera ("Met")—which had contracted with Restaurant Associates to provide food services at the Met—designed to "pressure" the Met "to help resolve [the] dispute" with Restaurant Associates over the card check and neutrality agreement "in the Union's favor." *Id.* at 174-75, 177. The Met, citing its status as a neutral third party to the underlying labor dispute, sought and secured a district court injunction against the Union's campaign. The Second Circuit, in recognition that "the Supreme Court has expressly afforded a special breadth of protection [under the First Amendment] to union speech that publicizes labor conflicts," *id.* at 177, dissolved the injunction, and in so doing emphasized:

> [W]e do not ascribe any particular significance to the district court's finding that the Union was motivated to coerce the Met through social pressure and the threat of social ostracism. The district court found the Union's actions to be "harassing" and "threatening" when the Union warned of "repercussions" against those who did not join its boycott. Such "repercussions" included, for example, follow-up leafleting condemning [another neutral employer] for refusing to join. Especially within the labor context, in seeking to exert social pressure on the Met, the Union's methods may be harassing, upsetting, or coercive, but unless we are to depart from settled First Amendment principles, they are constitutionally protected. *See e.g.*, *NAACP v. Claiborne Hardware Co.*, 458 U.S. 886, 909-11 (1982) . . .; *Organization for a Better Austin v. Keefe*, 402 U.S. 415, 419 (1971). [*Id.* at 177-78.]

In the cited portion of the *Keefe* decision, the Supreme Court had stated: "[t]he claim that the expressions were intended to exercise a coercive impact on respondent does not remove them from the reach of the First Amendment. Petitioners plainly intended to influence respondent's conduct by their activities; this is not fundamentally different from the function of a newspaper." And, in the cited portion of its *Claiborne Hardware* decision, the Supreme Court had reaffirmed this core First Amendment principle. *See also Beverly Hills Foodland v. UFCW*, *Local 655*, 39 F.3d 191, 197 (8th Cir. 1994) (under *Keefe* and *Claiborne Hardware*, "the prime directive in the Union [organizing] campaign, a boycott of [the target employer], is . . . constitutionally safeguarded," as is the accompanying "activity of peaceful pamphleteering").

*Metropolitan Opera*'s holding that a union negative publicity and boycott campaign that puts pressure on *a neutral third party* to have that party help resolve a labor dispute generated by the union's effort to secure a lawful card check and neutrality agreement from a primary employer is "constitutionally protected" entails the following conclusion: Defendants' negative publicity and boycott campaign against Cintas that puts pressure on Cintas—*the primary employer*—to resolve a labor dispute by entering into a lawful card check and neutrality agreement, is "constitutionally protected."

And, the conclusion that Defendants' negative publicity and boycott campaign against Cintas is "constitutionally protected," in its turn, entails the further conclusion that the First Amendment stands as a bar to Cintas' RICO Hobbs Act claim in this case. It goes without saying that Congress has no power to restrict—much less *to criminalize*—the exercise of "constitutionally protected" First Amendment rights. In other words, if the Hobbs Act plausibly could be construed to apply in the circumstances alleged by Cintas here—which we have shown it cannot be, *see supra* pp. 5-14—the Hobbs Act would be *unconstitutional* as so applied.

At an irreducible minimum, applying the Hobbs Act as Cintas would have it apply here would raise "serious constitutional problems." *Clearing House Ass'n v. Cuomo*, 510 F.3d 105, 113 (2d Cir. 2007) (internal quotations and citation omitted). Accordingly, "the doctrine of constitutional avoidance," *id.*, dictates that the Hobbs Act be construed *not* to apply here. That is the teaching of *DeBartolo Corp. v. Florida Gulf Coast Bldg. & Constr. Trades Council*, 485 U.S. 568 (1988), the leading labor law "constitutional avoidance" case.

The issue in *DeBartolo* was whether the respondent union violated § 8(b)(4) of the National Labor Relations Act ("NLRA") by "distributing handbills" urging "a consumer boycott" of a shopping mall in order to pressure the mall owner and its tenants to use "their influence" to help resolve a "primary labor dispute" with a mall construction contractor in the union's favor. 485 U.S. at 570-71. The Supreme Court reversed the NLRB's finding that the union's consumer boycott handbilling violated § 8(b)(4), on the ground that "the Board's construction of the statute, as applied in this case, poses serious questions of the validity of § 8(b)(4) under the First Amendment." *Id.* at 575. And, the Court explained that it had applied the constitutional avoidance doctrine to reach a similar result in "several" other labor cases:

> In *NLRB v. Drivers*, 362 U.S. 274, 284 (1960), for example, the Court rejected the Board's interpretation of the phrase "restrain or coerce" [in § 8(b)(4)] to include peaceful recognitional picketing . . . . Similarly, in *NLRB v. Fruit Packers*, 377 U.S. 58, 63 (1964) (*Tree Fruits*), we disagreed with the Board's determination that § 8(b)(4)(ii)(B) prohibited all consumer picketing at a secondary establishment, . . . [based, *inter alia*, on the] concern that a broad ban against peaceful picketing might collide with the guarantees of the First Amendment. [485 U.S. at 577-78.]

*Eastern R.R. Presidents Conference v. Noerr Motor Freight*, 365 U.S. 127 (1961), the leading Supreme Court "constitutional avoidance" case outside the labor law context, is precisely to the same effect. The issue in *Noerr* was whether the defendant railroads violated the Sherman Act by "conduct[ing] a publicity campaign against the [plaintiff] truckers designed to foster the

adoption and retention of laws and law enforcement practices destructive of the trucking business, to create an atmosphere of distaste for the truckers among the general public, and to impair the relationships existing between the truckers and their customers." *Id.* at 129. In holding that the railroads' publicity campaign did *not* violate the Sherman Act, the Court emphasized that a contrary construction of the Act "would raise important constitutional questions. The right of petition is one of the freedoms protected by the Bill of Rights, and we cannot, of course, lightly impute to Congress an intent to invade these freedoms." *Id.* at 138.

In short, given the constitutional protection afforded Defendants' negative publicity and boycott campaign against Cintas, acceptance of Cintas' claim that the Hobbs Act is to be read to criminalize such a campaign would "pose[ ] serious"—indeed, *unanswerable*—"questions of the [constitutional] validity of [the Hobbs Act] . . . ['as applied in this case']." *DeBartolo*, 485 U.S. at 575. For that *constitutional* reason—in addition to the separate *statutory* reasons given in the *Enmons*/*Clemente* and *Scheidler*/*Gotti* decisions, respectively—Cintas "cannot use the [Hobbs Act and RICO] either as a shield [against Defendants' campaign], or as a sword to [kill that campaign]." *Cf. Bosley Med. Inst., Inc. v. Kremer*, 403 F.3d 672, 680 (9th Cir. 2005) (discussed *infra* pp. 24-26, in the context of our showing that the First Amendment also stands as a bar to Cintas' Lanham Act claims in this case).

2. The Federal Labor Laws. The same conclusion follows from the federal labor law principles enunciated by the Supreme Court in *Teamsters Union v. Morton*, 377 U.S. 252 (1964) and *Machinists v. Wisconsin Empl. Rel. Comm'n*, 427 U.S. 132 (1976).

*Morton* raised the question of whether "the Ohio law of secondary boycott can be applied to proscribe the same type of conduct which Congress focused upon but did not proscribe when it enacted [the federal labor law's secondary boycott provisions]." 377 U.S. at 259-60. The

Court answered that question "no." It did so where the Ohio law had been applied to proscribe the defendant union's "request to [a neutral employer's] management to cease doing business with [the employer with whom the union had a labor dispute,]" and on the following ground:

> [A] union is free to approach [a neutral] employer to persuade him to engage in a boycott [of a primary employer], so long as it refrains from the specifically prohibited means of coercion through inducement of employees. . . . This weapon of self-help, permitted by federal law, formed an integral part of the [union's] effort to achieve its bargaining goals during negotiations with the [primary employer]. Allowing its use is a part of the balance struck by Congress between the conflicting interests of the union, the employees, the employer and the community. . . . [T]he inevitable result [of applying the Ohio secondary boycott law] would be to frustrate the congressional determination to leave this weapon of self-help available, and to upset the balance of power between labor and management expressed in our national labor policy. . . . We hold, therefore, that the damages awarded against the [union] based upon its peaceful persuasion of [the neutral employer's] management not to do business with the [primary employer] during the strike cannot stand. [*Id.* (internal quotations and citations omitted).]

As the Court added in *Machinists*, in invalidating a state labor board order enjoining "a union and its members from continuing to refuse to work overtime pursuant to a union policy to put economic pressure on the employer in negotiations for renewal of an expired collective-bargaining agreement," 427 U.S. at 133: "Central to *Morton*'s analysis was the observation that in selecting which forms of economic pressure should be prohibited, Congress struck the balance between the uncontrolled power of management and labor to further their respective interests." *Id.* at 146 (internal quotations and ellipsis omitted). It follows, said the Court, that "[t]o sanction state regulation of such economic pressure deemed by the federal Act desirably left for the free play of contending economic forces is not merely to fill a gap by outlawing what federal law fails to outlaw; it is denying one party to an economic contest a weapon that Congress meant him to have available." *Id.* at 150 (internal quotations, brackets and ellipsis omitted).

*Morton* and *Machinists* hold, in terms, that state laws cannot be applied to “regulat[e] . . . economic pressure [devices] deemed by the federal [labor] Act desirably left for the free play of contending economic forces.” *Machinists*, 427 U.S. at 150. Their rationale, however, goes further and provides that general federal laws, like the Hobbs Act and RICO, cannot be applied to regulate through criminal and civil sanctions the economic pressure device at issue here—*i.e.*, a negative publicity and boycott campaign, through free speech appeals to independent third parties, to pressure Cintas to resolve a labor dispute in the Defendant unions’ favor. For, like the application of the Ohio secondary boycott law to the union pressure device at issue in *Morton*—*i.e.*, a union request to a neutral employer to cease doing business with a primary employer to put pressure on the latter to resolve a labor dispute in the union’s favor—the application of the Hobbs Act and RICO to the union pressure device of the same kind at issue here “is not merely to fill a gap by outlawing what federal [labor] law fails to outlaw; it is denying one party to an economic contest a weapon that Congress meant him to have available.” *Id.*

As the Third Circuit put the point in concluding that a card check and neutrality agreement does not violate the general prohibitions of § 302 of the NLRA, 29 U.S.C. § 186:

> Issues of labor-unit recognition and bargaining are comprehensively regulated by the NLRA. Courts have repeatedly upheld labor-management agreements providing for arbitration over recognition disputes. Sage’s interpretation of section 302 would wreak havoc on the carefully balanced structure of the laws governing recognition of and bargaining with unions. [*Sage Hospitality*, *supra*, 390 F.3d at 219.]

*See also United States v. DeLaurentis*, 491 F.2d 208, 213-14 (2d Cir. 1974) (“Congress has paid a great deal of attention to its enactments in the labor field,” and against that background, it cannot be concluded that Congress, in a civil rights statute of general applicability, “silently import[ed] sweeping criminal liability into the regulation of labor relations.”).

* * * *

To be sure, Cintas does allege that Defendants in carrying out their negative publicity and boycott campaign against Cintas have, in a handful of instances, either "defam[ed]" Cintas or committed other "tort[s]." *See* Cplt. ¶¶ 8, 205-19. To put the matter in perspective, however, while Cintas alleges that Defendants have since "early 2003," *id.* ¶ 88, engaged in the "*almost daily* publication of misleading, negative and/or damaging information about Cintas to *countless* third parties," *id.* ¶ 93 (emphasis added), Cintas' Complaint contains a single state law defamation Count based on a single press release, *see id.* ¶¶ 334-341. Defendants deny the allegations of defamatory speech and other "tort[s]," but for present purposes it suffices to point out that the law provides for remedies designed specifically to deal with any such torts committed by Defendants. *See e.g. Linn v. Plant Guard Workers*, 383 U.S. 53 (1966).

What the law manifestly does *not* provide for is Cintas' effort to press the Hobbs Act (and, by extension, RICO) into service as a means of preventing Defendants from continuing a negative publicity and boycott campaign against Cintas that—aside from any defamations or other torts that may have been committed in the course of that campaign—is protected by the First Amendment and lawful under the federal labor laws. For the mere fact that isolated torts, remediable under state law, may have been committed in the course of an otherwise lawful negative publicity and boycott campaign entitled to constitutional protection cannot somehow transmute that campaign into an entirely unlawful campaign—much less into an "extortionate" campaign violative of the Hobbs Act and RICO. *Compare Noerr*, *supra*, 365 U.S. at 140-41 (that the defendant railroads have engaged in certain "decept[ive]" and "unethical" practices during the course of their otherwise constitutionally protected "publicity campaign" against the plaintiff truckers does *not* transmute that "publicity campaign" into a Sherman Act violation; "[i]nsofar as that Act sets up a code of ethics at all, it is a code that condemns trade restraints, not

political activity, and . . . a publicity campaign to influence governmental action falls clearly into the category of political activity”).

**C. Cintas’ Travel Act and “State Law Extortion” Allegations Cannot Salvage Its Rico Claims.**

Under the Supreme Court’s decision in *Scheidler*, our showing that the conduct alleged by Cintas here does not as a matter of law constitute the RICO predicate act of Hobbs Act “attempted extortion”—and, indeed, could not be found to constitute “attempted extortion” under the Hobbs Act consistent with the First Amendment and the federal labor laws—brings down Cintas’ claim that *this same conduct* constitutes the RICO predicate acts of (i) using the facilities of interstate commerce to commit extortion in violation of the Travel Act; and (ii) “extortion and attempted extortion” under Ohio law. *See supra* p.2 n.1.

In *Scheidler*, the Court held that “for a state offense to be an ‘act or threat involving . . . extortion, . . . which is chargeable under State law,’ as RICO requires, . . . the conduct must be capable of being generically classified as extortionate.” 537 U.S. at 409. And, the Court adopted for this purpose the following generic definition of extortion that had been adopted by the Court for Travel Act purposes in *United States* v. *Nardello*, 393 U.S. 286 (1969): “obtaining something of value from another with his consent induced by the wrongful use of force, fear, or threats.” *Scheidler*, 537 U.S. at 410. That generic definition of extortion—which includes both the “wrongful[ness]” requirement and the “obtaining” requirement—is for present purposes indistinguishable from the Hobbs Act definition of extortion. Accordingly, the words of the *Scheidler* Court respecting the state law and Travel Act claims asserted as RICO predicate crimes in that case are squarely applicable here:

> Because petitioners did not [“as the Hobbs Act requires”] obtain or attempt to obtain respondents’ property, both the state extortion claims and the claim of attempting or conspiring to commit state extortion were fatally flawed [“for RICO purposes.”] The 23

> violations of the Travel Act and 23 acts of attempting to violate the Travel Act also fail. These acts were committed in furtherance of allegedly extortionate conduct. But we have already determined that petitioners did not commit or attempt to commit extortion. [537 U.S. at 410.]

And, of course, on the same analysis, Cintas' failure to meet the Hobbs Act's "wrongful[ness]" requirement is an independent fatal flaw in Cintas' attempt to base its RICO claims on the predicate crimes of state law extortion and the Travel Act.

## II. EACH OF THE LANHAM ACT COUNTS (Counts Six Through Nine) FAILS TO STATE A CLAIM ON WHICH RELIEF MAY BE GRANTED.

Cintas asserts four Lanham Act claims: trademark infringement in violation of 15 U.S.C. § 1114(a) (Count 6); trademark dilution in violation of 15 U.S.C. § 1125(c) (Count 7); unfair competition in violation of 15 U.S.C. § 1125(a)(1) (Count 8); and cybersquatting in violation of 15 U.S.C. § 1125(d) (Count 9). These counts are based on the following allegations:

To carry out its "negative public relations campaign against Cintas" (the "Uniform Justice" campaign), in December 2002 defendants UNITE HERE, Unger, and Antonowicz (collectively "UNITE HERE") established three websites by registering three "CintasExposed" Internet addresses, or "domain names"; the site principally used in the campaign bears an ".org" suffix; the other two bear ".com" and ".net" suffixes respectively. Cplt. ¶¶ 232-36.

The CintasExposed.org site is devoted entirely to criticism of Cintas and its business practices; the site itself neither offers for sale any goods or services nor solicits contributions from the public or union members. *Id.* ¶ 240. Immediately upon entering the CintasExposed.org website, a visitor is "informed that the website purports to be 'an independent source of consumer information from UNITE HERE.'" *Id.* ¶ 238. An exhibit attached to the Complaint, which is properly treated as part of the Complaint for Rule 12(b)(6) purposes, *see I. Meyer Pincus & Assocs. v. Oppenheimer & Co., Inc.*, 936 F.2d 759, 762 (2d Cir.1991), establishes that

this identification of UNITE HERE as the source of the information is prominent, appearing at the top of the CintasExposed.org home page. *See* Cplt., Exh. 27. Cintas' own official website bears the address "Cintas.com." *Id.* ¶ 250.

On these allegations, all four Lanham Act counts are due to be dismissed under Rule 12(b)(6). Counts 6, 7 and 8 rest on Lanham Act provisions that make a person's use of another's trademark actionable only where the person has made *commercial use* of the mark, and Counts 6, 7 and 8 fail to meet that basic statutory requirement. The Count 6 and 8 statutory provisions also make a person's use of another's trademark actionable only where that use creates a "likelihood of confusion," and those Counts fail to meet that separate requirement as well. The Count 7 also statutory provision makes a person's use of another's trademark actionable only where that use "dilutes" the association between the mark and the mark owner's goods or services, and Count 7 fails to meet that additional requirement. Finally, the Count 9 statutory provision makes the registration of a domain name actionable only where the registrant (i) registered a name identical, confusingly similar to, or dilutive of another's trade name; and (ii) acted with a bad faith intent to profit from the registration. Count 9 fails to meet both of those requirements.

### A. Counts Six, Seven And Eight Fail To Allege That UNITE HERE Made "Commercial Use" Of Cintas' Trademark

The Lanham Act provisions underlying Counts 6, 7 and 8 rest on a common statutory requirement: that a person's use of another's trademark is actionable only where the person has made *commercial use* of the mark—that is, where the person has used the owner's mark to sell or market goods or services, and has *not* merely used the owner's mark to criticize the owner's goods or services. Counts 6, 7 and 8 fail to meet this basic requirement.

1. We begin with *Bosley Medical Institute, Inc. v. Kremer*, 403 F.3d 672, 676 (9th Cir. 2005), the appellate decision most closely on point. In that case, Bosley, a physician

who operated his hair replacement practice under the trade name of "Bosley Medical," brought both a traditional "infringement" claim under § 1114(a) and a "dilution" claim under § 1125(c) against a disgruntled former customer who created "BosleyMedical.com," a website devoted to criticism of Bosley Medical.

In rejecting the plaintiff's claims, the court of appeals began by observing that § 1114(a) contains a limiting clause that renders actionable only the use of another's trademark "in connection with the sale, offering for sale, or distribution of goods or services," and that § 1125(c) contains a limiting clause that renders actionable only the "commercial use in commerce" of another's mark. The court explained that, although the two limiting clauses employ different verbal formulas, both express the same substantive concept: that only persons who use a trademark owner's mark to sell or market their own or a third party's goods or services—and *not* those who use the owner's mark solely to engage in commentary or criticism about the mark owner—are within the statute's reach. 403 F.3d at 678-79. *See also id.* at 676 ("the term 'commercial use in commerce' is … roughly analogous to the 'in connection with' sale of goods and services requirement of the infringement statute"). On this basis, the court held that the defendant had made no "commercial use" of the mark, because he had used Bosley Medical's mark solely to criticize the company. *Id.* at 678.

The *Bosley Medical* court added that it was untenable to read the "in connection with" clause of § 1114(a) to reach persons who use a mark only in connection with *the trademark owner's* goods or services. Doing so would stretch § 1114(a) to "encompass almost all uses of a registered trademark, even when the mark is merely being used to identify the object of consumer criticism," and according the provision such a broad reach "is supported by neither the text of the statute nor the history of trademark laws in this country." *Id.* at 679. Those laws, the

court explained, were adopted to redress *competitive* injuries, and "[the defendant] is not Bosley's competitor; he is their critic." *Id.*

The *Bosley Medical* court observed as well that limiting §§ 1114(a) and 1125(c) to commercial uses serves to assure that the provisions do not conflict with the First Amendment. *Id.* at 677. In the court's pithy phrase: "Bosley cannot use the Lanham Act either as a shield from [the defendant's] criticism, or as a sword to shut [the defendant] up." *Id.* at 680.

A recent decision by the Tenth Circuit, *Utah Lighthouse Ministry v. Foundation for Apologetic Information*, 2008 U.S. App. LEXIS 11523 (10th Cir. May 29, 2008), follows *Bosley Medical* in every respect, and goes on to interpret the "in connection with any goods or services" clause in § 1125(a)(1)—at issue in *Utah Lighthouse* and in this case, but not in *Bosley Medical*—to include the same "commercial use" requirement that *Bosley Medical* held to be encompassed within § 1114(a)'s "in connection with the sale … of goods or services" clause. *Id.* at *14. The Tenth Circuit accordingly rejected Lanham Act unfair competition and dilution claims by the owner of the "Utah Lighthouse" trademark against the owner of the utahlighthouse.org and .com domain names, who used those domain names to criticize the mark owner. The court reasoned that "the defendant in a trademark infringement and unfair competition case must use the mark in connection with the goods or services of a competing producer, not merely to make a comment on the trademark owner's own goods or services." *Id.* at *16.

The *Bosley Medical* and *Utah Lighthouse* treatment of §§ 1114(a), 1125(a), and 1125(c) accords with *Bihari v. Gross*, 119 F. Supp. 2d 309, 318 (S.D.N.Y. 2000), where the court held that the "in connection with any goods or services" clause in § 1125(a)(1) is limited to use in connection with the alleged infringer's goods or services and imposes a "commercial use" requirement parallel to that set forth in § 1125(c). *See also, e.g., Ford Motor Co. v. 2600*

*Enterprises*, 177 F.Supp. 2d 661, 665 (E.D. Mich. 2001) (§ 1114(a)'s "in connection with … goods or services" clause encompasses only use of a mark in connection with goods or services marketed by a non-markholder).

Further, *Bosley Medical*'s observation that it would be inconsistent with the "history of trademark laws in this country" to read the "in connection with" clause to encompass uses that are solely in connection with the *trademark owner's* goods or services accords with the decision in *Wojnarowicz v. American Family Association*, 745 F. Supp. 130, 141-42 (S.D.N.Y. 1990), which thoroughly reviewed that history.

In *Wojnarowicz*, the court explained that between the Lanham Act's adoption in 1946 and its amendment in 1988, it was uniformly understood that the clause in former § 1125(a) that authorized actions for false designations of origin or source "in connection with any goods or services" did not encompass uses of an owner's mark to make false or disparaging statements about the *mark owner's* goods or services. As the court said: "Until 1988, [§ 1125(a)] covered only misrepresentations concerning one's own product, and did not apply to disparagement of a competitor's product. *See Fur Information and Fashion Council, Inc. v. E.F. Timme and Son, Inc.*, 501 F.2d 1048, 1051-52 (2d Cir. [1974])."

Then, in 1988, when § 1125(a) was amended to add, through § 1125(a)(1)(B), a new cause of action for false advertising—including certain kinds of false advertising about another person's product—Congress, mindful of the First Amendment implications, expressly limited that new cause of action to "false or misleading representation[s] of fact, which … *in commercial advertising or promotion*, misrepresent[] the nature, characteristics, qualities, or geographic origin of his or her or another person's goods, services, or commercial activities." (Emphasis

added.). In placing that amendment in its historical context, the *Wojnarowicz* court found the following passage from the legislative history of the amendment to be instructive:

> Under this proposed change *only* false or misleading "advertising or promotion" would be actionable, whether it pertained to the advertiser itself or another party. The change would exclude *all other misrepresentations* from [§ 1125(a)] coverage. These others are the type which raise free speech concerns, such as a Consumer Report which reviews and may disparage the quality … of products, *[and] misrepresentations made by interested groups which may arguably disparage a company and its products*.

S. 1883, 101st Cong., 1st Sess., 135 Cong. Rec. 1207, 1217 (April 13, 1989) (as quoted in *Wojnarowicz,* 745 F. Supp. at 142) (second emphasis added).

This history not only supports reading the former § 1125(a) as excluding uses of a trademark in connection with criticism of a mark owner's goods or services, but compels the *Bosley Medical* and *Utah Lighthouse* courts' parallel readings of § 1114(a) and the current § 1125(a)(1)(A). For if one were to adopt the contrary position that the "in connection with" clauses *include* such uses, it would follow that the use of a mark to disparage "another person's goods, services, or commercial activities"—conduct that the *Wojnarowicz* court explained had been *outside* the coverage of the Lanham Act until § 1125(a)(1)(B) was adopted in 1988—would have actually been *within* the coverage of the Act all along. Stranger still, the original 1946 Lanham Act infringement and unfair competition provisions, now codified in sections 1114(a) and 1125(a)(1)(A) respectively, would magically be rendered *more* generous to disparagement claims than the new provision adopted by Congress in 1988 specifically to authorize such claims, in that they would not be burdened by the new § 1125(a)(1)(B)'s specific limits on disparagement cases. *See Gmurzynska v. Hutton*, 355 F.3d 206, 210 (2d Cir. 2004) (elaborating on those limits). Thus, as *Bosley Medical* and *Utah Lighthouse* hold, the only way to reconcile sections 1114(a) and 1125(a) with "the history of trademark laws in this country" is to recognize

that these provisions exclude statutory coverage in cases where a mark is used solely in connection with the mark owner's own goods or services.

2. Consistent with the reasoning in *Bosley Medical* and with trademark law history, three district courts have dismissed Lanham Act claims under Rule 12(b)(6) for failure to meet the "commercial use" requirement in circumstances where, as here, a union defendant was allegedly using an employer's trademark in disseminating derogatory information about an employer/markholder in order to exert pressure on the employer in a labor dispute. *See Sodexho v. HERE Local 217*, 989 F. Supp. 169, 172 (D. Conn. 1997); *WHS Entm't Ventures v. United Paperworkers Int'l Union*, 997 F. Supp. 946, 949-51 (M.D. Tenn. 1998); *Cellco P'ship v. Communications Workers of Am.*, 2003 U.S. Dist. LEXIS 26823 (D.N.J.).

In *Sodexho*, the employer complained that the union defendants had, in the course of a negative publicity and boycott campaign, used the employer's trade name in misleading flyers critical of its business practices. The court dismissed the complaint under Rule 12(b)(6):

> While defendants' actions may have been intended to encourage customers to choose a food service provider other than Sodexho, they were not intended to cause consumers to choose the defendant unions themselves as the food service providers… [T]he Lanham Act … does not only require disparagement of a service or product, it additionally requires that the defendant do so in order to promote its own service or product. [989 F. Supp. at 172].

*WHS* is to the same effect. There the court, in a comprehensive opinion, dismissed an employer's § 1125(a)(1) and § 1125(c) complaint against a union that used the employer's mark in derogatory flyers distributed during a negative publicity campaign. 997 F. Supp. at 951.

*Cellco* too was a Lanham Act suit by an employer against a union that used the employer's trademarked slogan as part of a corporate campaign. The *Cellco* court followed *Sodexho* and *WHS* and added that "[a] union commenting on its employer adversary through using the latter's slogan during a labor dispute" is exercising "its First Amendment right," which

should not be "jeopardized by an overly-broad construction of the Lanham Act." 2003 U.S. Dist. LEXIS 26823 at *24 n.6.[4]

3. When the foregoing legal principles are applied to the facts alleged in the Complaint, it is clear beyond any question that Counts 6, 7 and 8 fail to meet the "commercial use" requirement.

As noted *supra* p. 23, the Cintas Exposed site is devoted exclusively to criticism of Cintas and neither sells nor advertises goods or services. The only nexus Cintas can identify between the Cintas Exposed website and the sale or marketing of any non-Cintas products or services is this: CintasExposed.org contains a hyperlink to the home page of UNITE HERE's principal website UNITEHERE.org, a page that "primarily consists of inflammatory union rhetoric, much of which is directed at Cintas." Cplt. ¶ 241. The UNITE HERE home page, in turn, includes 35 hyperlinks to other web pages, *see* Exh. 68, two of which Cintas deems relevant. One is a hyperlink to the home page of the UNITE HERE online store, which sells mugs, baseball caps, T-shirts, and similar bric-a-brac bearing the UNITE HERE logo, Cplt. ¶ 242; the other is to a "Buy Union" page whose purpose is "to encourage consumers to purchase only union-made products and apparel," *id.* ¶ 243. The "Buy Union" page, in turn, contains hyperlinks to pages that contain further hyperlinks to union-friendly uniform and apparel manufacturers, some of which compete with Cintas. *Id.* ¶¶ 244-45.

---

[4] In contending that the Lanham Act provisions at issue here apply only to *commercial* users of a trademark, we do not suggest that those provisions apply only to *for-profit* users. A nonprofit organization that, for example, appropriates a competing nonprofit organization's trade name to solicit contributions is making a "commercial use" of that mark just as surely as is a for-profit entity. *See United We Stand Am., Inc. v. United We Stand Am. N.Y. Inc.*, 128 F.3d 86, 90 (2d Cir. 1996). *See also Smithers Found. v. St. Lukes Roosevelt Hosp. Ctr*, 2001 WL 761076, at *4 (S.D.N.Y.) (Pauley, J.) (noting that it was "crucial" to the holding in *United We Stand* that the plaintiff and defendant nonprofit organizations were "direct competitors").

These twice- and thrice-removed links to the sale of non-Cintas goods establish far too remote a connection between the Cintas Exposed website and the sale of those goods to transform the plainly noncommercial Cintas Exposed website into one that makes "commercial use" of Cintas' trademark. Thus, in *Bosley Medical*, the Ninth Circuit rejected the argument that the defendant's website devoted to criticism of the mark holder's hair replacement services was rendered "commercial" by containing a hyperlink to a "discussion group" website that was, in turn, supported by advertising from competing hair replacement providers. The court held that this "roundabout path to the advertising of others is too attenuated to render [defendant's] site commercial." 403 F.3d at 678. The path that Cintas traces from the Cintas Exposed website to web pages that advertise non-Cintas goods for sale is even more "roundabout" and "attenuated" than that. *Accord Utah Lighthouse*, 2008 U.S. App. LEXIS 11523, at *13 (fact that gripe site contained link to home page of a site sponsored by an affiliated organization, which, in turn, included an online bookstore did not render gripe site "commercial").

4. In the face of *Bosley Medical*, the three on-point union 12(b)(6) cases, and the other cases discussed above—all holding that the use of a trademark solely in connection with criticism or disparagement of the mark owner's goods, services or business practices does not constitute a commercial use—Cintas relies on *OBH, Inc. v. Spotlight Magazine, Inc.*, 86 F. Supp. 2d 176 (W.D.N.Y. 2000), for the proposition that "a 'commercial use' is established any time an unauthorized use of a protected mark hinders or impacts the commercial success of the mark's owner or otherwise disparages the mark owner." *See* Cintas' May 1, 2008 Letter to the Court. But *OBH* is a factually distinguishable case that only provides support for Cintas' assertion in an unsupported and unsound *dictum*.

In *OBH*, the plaintiff and the defendant were in "direct competition" with one another. 86 F. Supp. 2d at 182. The plaintiff owned the "The Buffalo News" trademark, and published the "Apartment Finder," a circular containing rental listings. The defendant published the competing "Apartment Spotlight." The defendant set up a website under the name "thebuffalonews.com," and included on that site both criticism of the Buffalo News *and* a link to its own "Apartment Spotlight" publication. The district court began by holding that the use of "thebuffalonews.com" site to advertise a competing publication was a classic "commercial use." The court nevertheless went on to add, in a cursory *dictum*, that "the 'in connection with' requirement is not only met by use of the mark in connection with goods or services distributed or advertised by the alleged infringer; it may also be met by use in connection with the goods or services distributed *by the trademark holder*." *Id.* at 186 (emphasis added).[5]

The proposition stated in that *dictum* is in square conflict with the Lanham Act history set out above, and has been rejected in *Bosley Medical*, *Utah Lighthouse* and the numerous other cases cited *supra* at pp.26-29. It cannot therefore rescue Counts 6, 7 and 8 from dismissal for failure to meet the "commercial use" requirement.

**B. <u>Counts Six And Eight Fail To Allege The Requisite "Likelihood of Confusion"</u>**

A second requirement for a § 1114(a) claim of trademark infringement or a § 1125(a) claim of unfair competition is that the mark be used in such a way as to create a "likelihood of confusion" as to the source or sponsorship of the defendant's goods or services. *Louis Vuitton v. Dooney & Bourke*, 454 F.3d 108, 114 (2d Cir. 2006). *See also Famous Horse, Inc. v. Fifth*

[5] The *OBH* court supported its *dictum* only through reliance on a further *dictum*—a statement in *Planned Parenthood v. Bucci*, 1997 WL 133313 (S.D.N.Y.), *aff'd mem.*, 152 F.3d 920 (2d Cir. 1998), to the effect that the "in connection with" element can be met merely by showing a connection to the trademark owner's services. That statement was a *dictum* because the court had already concluded that the defendant there had used the plaintiff's mark to advertise, or "plug," the sale of a book authored by one of his confederates. 1997 WL 133313 at * 4.

*Avenue Photo, Inc.*, 2008 WL 2156727 (S.D.N.Y. May 19, 2008) (Pauley, J.) (dismissing Lanham Act claim for failure to satisfy the confusion element); *WHS Entm't*, 997 F. Supp. at 951-52 (same). Cintas' Counts 6 and 8 fail this requirement.

Cintas contends that the use of the term "CintasExposed" as the domain name of a website critical of Cintas' business practices is apt to confuse Internet users into believing that Cintas itself is the sponsor of the site. But it is plain from the allegations in the Complaint and the attached exhibits that Counts 6 and 8 do not meet the confusion requirement.

An Internet user, upon entering the CintasExposed.org site, will immediately be confronted with a disclaimer, at the top of the page, "inform[ing] [the user] that the website purports to be 'an independent source of consumer information from UNITE HERE.'" Cplt. ¶ 238.

Although Cintas recognizes, as it must, that this disclaimer would instantly dispel any possible confusion as to whether Cintas sponsored the site, Cintas presses on, claiming that search engine users entering "Cintas" as a search term and viewing, as one of the items on the results list, "Cintas Exposed," might experience momentary confusion, or "initial interest confusion," Cplt. ¶ 254, during the fleeting period between forming the belief that "Cintas Exposed" might be Cintas' official site and then seeing, after clicking onto the site, the disclaimer prominently declaring the site to be an "independent source of consumer information from UNITE HERE." Such momentary confusion, Cintas argues, is sufficient to establish the likelihood-of-confusion element of a cause of action under §§ 1114(a) and 1125(a).

Cintas is wrong for two separate and independent reasons.

First, the Exhibits to the Complaint negate the existence of any confusion, including initial interest confusion. Exhibit 78 to the Complaint is a printout of the results generated by a

search for “Cintas” on a search engine. This results page shows that, immediately following the listing for CintasExposed.org is a disclaimer that UNITE HERE included in the CintasExposed.org website as a “metatag”—a tag that can be read by Internet “search engines” and then displayed to assist search engine users. The disclaimer states: “CintasExposed.org is an independent website posted by the labor union UNITE. It contains criticism and information about the uniform and facilities services rental company Cintas…” Exh. 78.[6]

After this factual hole in Cintas’ “initial interest confusion” theory was exposed at the May 27 status conference, Cintas amended its complaint and added a new exhibit (Exhibit 77) to show that some search engines do not display UNITE HERE’s metatag disclaimer. But Exhibit 77 does not serve to fill the hole in Cintas’ theory. Cintas’ problem is that Exhibit 77, which sets out the results of searches for the term “Cintas” in a series of search engines, shows that, in every instance, the official company site, “Cintas.com”—which bears the intuitively obvious name for an official site[7]—is always listed first and well ahead of “CintasExposed.org.” Because the purpose of the “initial interest confusion” doctrine in the Internet context is to prevent an opportunist from diverting a user to another site *before* he or she encounters the company’s official site, *see Brookfield Communications, Inc. v. West Coast Entm’t Corp.*, 174 F.3d 1036 (9th Cir. 1999), the doctrine cannot logically be applied in cases where, as here, search engines list the mark owner’s official site above the “gripe site,” and the official site bears the intuitively obvious name whereas the lower-listed gripe site does *not* bear such a name.

---

[6] At the May 27 status conference, counsel for Cintas stated that Exhibit 78 (which was then Exhibit 77) showed the results of a search using Google, the world’s most dominant search engine. Tr.21-22. The document itself indicates that Microsoft’s MSN search generated those results, but the discrepancy is immaterial, because it is a fact of public record that a search using Google generates the very same disclaimer as that displayed on Exhibit 78.

[7] *See Entrepreneur Media, Inc. v. Smith*, 279 F.3d 1135, 1146 (9th Cir. 2002) (“Internet users searching for a company's Web site often assume, as a rule of thumb, that the domain name of a particular company will be the company name [or trademark] followed by ‘.com.’ ”).

Second, even if it were assumed, contrary to our submission, that some Internet users might experience some "initial interest confusion" in searching for Cintas' official site, Cintas' "initial interest confusion" theory would still fail. In *Savin Corp. v. Savin Group*, 391 F.3d 439 (2d Cir. 2004), the Second Circuit held that "[b]ecause consumers diverted on the Internet can more readily get back on track than those in actual space, thus minimizing the harm to the owner of the searched-for site from consumers becoming trapped in a competing site, Internet initial interest confusion requires a showing of *intentional deception*." *Id.* at 462 n.13 (emphasis added). As a matter of law, no such showing of "intentional deception" can be made here, because (i) UNITE HERE gave its Cintas "gripe site" the thoroughly non-deceptive name "Cintas Exposed"; and (ii) UNITE HERE, as just noted, included a metatag in the CintasExposed.org website containing a disclaimer that is designed to be displayed by search engines—and that in fact *is* displayed by at least two very prominent search engines, *see* note 6 *supra*—informing Internet users that the union is the site sponsor.[8]

**C. Count Seven Fails To Allege Facts Establishing Dilution Of The Association Between The Term "Cintas" And The Services Cintas Provides.**

Cintas' Count 7 claim under § 1125 (c) has a second fatal defect as well: It fails to meet that provision's dilution requirement.

The anti-dilution provision serves to protect the strength and quality of the *associations* that exist between a famous trademark and the trademarked product or service. *See Moseley v. V Secret Catalogue, Inc.*, 537 U.S. 418, 433 (2003). Thus, the provision applies against those who

[8] To be sure, the Complaint includes a conclusory recitation that UNITE HERE "intentionally" caused initial interest confusion. Cplt. ¶ 254. But under *Bell Atlantic Corp. v. Twombly*, 127 S. Ct. 1955, 1965 (2007), "a formulaic recitation of the elements of a cause of action will not do"—particularly where, as here, the specific allegations in the complaint and attached exhibits contradict the conclusory recitation. "If a plaintiff's allegations are contradicted by such a document [attached to the complaint], those allegations are insufficient to defeat a motion to dismiss." *Matusovsky v. Merrill Lynch*, 186 F. Supp. 2d 397, 400 (S.D.N.Y. 2002).

would use a famous mark to identify a *new* product or service and in so doing weaken the original association, as "[f]or example, Tylenol snowboards, Netscape sex shops and Harry Potter dry cleaners," which "diminish [the marks'] ability to evoke their original associations… by blurring their uniqueness and singularity … and/or by tarnishing them with negative associations." *Mattel, Inc. v. MCA Records*, 296 F.3d 894, 903 (9th Cir. 2002) (internal quotation marks omitted).

Here, the Complaint contains no allegation that UNITE HERE has used Cintas' mark to identify any *new* product or service. Rather, Cintas' claim is that UNITE HERE is using Cintas' mark to criticize services Cintas provides under that mark. Such criticism does not have any tendency to weaken the association between Cintas and the services it provides; indeed, it has the effect of reinforcing the association, albeit in a way that is not to Cintas' liking. Count 7 thus fails to meet § 1125(c)'s dilution requirement.

**D. Count Nine Should Be Dismissed, Because UNITE HERE's Use Of "Cintas Exposed" As A Domain Name Does Not Constitute "Cybersquatting"**

Cintas' final Lanham Act count (Count 9) rests on the Anticybersquatting Consumer Protection Act of 1999 ("ACPA"), codified as part of the Lanham Act in 15 U.S.C. § 1125(d).

To make out a claim, ACPA requires the plaintiff owner of a famous mark to make two showings: (1) that the domain name "is identical or confusingly similar to, or dilutive of" the owner's mark; and (2) that the defendant registered the domain name with a "bad faith intent to profit" from the name. *Id.* Count 9 does not meet either of these requirements.

1. The domain name "Cintas Exposed" is not "identical" to, or "confusingly similar" to, Cintas' mark. By adding "Exposed" to Cintas, UNITE HERE ensured that there could be no basis for a user to assume that Cintas sponsored the site, since the word "exposed" in this context connotes adverse scrutiny of the company. *See, e.g., Bally Total Fitness v. Faber*,

29 F. Supp. 2d 1161, 1164 (C.D. Cal. 1998) ("ballysucks.com" not confusingly similar to "Bally").[9]

Furthermore, as the Fourth Circuit explained in *Lamparello v. Falwell*, 420 F.3d 309, 320 (4th Cir. 2005), the inquiry as to whether a domain name is "confusingly similar" for ACPA purposes extends not only to an examination of the bare name of the site, but also to contextual factors such as how the site presents itself to a user. 420 F.3d at 316, 320. Here, as already shown, the Cintas Exposed site includes a prominent disclaimer on its home page, and it is tagged in such a way that a similar disclaimer can be read and displayed by search engines. *See supra* pp. 33-34. There is, accordingly, no "confusing similarity."

Nor is the "Cintas Exposed" domain name "dilutive" of the Cintas mark. The discussion above of Cintas' dilution claim establishes that the use of the term "Cintas Exposed" to describe a website that comments on Cintas in no way dilutes the association between the term "Cintas" and the laundry-and-uniform services that Cintas is famous for providing. Count 9 thus fails to meet the first requirement of its ACPA claim.

2. Count 9 also fails to meet ACPA's second requirement, that the defendant registered the mark with a "bad faith intent to profit" from the domain name. As the court held in *Bosley Medical*, a "bad faith intent to profit" within the meaning of ACPA can manifest itself

---

[9] Although the word "exposed" might have a positive connotation when added to the name of a tanning salon or film developer, *cf. Sunlight Saunas, Inc. v. Sundance Sauna, Inc.*, 427 F. Supp. 2d 1032, 1064 (D. Kan. 2006), the word has no such possible connotation here, and use of it in the "Cintas Exposed" domain name defeats confusing similarity as a matter of law. To say that because the word "exposed" might not connote adverse scrutiny when juxtaposed with some domain names, the word's negative connotation can never be determined as a matter of law, would be to indulge in fallacy. That argument would be no different than saying that because adding "sucks" to a domain name promoting Hoover vacuum cleaners would have a positive connotation, the negative connotation of "sucks" should never be determined as a matter of law—as it often is. *See Bally*, 29 F. Supp. 2d at 1164; *Taubman v. Webfeats*, 319 F.3d 770, 777-78 (6th Cir. 2003).

in two distinct ways: "Cybersquatting occurs when a person other than a trademark holder registers the domain name of a well known trademark and then attempts to profit from this by either [1] ransoming the domain name back to the trademark holder or by [2] using the domain name to divert business from the trademark holder to the domain name holder." 403 F.3d at 680 (internal quotation marks omitted).

The Tenth Circuit's recent decision in *Utah Lighthouse* is in accord:

> [B]ad faith intent to profit is when a defendant purchases a domain name very similar to the trademark and then offers to sell the name to the trademark owner at an extortionate price. A defendant could also intend to profit by diverting customers … to the defendant's own website … [to] purchase the defendant's products or services instead of the trademark owner's. [2008 U.S. App. Lexis 11523, at *29]

As to the first of the two prohibited means of profiting from a domain name registration, the Complaint contains no allegation that UNITE HERE registered the Cintas Exposed name in order to "ransom[]" or "sell" that name to Cintas. As to the second, the Complaint contains no allegation that UNITE HERE registered the Cintas Exposed name to "divert customers" to the Cintas Exposed website to "purchase [UNITE HERE's] products or services instead of [Cintas']" products or services. Indeed, the Cintas Exposed site does not sell *any* products or services. And, the only items that the Complaint alleges UNITE HERE sells *anywhere* are union-logo mugs, t-shirts, and other bric-a-brac—items that UNITE HERE sells, not on the Cintas Exposed site, but rather on a page on UNITE HERE's official site that, as explained *supra* at 30-31, is at two removes from the Cintas Exposed site. Furthermore, Cintas itself does not sell such items, which means there can be no "diversion" of Cintas' sales to UNITE HERE of the kind necessary to form the predicate for showing the second prohibited means of profiting from cybersquatting.

While the foregoing is sufficient to dispose of Cintas' cybersquatting claim, we would add that even if, contrary to the case law, an intent to profit from the sale of goods not sold by

the mark owner could constitute actionable cybersquatting, the Complaint still would be deficient. For the suggestion that UNITE HERE registered the Cintas Exposed domain name with the "intent to profit" from the sales on the UNITE HERE official website of union-logo mugs and other trinkets is foreclosed by Cintas' own allegations. The Complaint alleges that the Cintas Exposed website was created by UNITE HERE to be "a critical tool" in its negative public relations and boycott campaign against Cintas, Cplt. ¶ 232, and the Complaint further identifies the precise "goal" that the website is "specifically designed" to achieve, *id.* ¶ 112. Unsurprisingly, that "goal" is *not* an increased-sales goal for union-logo mugs and other trinkets. Rather, consistent with Cintas' entire theory of the case, it is "to encourage consumers and others not to conduct business with Cintas." *Id.* 112. As we have shown, Defendants have a First Amendment right to pursue such a "goal" through speech on a website, and exercising that right does not constitute cybersquatting or any other violation of the Lanham Act.

## III. THE COURT SHOULD DECLINE TO EXERCISE ITS SUPPLEMENTAL JURISDICTION OVER CINTAS' PENDENT STATE LAW CLAIMS (Counts Five, Ten-Fourteen)

A district court "may decline to exercise supplemental jurisdiction over a [pendent state law] claim" if the court "has dismissed all [federal] claims over which it has original jurisdiction." 28 U.S.C. § 1367(c)(3). That is the proper course here given our showing that Cintas' RICO and Lanham Act claims are due to be dismissed: "[I]f the federal claims are dismissed before trial, even though not insubstantial in a jurisdictional sense, the state claims should be dismissed as well." *First Capital Asset Mgmt. v. Satinwood, Inc.*, 385 F.3d 159, 183 (2d Cir. 2004) (internal quotations omitted); *see also Kolari v. New York-Presbyterian Hosp.*, 455 F.3d 118, 122 (2d Cir. 2006) ("in the usual case in which all federal-law claims are

eliminated before trial, the balance of factors . . . will point toward declining to exercise jurisdiction over the remaining state-law claims") (internal quotations omitted).

Applying these well-settled jurisdictional principles, this Court routinely has dismissed the plaintiff's pendent state claims after having dismissed all of the plaintiff's federal claims prior to trial. *E.g.*, *Tojzan v. New York Presbyterian Hosp.*, 2003 WL 1738993, at *9 (S.D.N.Y.); *D.R.S. Trading Co. v. Fisher*, 2002 WL 1482764, at *5 (S.D.N.Y.); *Whitely v. Comsat Corp.*, 2001 WL 1135946, at *7 (S.D.N.Y.); *EPA v. Port Auth.*, 162 F. Supp. 2d 173, 192 (S.D.N.Y. 2001), *aff'd*, 23 Fed. Appx. 81 (2d Cir. 2001). There is no basis for a contrary result here.

**CONCLUSION**

For the foregoing reasons, Cintas' Complaint should be dismissed in its entirety.

Respectfully submitted,

*/s/* Irwin Rochman
Irwin Rochman (SDNY Bar No. SS7573)
Tesser, Ryan & Rochman, LLP
509 Madison Avenue
New York, New York 10022
Phone: (212) 754-9000
Fax: (212) 754-5906

Attorney for Defendants UNITE HERE, Bruce Raynor, Ahmer Qadeer, Keith Mestrich, Elizabeth Gres, Peter DeMay, Katie Unger and Stefan Antonowitz

*/s/* Robert M. Weinberg
Robert M. Weinberg *(pro hac vice)*
Andrew D. Roth *(pro hac vice)*
Leon Dayan *(pro hac vice)*
Bredhoff & Kaiser, PLLC
805 Fifteenth Street, N.W., Suite 1000
Washington, DC 20005
Phone: (202) 842-2600
Fax: (202) 842-1888

Attorneys for Defendants International Brotherhood of Teamsters and Change to Win