UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

|  |  |
|---|---|
| Cintas Corporation, Cintas Corporation No. 2, Cintas Corporation No. 3 and Cintas Holdings, LLC, <br><br> Plaintiffs, <br><br> v. <br><br> UNITE HERE, Change to Win, International Brotherhood of Teamsters, Bruce Raynor, Ahmer Qadeer, Keith Mestrich, Elizabeth Gres, Peter DeMay, Katie Unger, Stefan Antonowicz and Does 1 through 100, <br><br> Defendants. | Civil Action No. 08-CV-2185 <br><br> (Judge William H. Pauley, III) |

## PLAINTIFFS' MEMORANDUM IN OPPOSITION
## TO DEFENDANTS' JOINT RULE 12(b)(6) MOTION TO DISMISS

Gregory M. Utter (*admitted pro hac vice*)
Jamie M. Ramsey (*admitted pro hac vice*)
Patricia B. Hogan (*admitted pro hac vice*)
Christy M. Nageleisen (*admitted pro hac vice*)
Drew M. Hicks (*admitted pro hac vice*)
KEATING MUETHING & KLEKAMP PLL
One East Fourth Street, Suite 1400
Cincinnati, Ohio 45202
Tel: (513) 579-6540
Fax: (513) 579-6457

G. Robert Blakey (*pro hac vice pending*)
326 Law School
Notre Dame, Indiana 46556
Tel: (574) 631-5717
Fax: (574) 631-6197

Harold P. Weinberger
Jonathan M. Wagner
KRAMER LEVIN NAFTALIS & FRANKEL LLP
1177 Avenue of the Americas
New York, New York 10036
Tel: (212) 715-9100
Fax: (212) 715-8000

## **TABLE OF CONTENTS**

**Page No.**

INTRODUCTION .................................................................................................1

ARGUMENT ........................................................................................................3

I.     CINTAS HAS STATED CLAIMS UNDER THE FEDERAL RICO STATUTE..3

    A.     Numerous Courts Have Applied RICO To Union Corporate Campaigns ..3

    B.     Cintas Has Sufficiently Pleaded The Predicate Act Of
          Attempted Extortion Under The Hobbs Act .......................................6

        1.     The "Wrongful[ness]" Requirement ....................................6

        2.     The "Obtaining Property" Requirement ......................................10

    C.     Defendants' Conduct Is Not Protected By The First Amendment ...........16

        1.     The First Amendment Does Not Protect Extortion ......................17

        2.     The *Noerr-Pennington* Doctrine ....................................17

        3.     The Cases Cited by Defendants are Inapposite .............................19

    D.     Federal Labor Laws Do Not Preclude Cintas's RICO Claims .................23

    E.     Cintas Has Sufficiently Pleaded Predicate Acts Under The
          Travel Act And The Ohio Extortion Statute ............................................23

II.     CINTAS HAS STATED CLAIMS UNDER THE LANHAM ACT ...................25

    A.     Cintas Has Sufficiently Alleged That Defendants Have Made
          A "Commercial Use" Of The Cintas Mark ...............................................25

    B.     A Trademark Infringement Claim Under Section 1114 Does
          Not Require A Showing Of "Commercial Use" ........................................28

        1.     Defendants' Use Constitutes a "Use In Commerce" ....................29

        2.     "In Connection With" Goods and Services ...................................29

            a.     In Connection With *Defendants'* Goods and Services .........30

b.    In Connection with *Cintas's* Goods and Services ................31

C.    Cintas Has Sufficiently Pleaded A Likelihood  Of Confusion ................33

D.    Cintas Has Sufficiently Pleaded "Dilution" Of Its Mark ........................37

E.    Cintas Has Stated A Claim Under The Anticybersquatting Statute .........39

## TABLE OF AUTHORITIES

### CASES

**Page No.**

*A.C. Legg Packing Co. v. Olde Plantation Spice Co.,*
61 F.Supp.2d 425, 430-31 (D. Md. 1999)..................................................38

*A. Terzi Productions, Inc. v. Theatrical Protective Union,*
2 F.Supp.2d 485 (S.D.N.Y. 1998) ..............................5,6,7,9,14,16,23

*Agency Holding Corp. v. Malley-Duff & Associates, Inc.,*
483 U.S. 143, 151 (1987)..................................................................3

*Amendolare v. Schenkers Int'l Forwarders, Inc.,*
747 F.Supp.162 (E.D.N.Y. 1990) ............................................................23

*Asbestos & Lead Removal Corp. v. Severino,*
2007 WL 925485 (E.D.N.Y. Mar. 23, 2007)..........................................7,10

*Australian Gold v. Hatfield,*
436 F.3d 1228, 1240 (10th Cir. 2006) ..................................................35

*Bayou Steel Corp. v. United Steelworkers of America,*
No. Civ. A. 95-496-RRM, 1996 WL 76344 (D. Del. Jan. 11, 1996)..................5

*Bihari v. Gross,*
119 F.Supp.2d 309, 318 (S.D.N.Y. 2000) ..............................................27

*Bosley Medical Insitute, Inc. v. Kremer,*
403 F.3d 672 (9th Cir. 2005) ..............................................................29

*Bridge v. Phoenix Bond & Indemnity Co.,*
553 U.S. ___ (2008)........................................................................3

*Buti v. Perosa, S.R.L.,*
139 F.3d 98, 102 (2d Cir. 1998)..........................................................29

*C&W Construction Co. v. Brotherhood of Carpenters,*
687 F.Supp.1453, 1468 (D. Haw. 1988) ................................................16

*Caterpillar, Inc. v. Telescan Techs, LLC,*
2002 U.S. Dist. LEXIS 344 (C.D. Ill.)..................................................16

*Cellco Partnership v. Communication Workers of Amer.,*
2003 U.S. Dist. LEXIS 26823 (D.N.J. Dec. 11, 2003) ................................................32

*City of Columbia v. Omni Outdoor Adver.,*
499 U.S. 365, 380 (1991) ................................................18

*DeBartolo Corp. v. Florida Gulf Coast Bldg. and Constr. Trades Counsel,*
485 U.S. 568 (1988) ................................................21

*Domestic Linen Supply & Laundry Co. v. Central States Se & Sw. Areas Pension Fund,*
722 F.Supp.1472 (E.D. Mich. 1989) ................................................5,16

*Dooley v. Crab Boat Owners Ass'n,*
271 F.Supp.2d 1207 (N.D. Cal. 2003) ................................................14,15

*Eastern R.R. Presidents Conference v. Noerr Motor Freight,*
365 U.S. 127 (1961) ................................................17

*Eliya, Inc. v. Kohl's Dep't Stores,*
2006 U.S. Dist. LEXIS 66637 (S.D.N.Y. 2006) ................................................33

*EMI Catalogue P'shp v. Hill, Holliday, Connors, Cosmopulos, Inc.,*
228 F.3d 56, 68 (2d Cir. 2000) ................................................16

*Federal Express Corp. v. Federal Espresso, Inc.,*
201 F.3d 168, 174 (2d Cir. 2000) ................................................39

*Federal Trade Commission v. Superior Court Trial Lawyers' Ass'n,*
493 U.S. 411 (1990) ................................................22

*Food Lion, Inc. v. United Food and Commercial Workers,*
Case No. 2:96-CV0687 (D.S.C. September 10, 2003) ................................................5,14

*Golden Door, Inc. v. Odisho*
646 F.2d 347, 350 (9th Cir. 1980) ................................................38

*Gregory v. American Guild of Musical Artists,*
1993 WL 1781190 (S.D.N.Y. May 24, 1993) ................................................23

*Hearts on Fire Co., LLC v. L C Int'l Corp.,*
2004 U.S. Dist. Lexis 14828 (S.D.N.Y. 2004) ................................................33

*H.J. Inc. v. Northwestern Bell Telephone Co.,*
492 U.S. 229, 244 (1989) ................................................3

*Jews for Jesus v. Brodky,*
993 F.Supp.282, 307-08 (D.N.J. 1998), aff'd 159 F.3d 1351 (3d Cir. 1998) ................27,28,32,40

*Lang v. Retirement Living Pub. Co.,*
949 F.2d 576, 583 (2d Cir. 1991)....................................................................................16

*MasterCard Int'l, Inc. v. Nader 2000 Primary Committee, Inc.,*
2004 WL 434404 (S.D.N.Y. Mar. 8, 2004) ...............................................................28,29

*Merck & Co., Inc. v. Mediplan Health Consulting, Inc.,*
425 F.Supp.2d 402 (S.D.N.Y. 2006)................................................................................39

*Metropolitan Opera, Assoc., Inc. v. Local 100,*
239 F.3d 172 (2d Cir. 2001)...........................................................................................20

*Mobil Oil Corp. v. Pegasus Petroleum Corp.,*
818 F.2d 254, 258 (2d Cir. 1987).....................................................................................33

*NAACP v. Claiborne Hardware Co.,*
458 U.S. 886 (1982)..............................................................................................20,21,22

*Nalpac, Ltd. v. Corning Glass Works,*
784 F.2d 752, 755-56 (6th Cir. 1986) ..............................................................................40

*National Electrical Benefit Fund v. Heary Bros. Lightning Protection Co., Inc.,*
931 F.Supp.169 (W.D.N.Y 1995) ....................................................................................23

*New York State Soc'y of Certified Pub. Accountants v. Eric Louis Assocs., Inc.,*
79 F.Supp.2d 331, 340 (S.D.N.Y. 1999) ................................................................33,35,40

*Northern Light Tech., Inc. v. Northern Lights Club,*
97 F.Supp.2d 96, 115 (D. Mass. 2000) ............................................................................37

*OBH, Inc. v. Spotlight Magazine, Inc.,*
86 F.Supp.2d 176, 192 (W.D.N.Y. 2000)..............................27,28,29,30,31,32,35,39,40

*Official Airline Guides, Inc. v. Goss,*
6 F.3d 1385, 1394 (9th Cir. 1993) ...................................................................................40

*Organization for a Better Austin v. Keefe,*
402 U.S. 415 (1971).........................................................................................................21

*Paccar, Inc. v. Telescan Techs., LLC,*
319 F.3d 243, 253 (6th Cir. 2003) ...................................................................................35

*People for the Ethical Treatment of Animals v. Dougney*,
263 F.3d 359, 365 (4th Cir. 2001) ................................................................32

*PGC Property, LLC v. Wainscott/Sagaponack Property Owners, Inc.*,
250 F.Supp.2d 136, 143 (E.D.N.Y. 2003) ...................................................16

*Planned Parenthood Federation of America, Inc. v. Bucci*,
1997 WL 133313 (S.D.N.Y. Mar. 19, 1997), *aff'd* 152 F.3d 920 (2d Cir. 1998)...........26,27,29,35

*Polaroid Corp. v. Polarad Elecs. Corp.*,
287 F.2d 492 (2d Cir. 1961)..........................................................................33

*Professional Real Estate Investors v. Columbia Pictures*,
508 U.S. 49 (1993)....................................................................................17,18

*Rodonich v. House Wreckers Union Local 95 of Laborers' Int'l Union of North Am.*,
624 F.Supp.678, 686 (S.D.N.Y. 1985)...........................................................23

*Rogers v. Grimaldi*,
875 F.2d 994, 997 (2d Cir. 1989).................................................................31

*Savin Corp. v. Savin Group*,
391 F.3d 439 (2d Cir. 2004).....................................................................35,38

*Scheidler v. National Organization of Women*,
537 U.S. 393, 393-94 (2003) ...................................10,11,12,13,14,25

*Sedima SPRL v. Imrex Co.*,
473 U.S. 479, 497-98 (1985) ..........................................................................3

*SMJ Group, Inc. v. 417 Lafayette Restaurant LLC*,
439 F.Supp.2d 281, 287 (S.D.N.Y. 2006) ...........................................29,30,31

*Smithfield Foods, Inc. v. United Food and Commercial Workers International Union*,
2008 WL 2233979 (E.D. Va. May 30, 2008) ...............................2,4,5,12,13,16

*Sodexho USA, Inc. v. HERE Local 217*,
989 F.Supp.169 (D. Conn. 1997)...................................................................32

*Sosa v. DIRECTV, Inc.*,
437 F.3d 923, 931 (9th Cir. 2006) ................................................................18

*Steele v. Bulova Watch Co.*,
344 U.S. 280 (1952).......................................................................................29

*Sunlight Saunas, Inc. v. Sundance Sauna, Inc.*,
427 F.Supp.2d 1032, 1064 (D. Kan. 2006) ..............................................33,39

*Titan Int'l, Inc. v. Becker*,
19 F.Supp.2d 817, 826 (C.D. Ill. 2001) ..............................................5

*United Mine Workers v. Pennington*,
381 U.S. 657 (1965) ..............................................17,19

*United States v. Debs*,
949 F.2d 199 (6th Cir. 1991) ..............................................7

*United States v. Enmons*,
410 U.S. 396 (1973) ..............................................6,7,8,10,24

*United States v. Gotti*,
459 F.3d 296 (2d Cir. 2006) ..............................................13,15

*United States v. Hutson*,
843 F.2d 1232, 1235 (9th Cir. 1988) ..............................................17

*United States v. International Bhd. of Teamsters*,
708 F.Supp.1388, 1395 (S.D.N.Y. 1989) ..............................................23

*United States v. Jacobs*,
543 F.2d 18, 21 (7th Cir. 1976) ..............................................10

*United States v. Jones*,
766 F.2d 994, 1002-03 (6th Cir. 1985) ..............................................8

*United States v. Local 30*,
686 F.Supp. 1139, 1143-44 (E.D. Pa. 1988) ..............................................16

*United States v. Quinn*,
514 F.2d 1250, 1268 (5th Cir. 1975) ..............................................17

*United States v. Santoni*,
585 F.2d 667 (4th Cir. 1978) ..............................................14,15

*United States v. Slavin*,
1990 WL 71479 (S.D.N.Y. May 23, 1990) ..............................................17

*United States v. Stofsky*,
409 F.Supp.609, 616 (S.D.N.Y. 1973) ..............................................8

*United States v. Traitz,*
871 F.2d 368, 389 (3d Cir. 1989)................................................................24

*United States v. Tropiano,*
418 F.2d 1069 (2d Cir. 1969)..........................................................13,14,15

*United States v. Vigil,*
523 F.3d 1258 (10th Cir. 2008) .............................................................15

*United States v. Zappola,*
677 F.2d 264 (2d Cir. 1982)......................................................................24

*United We Stand, America New York, Inc.,*
128 F.3d 86, 93 (2d Cir. 1997).............................................................29,30,32

*WHS Entertainment Ventures v. United Paper Workers Int'l Union,*
997 F.Supp.946 (M.D. Tenn. 1998)............................................................32

*Wisconsin v. Mitchell,*
508 U.S. 476, 489 (1993).........................................................................19

## STATUTES

15 U.S.C. § 1114 ......................................................................................32

15 U.S.C. § 1125(a)(1)(A) .......................................................................32

15 U.S.C. § 1125(a)(1)(B) ........................................................................32

15 U.S.C. § 1125(c)(4)(B) ........................................................................26

18 U.S.C. § 1951 .......................................................................................6

18 U.S.C. § 1151(2) ...................................................................................6

18 U.S.C. § 1152(a)(3) .............................................................................24

18 U.S.C. § 1152(b)(2) .............................................................................24

18 U.S.C. § 1161, *et seq.*.......................................................................6,24

18 U.S.C. § 1161(1) ...................................................................................3

Ohio Rev. Code Ann. § 2905.11 ...............................................................24

Pub.L. 91-452, § 904(a), 84 Stat. 947 (1970) ............................................3

## INTRODUCTION

This case does *not* involve a traditional labor dispute between an employer and its union-represented employees. Much to the contrary, this is a case in which the Defendant labor organizations, none of whom actually represents a majority of Cintas Corporation's employees, are attempting to *force* a collective bargaining agreement upon Cintas and its *unwilling* employees. To achieve their objective, Defendants have abandoned the normal democratic processes specified in federal labor law (i.e., a secret ballot election by employees) and, instead, launched a ruthless "corporate campaign" designed to inflict severe economic pain on Cintas until the company either agrees to Defendants' demands or is forced out of business. In the words of Defendant Bruce Raynor, the General President of Defendant UNITE HERE, "I think Cintas has a decision to make. Are they in the business of serving shareholders and owners or fighting the union? You can't do both. We will set the stage so the company will not do both." [Cplt., ¶ 96, Ex. 23].

Defendants have moved to dismiss this case maintaining that their corporate campaign activities amount to nothing more than legitimate and lawful labor activity, regardless of the specific tactics they employ or the repeated threats they make. But the law calls their conduct something else: "criminal extortion." Indeed, it is hornbook law that a threat, communicated with the intent to obtain property from another party, constitutes actual or attempted extortion. In this case, Defendants have engaged in activity specifically designed and intended to force Cintas to turn over its valuable property rights, including the intangible property right to operate its business free from interference by Defendants. As recently explained by one court in a case having facts remarkably similar to the one at bar, "the right to recognize (or not) a union as bargaining representative is among the most valuable and important rights possessed by business

1

owners." *Smithfield Foods, Inc. v. United Food and Commercial Workers International Union*, 2008 WL 2233979 (E.D. Va. May 30, 2008). Defendants' attempt to obtain this right from Cintas – a right to which Defendants have no lawful claim – constitutes actual or attempted extortion. Such extortionate conduct towards Cintas, as well as the numerous other targets of Defendants' corporate campaigns, constitutes a "pattern of racketeering activity" that is actionable under the RICO statutes. Contrary to Defendants' assertion, labor unions and their operatives have no special privilege under federal labor law, or any other source of law, to commit the crime of extortion without facing the very same legal sanctions that apply to everyone else. As demonstrated herein, Defendants' use of criminal methods like extortion to compel Cintas to recognize a union that lacks any indicia of majority support by Cintas's employees is exactly the type of conduct at which the RICO statute is aimed. Thus, Defendants' motion to dismiss should be denied.

The same is true for Cintas's various trademark claims. Although Defendants may have a limited First Amendment right to use the Internet to criticize Cintas and its business practices, Defendants do not have the right to infringe upon Cintas's protected trademarks when exercising that First Amendment right. Nor does Defendants' right to free speech trump the public's right not to be deceived by a "confusingly similar" Internet domain name. To be clear, the trademark issues raised in Cintas's Complaint do not challenge the *content* of Defendants' message; instead, Cintas's Complaint challenges the unlawful way in which Defendants are communicating their message. As demonstrated herein, Defendants' unauthorized use of Cintas's protected trademarks in connection with their "CintasExposed.org" website is prohibited by the Lanham Act.

## ARGUMENT

## I.   CINTAS HAS STATED CLAIMS UNDER THE FEDERAL RICO STATUTE

We note at the outset that, although RICO was created to serve as a "new weapon[] of unprecedented scope" for fighting crime, such "crime" is not limited to traditional "organized crime;" that is, RICO extends to the operation of both "legitimate" and "illegitimate" enterprises. *H.J. Inc. v. Northwestern Bell Telephone Co.*, 492 U.S. 229, 244 (1989). The federal RICO statute includes two critical "weapons" for fighting crime. First, like the antitrust statutes from which it is modeled, RICO uses the "carrot of treble damages" to convert injured parties into "'private attorneys general' on a serious national problem for which public prosecutorial resources are deemed inadequate." *Agency Holding Corp. v. Malley-Duff & Associates, Inc.*, 483 U.S. 143, 151 (1987). Second, RICO brings to bear a liberal construction that can be adapted to ever evolving methods of "racketeering activity." 18 U.S.C. § 1961(1). This liberal construction of the RICO statute is a matter of express statutory language, which commands that the statute be "liberally construed to effectuate its remedial purposes." Pub. L. 91-452, § 904(a), 84 Stat. 947 (1970); *Sedima SPRL v. Imrex Co.*, 473 U.S. 479, 497-98 (1985) ("RICO is to be read broadly," particularly in the context of a "private action for those injured by racketeering activity."). As recently stated by the Supreme Court, "we are not at liberty to rewrite RICO to reflect [defendants'] – or our – views of good policy. We have repeatedly refused to adopt narrowing constructions of RICO in order make it conform to a preconceived notion of what Congress intended to proscribe." *Bridge v. Phoenix Bond & Indemnity Co.*, 553 U.S. __ (2008).

### A.   Numerous Courts Have Applied RICO to Union Corporate Campaigns

Noticeably absent from Defendants' motion to dismiss is any mention of the numerous courts that have permitted RICO claims against unions and their operatives to proceed past the

3

motion to dismiss stage based upon allegations strikingly similar to those at issue here. Thus, we start by discussing the directly on-point union-related extortion cases which Defendants inexcusably fail to address or even mention, and which compel denial of their motion to dismiss.

In *Smithfield Foods, Inc. v. United Food and Commercial Workers International Union*, 2008 WL 2233979 (E.D. Va. May 30, 2008), the plaintiff company, Smithfield, alleged that, after several failed attempts to achieve a majority vote of employees through an NLRB certified election, the defendant labor unions (including Change to Win, a Defendant herein) and their operatives devised an unlawful scheme to extort an agreement from Smithfield to recognize the unions as the exclusive bargaining agent of its employees. *Id.* at *1. With this goal in mind, the defendant unions planned and implemented a corporate campaign against Smithfield, the object of which was "either to force Smithfield to recognize [the union] as the collective bargaining representative of the employees at the Tar Heel plant or to force the plant, if not Smithfield, to become so unprofitable as to necessitate cessation of operations." *Id.* at *2.

The tactics employed by the union defendants against Smithfield were virtually identical to the tactics being employed by Defendants against Cintas in this case, including, among other things: constant publication of negative or damaging information about the company to third parties; unlawfully interfering with Smithfield's business and its relationships with third parties; orchestrating boycotts and protests; and communicating with financial analysts in an attempt to reduce the value of Smithfield stock. *Id.* at **2-3. Those acts, and others, were undertaken for the purpose of causing Smithfield either "to recognize the unions without the use of NLRB supervised elections or, alternatively, to cause Smithfield great economic loss, if not financial ruin." *Id.* at *3. For reasons discussed more fully below, the court in *Smithfield* denied the union defendants' motion to dismiss Smithfield's RICO claims finding that:

By any reasonable interpretation of applicable state or federal law, the Complaint presents facts that plausibly posit the existence of extortion and thus racketeering activity. Because the Complaint adequately alleges that the Defendants are attempting to extort from Smithfield, its right to conduct its business as it is so advised and its right to refrain from recognizing unions, the Complaint adequately alleges that the Defendants have committed predicate acts of extortion. [*Id.* at \*7].

In *A. Terzi Productions, Inc. v. Theatrical Protective Union*, 2 F.Supp.2d 485 (S.D.N.Y. 1998), union members sought to extort an employer to enter into a collective bargaining agreement by picketing a televised fashion show where the employer, a production services company, provided services. Over two days of the show, the union members made threats of "financial ruin," "verbal[] assault[s]," and warning of future "problems," forcing the employer to sign a collective bargaining agreement. *Id.* at 489-90. In a thoughtful opinion, Judge Sotomayor denied the defendants' motion to dismiss the RICO complaint, holding that the defendants had "obtain[ed the employer's] property through extortion." *Id.* at 502. Like the plaintiff companies in *Smithfield*, *A. Terzi*, and several other strikingly similar cases,[1] Cintas has stated claims under the RICO statute.

---

[1]      At least four other courts have denied a union's motion to dismiss a company's RICO claims based upon predicate acts of state or federal extortion in circumstances very similar to the case at bar. *See Food Lion, Inc. v. United Food and Commercial Workers*, Case No. 2:96-CV0687 (D.S.C. September 10, 2003) (court found that plaintiff had pleaded RICO extortion claim where union was alleged to have engaged in conduct essentially the same as that alleged in this case); *Titan Int'l, Inc. v. Becker*, 189 F.Supp.2d 817, 826 (C.D. Ill. 2001) (union sought to extort wages, benefits and other concessions through strikes, violence and prosecuting baseless workers' compensation claims and destruction of business relationships); *Bayou Steel Corp. v. United Steelworkers of America*, No. Civ. A. 95-496-RRM, 1996 WL 76344 (D. Del. Jan. 11, 1996) (union sought to negotiate improved terms of employment through strike and publicity campaign involving allegations of environmental violations, opposition to company tax abatements, and distribution of negative publicity to potential investors); *Domestic Linen Supply & Laundry Co. v. Central States Se. & Sw. Areas Pension Fund*, 722 F. Supp. 1472 (E.D. Mich. 1989) (union sought to extort inclusion of supervisors in bargaining union, which would increase pension benefits for union, by threatening to put the company "out of business").

**B.**    **Cintas Has Sufficiently Pleaded the Predicate Act of Attempted Extortion Under the Hobbs Act.**

Violations of the federal Hobbs Act constitute predicate acts for purposes of establishing racketeering activity under the federal RICO statute. 18 U.S.C. § 1961. The Hobbs Act outlaws, among other things, interference or attempted interference with commerce by extortion. 18 U.S.C. § 1951. Extortion is defined in the Act as "obtaining property from another with his consent, induced by the wrongful use of actual or threatened force, violence or fear ...." 18 U.S.C. § 1951(2). Defendants have challenged Cintas's Hobbs Act claim on two separate grounds: "(1) it fails to meet the Act's 'wrongful[ness]' requirement; and (2) it does not meet the Act's 'obtaining of property' requirement." [Def. Br. at 11]. Both grounds are without merit.

1.    **The "Wrongful[ness]" Requirement.** The "wrongfulness" requirement is derived from the Supreme Court's decision in *United States v. Enmons*, 410 U.S. 396 (1973), in which the court reasoned that the term "wrongful" in the Hobbs Act limits the statute's coverage "to those instances where the obtaining of the property would itself be 'wrongful' because the alleged extortionist has *no lawful claim to that property*." *Id.* at 399-400 (emphasis added). Thus, union conduct is actionable under the Hobbs Act so long as it is wrongful both in its means and in its ends. The *Enmons* Court ultimately found that violence occurring during a lawful employee strike for higher wages does not meet this standard because "[i]n that type of case, there has been no 'wrongful' taking of the employer's property; he has been paid for the services he bargained for, and the workers receive the wages to which they are entitled in compensation for their services." *Id.* at 400; *see also A Terzi*, 2 F.Supp.2d at 505. In other words, there was no "wrongful" taking of the employer's property because the union employees, as a result of the employer-employee relationship, had a *lawful claim* to the property they obtained. The character or legality of the property itself was immaterial.

6

In the instant case, Defendants maintain that because a card check neutrality agreement is itself a "lawful" thing, it automatically constitutes a "legitimate labor ends" and, as such, the Hobbs Act does not apply to any of their corporate campaign activities designed to obtain that agreement. [Def. Br. at 5-8]. As discussed below, however, Defendants are wrong for at least two reasons: (a) Defendants' analysis is based upon a broad and sweeping application of the *Enmons* decision that has been routinely rejected by the courts; and (b) the proper inquiry for purposes of *Enmons* is not whether a card check neutrality agreement itself is a legal and enforceable contract; instead, the focus must be on whether Defendants have a lawful claim to obtain such an agreement by forcing it upon an unwilling employer and its employees.

Labor unions and their operatives are not immune from liability under the Hobbs Act merely because their otherwise illegal extortion is committed in the context of purported labor activity. Indeed, the *Enmons* decision does not extend as far as Defendants would have this court believe. In *Enmons*, the Supreme Court "did not reach the question of what activity besides striking for higher wages constitutes 'legitimate labor ends,' … but courts have been careful to apply *Enmons* restrictively, limiting it almost exclusively to the strike context." *Asbestos & Lead Removal Corp. v. Severino*, 2007 WL 925485, at *3 (E.D.N.Y. Mar. 23, 2007).

Within the labor context, courts have been reluctant to extend *Enmons* to union activities beyond the scope of *traditional* labor disputes; that is, *Enmons* has been limited to traditional employer-employee disputes. *See A. Terzi*, 2 F.Supp.2d at 505-06 (citing cases). In *United States v. Debs*, 949 F.2d 199 (6th Cir. 1991), for example, a union local's president was indicted for violations of the Hobbs Act in connection with threats of violence during a union election campaign. Relying upon *Enmons*, the defendant maintained that campaigning in union elections "is a legitimate labor end" and, as such, the use of extortion in service of union political goals is

beyond the scope of the Hobbs Act. *Id.* at 200. The court rejected the defendant's argument, however, stating that if every union activity were held to be "within the orbit of *Enmons* …, [s]uch a holding would immunize union members from sanction so long as their otherwise illegal action is committed in the context of labor activity. We decline to expand *Enmons* this far." *Id.* at 201 (noting that *Enmons* has not been extended beyond its own facts); *see also United States v. Jones*, 766 F.2d 994, 1002-03 (6th Cir. 1985) (doubting whether *Enmons* covers the use of violence to persuade employees of non-union employer to join union, because such conduct is "outside of the collective-bargaining context and in pursuit of goals other than higher wages and against individuals other than the strikers' employer"); *United States v. Stofsky*, 409 F. Supp. 609, 616 (S.D.N.Y. 1973) (RICO case in which the court doubted whether *Enmons* applies to force used against neutral, non-union employer caught in the middle of labor dispute between union and unionized sub-contractor: "it must be recognized that *Enmons* deals specifically with employer-employee disputes").

The instant case does not involve a traditional labor dispute between an employer and its unionized employees. Indeed, none of the union Defendants is recognized by a majority of Cintas's employees as their collective bargaining agent; *none of the Defendants is authorized by a majority of Cintas employees to represent them in any bona fide labor dispute with Cintas or in the attainment of any legitimate labor objective on their behalf*; and this case does not involve a strike by unionized employees seeking to obtain higher wages following the expiration of a prior collective bargaining agreement. [Cplt., ¶¶ 5-7, 223]. In short, none of the material facts in *Enmons* is present in this case. Instead, this case involves a group of outsiders who seek to force (by use of extortion) union recognition upon uninterested employees and, more important, the execution of a card check neutrality agreement upon an unwilling employer. [Cplt., ¶¶ 5-10, 48,

8

51, 93, 94, 224]. This is a case in which a group of outsiders seeks to obtain, among other things, union dues, pension fund payments, and various intangible property rights belonging to Cintas as an employer, including the rights to refuse to recognize these outsider unions and to make business decisions free from outside union influence – all of which constitutes property to which Defendants have no lawful claim. [Cplt., ¶¶ 224, 227].

This court's decision in *A. Terzi* is instructive on this issue. In that case, the issue before the court was "whether *Enmons* protection should apply to a union's actual and threatened use of force to compel an employer to recognize and bargain with the union where the union is not authorized to represent any of the employer's employees." *A. Terzi*, 2 F.Supp.2d at 506. Like Defendants in this case, the defendants in *A. Terzi* argued that, because the objective of their conduct was to obtain a collective bargaining agreement with the employer, a lawful goal, their alleged use of force or threats cannot constitute extortion under the Hobbs Act. *Id.* This court rejected such an application of *Enmons* stating that "while this argument is compelling at first blush, what it omits is the critical factor that defendants were not authorized to negotiate an agreement" on behalf of the company's employees when they committed the alleged extortionate acts. *Id.* As explained by now Circuit Judge Sotomayor:

> It is a basic tenet of federal labor law that a union has no right to demand that an employer recognize or bargain collectively with the union unless it has first obtained the majority backing of that employer's employees and been certified as their bargaining representative. Thus, while [defendants] certainly may have wanted to procure a collective bargaining agreement with ATP, the clear objective of their conduct was to force ATP to recognize and bargain with the Union notwithstanding the fact that Local One had no lawful basis for demanding that ATP do so. Defendants' collective-bargaining demands of ATP, therefore, were not legitimate and *Enmons* does not apply. While *Enmons* might apply to violence incident to the recognition and bargaining demands of a properly authorized union, because in that instance the employer has a legal duty to recognize and bargain with the union, ... that is not this case. [*Id.*].

9

The court further reasoned that "forcing a collective bargaining agreement upon unwilling employees and their employer is 'wrongful' within the Hobbs Act's meaning; the union is an outside meddler with no lawful claim to the employer's property." *Id.* at 507.

The same is true in the instant case. Defendants are nothing more than outside meddlers with no lawful claim to Cintas's property (*see* Cplt. at ¶¶ 10, 100, 224) and, as such, the *Enmons* decision simply does not apply. *Id.*; *see also Severino*, 2007 WL 925485, at *3 (denying union defendants' motion to dismiss on similar grounds; court later denied defendants' motion for summary judgment finding that the existence of a lawful strike is an essential requirement for *Enmons* to apply, see Case No. 1:06-cv-05949, Feb. 4, 2008 Memorandum Decision and Order). Indeed, courts routinely find that a defendant commits Hobbs Act extortion when he obtains, by the wrongful use of fear, a labor agreement to which he has no lawful right. *See, e.g., United States v. Jacobs*, 543 F.2d 18, 21 (7th Cir. 1976) (threat aimed at obtaining agreement to recognize union was a Hobbs Act violation when defendant had no lawful claim to recognition).

Thus, contrary to Defendants' argument, it is immaterial for purposes of *Enmons* whether a card check neutrality agreement is *itself* a lawful agreement. Instead, the focus must be on whether Defendants in this case have a lawful right to force Cintas to execute such an agreement through their extortionate corporate campaign. As demonstrated herein, Defendants have no such right and, as a result, *Enmons* does not shield them from Hobbs Act liability.

2. __The "Obtaining Property" Requirement.__ Defendants also challenge Cintas's Hobbs Act claim on the ground that the conduct alleged in Cintas's Complaint constitutes merely coercive activity, not the racketeering activity of extortion under the Hobbs Act. [Def. Br. at 9-14]. To support their argument, Defendants rely principally upon the decision in *Scheidler v. National Organization of Women*, 537 U.S. 393, 393-94 (2003), wherein

10

the Supreme Court analyzed the distinction between coercion and extortion, holding that the predicate act of extortion requires a showing that the defendant obtained (or sought to obtain) the property of another by depriving the owner of that property. Based upon *Scheidler*, Defendants argue that none of Cintas's asserted tangible and intangible property rights, including the right not to recognize a union, constitutes property that can be "obtained" within the meaning of the Hobbs Act. [Def. Br. at 9-14]. Defendants' argument, however, is without merit and, in fact, already has been rejected by several courts.

In *Scheidler*, the defendants were abortion protesters who had engaged in a pattern of activities aimed at shutting down abortion clinics. *Id.* at 393. The Court held that, although the defendants' actions were coercive because they interfered with, disrupted, and in some cases, completely deprived the plaintiffs of their property rights, including the right to operate the abortion clinics, the actions did not rise to the level of extortion because they did not obtain, nor were they designed to obtain, the property at issue. *Id.* at 394. In other words, the defendant abortion protestors were not interested in obtaining anything for themselves. Instead, they were morally opposed to the plaintiffs' conduct and wanted only to cause that conduct to stop. The key distinction drawn by the Court was between "obtain[ing] property from another," which amounts to the predicate act of extortion, and "merely interfering with or depriving someone of property," which does not. *Id.* at 405.

Defendants' reliance upon *Scheidler* ignores the obvious distinctions between abortion protestors who have no objective to "obtain" anything from the clinics they are protesting, and the Defendants in this case, whose stated objective is to obtain valuable property and benefits for themselves. As specifically pleaded in the Complaint, Defendants seek to obtain, among other things: (1) certain labor agreements to which Defendants have no right, including a card check

11

neutrality agreement and, eventually, a collective bargaining agreement; (2) Cintas's right to recognize, or refrain from recognizing, Defendants or any other union as the collective bargaining agent for its employees; (3) Cintas's right to the benefits of an NLRB supervised election process; (4) Cintas's right to deal directly with its employees; (5) Cintas's right to conduct its business without Defendants' interference; (6) pension fund payments from Cintas; and (7) millions of dollars in union dues. [Cplt., ¶¶ 10, 48, 51, 83-84, 86, 222]. Indeed, Defendants want far more than to cause Cintas to give something up; Defendants want in addition to get something quite valuable for themselves. As such, the instant case is completely different from *Scheidler*.

As noted above, Defendants' *Scheidler* argument already has been rejected by several courts. In *Smithfield*, for example, the defendants were engaged in a vicious union corporate campaign strikingly similar to the campaign being waged against Cintas. The union defendants' alleged extortionate conduct involved, among other things, unlawfully interfering with the employer's business and its relationships with third parties, unlawfully attempting to inflict financial and reputational losses, and engaging in a wide variety of other unlawful conduct. 2008 WL 2233979 at *7. It also was alleged that the union defendants threatened the employer with more of the same, "even financial ruin," if the employer did not forego its property right not to recognize the unions as the collective bargaining agent of its employees. *Id.*

Like Defendants in this case, the union defendants in *Smithfield* insisted that "an employer's right to recognize a union is an intangible right which, for that reason, is not property that can be obtained, and that, therefore, they could not have engaged in extortion even if they had committed every act charged in the Complaint." *Id.* at *5. The *Smithfield* court flatly rejected the union defendants' argument, however, finding that "[v]irtually the same contention

was addressed and rejected by the United States Court of Appeals for the Second Circuit in *United States v. Gotti*, 459 F.3d 296 (2d Cir. 2006)." *Id.*

In *Gotti*, the Second Circuit characterized *Scheidler* as not affecting at all its prior holding that an "intangible right" can be extorted, but rather as "simply clarifying that before liability can attach, the defendant must truly have obtained (or, in the case of attempted extortion, sought to obtain) the property right in question." *Gotti*, 459 F.3d at 323. The court then determined that, within the meaning of *Scheidler*, the defendants had "obtained" (and thus extorted): (i) union members' rights to participate in the affairs of their union by selecting representatives of their choice; (ii) an actor's intangible right to decide with whom he will work; and (iii) a business owner's intangible property rights to make various business decisions (such as whether to keep illegal gambling machines on the premises). *Id.* at 325, 327.

Based, in part, upon the Second Circuit's analysis of *Scheidler*, the court in *Smithfield* denied the union defendants' motion to dismiss the employer's RICO claims finding that:

> the right to recognize (or not) a union as bargaining representative is among the most valuable and important rights possessed by business owners. The very existence of the Corporate Campaign concept is founded on the recognition that the exercise of that right is of great import and of great consequence .... Until the Unions prevail in a valid NLRB certified election ..., Smithfield has the property right not to recognize UFCW and Local 400 and, on the issue of union recognition, to operate its business free from interference by, or the involvement of, the Defendants. According to the Complaint, UFCW and Local 400 have sought to obtain from Smithfield the property right of recognizing, or refraining from recognizing, the Unions as bargaining representative of [its] employees. **Those efforts are no less an effort to obtain a property right than were the efforts of the defendants in Gotti** to obtain the "intangible property rights to make various business decisions ... free from outside pressure."

*Smithfield*, 2008 WL 2233979 at ** 6, 7 (emphasis added). The same is true in the instant case.

The result in *Smithfield* is consistent with decisions rendered in several very similar post-*Scheidler* decisions and the extensive pre-*Scheidler* case law that expressly survived that decision, including decisions from the Second Circuit and this District. In *United States v.*

13

*Tropiano*, 418 F.2d 1069 (2d Cir. 1969), for example, the Second Circuit held that property, within the meaning of the Hobbs Act and hence RICO, included "in a broad sense, any valuable right considered as a source or element of wealth and does not depend upon a direct benefit being conferred on the person who obtains the property." *Id.* at 1075-76 (the property right at issue was the right to solicit customers as an integral part of the intangible right to do business). The *Tropiano* court further held that "[t]he right to pursue a lawful business including the solicitation of customers … has long been recognized as a property" right that can be obtained through extortion. *Id.* at 1074; *see also United States v. Santoni*, 585 F.2d 667, 673 (4th Cir. 1978) (relying upon *Tropiano* to conclude that a business' right "to make a business decision free from outside pressure wrongfully imposed" is an "intangible" right that may be the subject of extortion); *Food Lion, Inc. v. United Food and Commercial Workers*, No. 2:96-cv-0687 (D.S.C. Sept. 10, 2003) (rejecting the same arguments made herein by Defendants); *A. Terzi*, 2 F.Supp.2d at 507.

In *Dooley v. Crab Boat Owners Ass'n*, 271 F.Supp.2d 1207 (N.D. Cal. 2003), the court confirmed that, in the business context, unlike the moral context (e.g., abortion protestors), changing one party's behavior often equates to the obtaining of property by a party causing that change. In *Dooley*, the defendants argued that *Scheidler* barred a RICO claim alleging that a group of fisherman had unlawfully sought to extort plaintiff, a competing fisherman, into refraining from fishing. The defendants argued that *Scheidler* precluded the claim because refraining from fishing amounted only to a change in behavior, not an "obtaining" of property for themselves. The *Dooley* court rejected this argument:

> Control over the [plaintiff's] fishing operations during crab season was of value to defendants. If the defendants exercised their control to stop [plaintiff] from harvesting crab …, defendants could have bettered their bargaining position with purchasers and received a higher price for their crab.

271 F.Supp.2d at 1212; *see also United States v. Vigil*, 523 F.3d 1258, 1264 (10th Cir. 2008) (acknowledging that a number of intangible property rights are cognizable under the Hobbs Act, including "the right to contract with a party of one's choosing, the right to make various business decisions free from outside pressure, and the right to decide with whom to work").

The same is true in this case. Indeed, Defendants are not, for example, human rights activists seeking only some sort of moral victory against Cintas. Much to the contrary, Defendants have a direct financial stake in changing Cintas's behavior and, as set forth in the Complaint, Defendants will immediately suspend their campaign activities once they obtain what they really are seeking: Cintas's various intangible property rights, including the right to control its business without union interference. [Cplt., ¶¶ 20, 50 (stating that once Defendant UNITE HERE extorted the valuable benefits and property it was demanding from Angelica Corporation, the union and its operatives ceased all negative activity toward the company and moved on to victimize other companies using the same tactics – although the "peace" achieved will continue only so long as the company continues to give in to Defendants' demands)].

All of the intangible property rights discussed above – the right to fish for crabs (*Dooley*), to deal with the business partners, and select the union representatives, whom one wants (*Gotti* and *Santoni*), to make business decisions free from outside pressure and to decide with whom to work (*Gotti* and *Vigil*), and to solicit customers (*Tropiano*) – are no different from the rights at issue in the instant case. *See* discussion *supra*. These intangible property rights, including the right to recognize (or not) a union and to operate a business without union interference, are valuable property rights that may be "obtained" for purposes of a RICO predicate act of extortion. Indeed, there are numerous decisions holding that union recognition and collective bargaining rights are valuable intangible property rights for purposes of a RICO predicate act.

*See, e.g., A. Terzi*, 2 F.Supp.2d at 507; *Jacobs*, 543 F.2d at 21 (a union's demand for recognition on behalf of employees whom it is not authorized to represent could violate the Hobbs Act); *Domestic Linen*, 722 F. Supp. at 1476-77 (threats aimed at forcing agreement to include supervisors in bargaining unit was Hobbs Act extortion); *C&W Construction Co. v. Brotherhood of Carpenters*, 687 F. Supp. 1453, 1468 (D. Haw. 1988) (corporate campaign designed to coerce the signing of a collective bargaining agreement constitutes Hobbs Act extortion); *United States v. Local 30*, 686 F. Supp. 1139, 1143-44 (E.D. Pa. 1988) (extortion violation where union forced roofing companies into collective bargaining agreements).

Thus, unless and until a valid NLRB certified election takes place, applicable law provides that Cintas has the property right not to recognize UNITE HERE or the Teamsters and to operate its business free from Defendants' outside interference. Defendants seek to take away these property rights, and gain for themselves the substantial financial benefits of recognition. As stated by the court in *Smithfield*, Defendants' "efforts are no less an effort to obtain a property right than were the efforts of the defendants in *Gotti* to obtain 'the intangible property rights to make various business decisions ... free from outside pressure.'" 2008 WL 2233979 at *7.

### C. **Defendants' Conduct Is Not Protected by the First Amendment**

In an effort to obtain First Amendment protection for their corporate campaign activities, Defendants have cleverly mischaracterized the allegations contained in Cintas's Complaint and misrepresented applicable law. Defendants contend that Cintas seeks to hold them liable merely for engaging in "a negative publicity and boycott campaign – comprised of disparaging commentary on an employer and free speech appeals to independent third parties not to deal with the employer – that puts pressure on the employer, through fear of economic loss, to enter into a lawful card check and neutrality agreement." [Def. Br. at 14]. Based upon this rather

16

disingenuous description of their corporate campaign, Defendants maintain that the First Amendment stands in the way of Cintas's RICO claim. Defendants are wrong for several reasons.

1.    **The First Amendment Does Not Protect Extortion.**  Defendants' entire argument is based upon a faulty premise. That is, Cintas does not seek to hold Defendants liable under the RICO statute merely for disseminating disparaging information and commentary about Cintas, or for making appeals to various third parties begging them not to deal with Cintas. Indeed, as discussed above, Cintas seeks to hold the defendants liable for *extortion*. Cintas seeks to hold Defendants liable for attempting to obtain through extortion certain intangible property rights to which Defendants are not legally entitled. As demonstrated above, numerous courts have determined that conduct similar to that engaged in by Defendants in this case constitutes extortion under the Hobbs Act. Moreover, extortionate speech is *not* protected by the First Amendment. *See, e.g., United States v. Quinn*, 514 F.2d 1250, 1268 (5th Cir. 1975) (Hobbs Act case stating that "[i]t may categorically be stated that extortionate speech has no more constitutional protection than that uttered by a robber while ordering his victim to hand over the money, which is no protection at all"); *see also United States v. Hutson*, 843 F.2d 1232, 1235 (9th Cir. 1988); *United States v. Slavin*, 1990 WL 71479 (S.D.N.Y. May 23, 1990).

2.    **The *Noerr-Pennington* Doctrine.**  Defendants' reliance upon the decision in *Eastern R.R. Presidents Conference v. Noerr Motor Freight*, 365 U.S. 127 (1961), is misplaced. The decision in *Noerr*, coupled with the decision in *United Mine Workers v. Pennington*, 381 U.S. 657 (1965), serves as the basis for the Supreme Court's *Noerr-Pennington* doctrine. Under this doctrine, those who petition any department of the government for redress are generally immune from statutory liability for their petitioning conduct. *Professional Real*

*Estate Investors v. Columbia Pictures*, 508 U.S. 49 (1993). In other words, "the *Noerr-Pennington* doctrine stands for a generic rule of statutory construction, applicable to any statutory interpretation that could implicate the rights protected by the Petition Clause." *Sosa v. DIRECTV, Inc.*, 437 F.3d 923, 931 (9th Cir. 2006). Under the *Noerr-Pennington* rule of statutory construction, federal statutes should be construed so as to avoid burdening conduct that implicates the protections afforded by the Petition Clause unless the statute provides otherwise. *Id.* at 931.

In the instant case, Cintas's RICO claim is not based upon any activity or conduct by Defendants that could fairly fall within the scope of the Petition Clause. Indeed, Cintas's Complaint makes no substantive mention of any activities that could accurately be characterized as legitimate petitioning activity. Although Defendants certainly have orchestrated numerous frivolous regulatory investigations and lawsuits against Cintas as part of their corporate campaign, Cintas's RICO claims are not based upon any of those purported petitioning activities. Instead, Cintas's claim is based only upon Defendants' *non*-petitioning activities. [Cplt., ¶¶ 8, 97-219]. As such, the *Noerr-Pennington* doctrine simply does not apply.

But even if some of the conduct challenged in Cintas's Complaint could be characterized as petitioning activity, "neither the Petition Clause nor the *Noerr-Pennington* doctrine protects sham petitions, and statutes need not be construed to permit them." *Sosa*, 437 F.3d at 932. In other words, protection under this doctrine requires a genuine interest in the redress sought. *City of Columbia v. Omni Outdoor Adver.*, 499 U.S. 365, 380 (1991). One may not exploit a governmental process merely "as a means of imposing cost and delay." *Id.* at 382. A "private action that is not genuinely aimed at procuring favorable government action" is considered a sham. *Columbia Pictures*, 508 U.S. at 58. In this case, Cintas has sufficiently alleged that all of

Defendants' conduct, including any purported petitioning activity, is not genuinely aimed at procuring favorable government action; instead, it is designed to extort valuable property rights from Cintas. Such conduct enjoys no protection under the First Amendment.

Moreover, even if some of Defendants' various tactics and statements enjoyed some level of First Amendment protection, such tactics still would constitute relevant evidence of Defendants' state of mind and intent to extort valuable property rights from Cintas. The mere fact that Defendants engaged in such tactics in a blatant effort to inflict severe economic damage on Cintas certainly is relevant evidence of Defendants' state of mind and intent to commit extortion. Nothing, including the First Amendment, prevents Cintas from introducing such state of mind evidence. Indeed, Defendants conveniently omitted from their motion any mention of the second case from which the *Noerr-Pennington* doctrine is derived. In *United Mine Workers v. Pennington*, the Supreme Court observed:

> It would of course be within the province of the trial judge to admit this evidence, if he deemed it probative and not unduly prejudicial, under the established judicial rule of evidence that testimony of prior or subsequent transactions, which for some reason are barred from forming the basis for a suit, may nevertheless be introduced if it tends reasonably to show the purpose and character of the particular transactions under scrutiny.

381 U.S. 657, 670 n.3 (1965). Thus, Cintas is permitted to rely upon Defendants' tactics as evidence of their intent to commit extortion, even if some of those tactics may enjoy some First Amendment protection. *See also Wisconsin v. Mitchell*, 508 U.S. 476, 489 (1993) ("The First Amendment … does not prohibit the evidentiary use of speech to establish the elements of a crime or to prove motive or intent.").

      **3.**     **The Cases Cited by Defendants are Inapposite.** None of the cases cited by Defendants supports the conclusion that, under the First Amendment, Defendants are immune from liability for extortion. Indeed, none of Defendants' cases even involved an extortion claim.

In *Metropolitan Opera Assoc., Inc. v. Local 100*, 239 F.3d 172 (2d Cir. 2001), for example, the issue before the court was whether a preliminary injunction issued by the trial court was "impermissibly vague" because it prohibited a union and its members generally from "threatening or harassing" and "engaging in fraudulent or defamatory representations" regarding the Met. *Id.* at 174. Contrary to Defendants' assertion, the court did not determine that labor unions have a First Amendment right to engage in any and all corporate campaign activities with impunity. Indeed, the court relied upon the First Amendment only to find that the preliminary injunction at issue constituted an unconstitutional prior restraint. *Id.* at 176-77. The court reasoned that:

> the Union risks contempt sanctions for speech that may ultimately, after full appellate review, be found constitutionally protected. The risk of contempt sanctions [for violating the injunction] may thus "freeze" the Union's attempts to exert what it perceives as legitimate social pressure on the Met, rather than simply "chill" the Union's speech, as might result from the threat of a subsequent damage award.

*Id.* at 177. Thus, the court did not hold that the union and its members, by virtue of their status as a labor organization, had a First Amendment right to say whatever they wanted about the Met with impunity. The court merely held that the First Amendment prohibited the Met from stopping the union and its members from saying defamatory things before they said them. But the court specifically acknowledged that, once the defamatory words had been spoken, the First Amendment would not protect the union from a subsequent damage award. In this case, Cintas does not seek to impose a prior restraint on Defendants' rights to free speech; Cintas merely seeks to hold Defendants responsible for the damages caused by their extortionate conduct.

The decisions upon which Defendants rely also are inapposite because, unlike here, those cases involved instances in which the plaintiff sought to hold the defendant liable for the speech *itself*, not merely to use the speech as evidence of the defendants' intent. *NAACP v. Claiborne*

20

*Hardware Co.*, 458 U.S. 886 (1982) (plaintiffs alleged that the concerted speech itself violated antitrust statute and tort law); *DeBartolo Corp. v. Florida Gulf Coast Bldg. and Constr. Trades Counsel*, 485 U.S. 568 (1988) (plaintiff alleged that speech itself violated § 8 of the NLRA); *Organization for a Better Austin v. Keefe*, 402 U.S. 415 (1971) (plaintiff sought to impose prior restraint on the speech itself as violating the right to privacy). *See* discussion *supra* Part I.C.2.

Defendants' reliance upon the decision in *Claiborne* is especially misplaced. In *Claiborne*, a group of black citizens boycotted white merchants seeking to put an end to racial segregation and centuries of abuse. *Id.* at 914-32. The white merchants sued under state law to recover the economic losses they sustained as a result of the boycott. The Supreme Court found that "[t]he right of the States to regulate economic activity could not justify a complete prohibition against a non-violent, politically motivated boycott designed to force governmental and economic change and to effectuate rights guaranteed by the Constitution itself." *Id.* at 914. Although the defendants in *Claiborne* intended to inflict economic injury on the white merchants, their campaign was not motivated by a desire to gain an economic advantage for themselves; they merely sought to vindicate the fundamental rights of equality and freedom – rights guaranteed by the Constitution. *Id.* Moreover, the defendants in *Claiborne* genuinely wanted what they demanded in their campaign – equality.

Although Defendants have likened themselves to "civil rights, environmental and anti-abortion organizations," Def. Br. at 14, the truth of the matter is that Defendants' motives are purely economic, and certainly not philanthropic or altruistic. Unlike the civil rights protestors in *Claiborne*, the goal of Defendants' corporate campaign is to obtain substantial economic benefits for themselves in the form of, among other things, union dues and pension funds. [Cplt., ¶¶ 222, 224]. Moreover, Defendants do not genuinely desire the ends they nominally seek; that

21

is, once Defendants obtain what they really want, so-called "voluntary" recognition by Cintas, Defendants' feigned interest in civil rights, workplace safety and environmental issues associated with Cintas will immediately disappear, just as it did when Defendants obtained what they wanted in prior corporate campaigns against other companies. [Cplt., ¶¶ 54-58 (explaining that, once Defendant UNITE HERE obtained a card check neutrality agreement from Angelica Corporation, Defendant executed a written peace agreement pursuant to which the union agreed to "cease all adverse economic activity and adverse publicity of every nature whatsoever" against Angelica, including any comments or actions relating to the company's record on safety, environmental, consumer protection, or human rights issues, etc.)].

Such pure economic interests like Defendants' have been analyzed under the First Amendment. In *Federal Trade Commission v. Superior Court Trial Lawyers' Ass'n*, 493 U.S. 411 (1990), the Supreme Court unanimously found that a well-publicized boycott by the District of Columbia lawyers who regularly represented indigents was not protected by the Constitution. The lawyers had agreed not to represent indigent criminal defendants until the government increased the lawyers' compensation. *Id.* at 412. The Court first determined that the lawyers' unlawful boycott was not protected by *Noerr*, even though their objective was the enactment of socially beneficial legislation. *Id.* at 424-25. The Court then ruled that the lawyers were not protected by *Claiborne*: "[t]hose who joined the Claiborne Hardware boycott sought no special advantage for themselves. They were black citizens in Port Gibson, Mississippi, who had been victims of political, social, and economic discrimination for many years. They only sought the equal respect and equal treatment to which they were constitutionally entitled." *Id.* at 426. With respect to the lawyers, the Court found that "[n]o matter how altruistic the motives of respondents may have been, it is undisputed that their immediate objective was to increase the

price that they would be paid for their service." *Id.* at 427. The same is true in this case. Defendants' immediate objective is to obtain valuable property and benefits for themselves and, as such, their conduct is not analogous to the conduct at issue in *Claiborne*.

**D.    Federal Labor Laws Do Not Preclude Cintas's RICO Claims**

Contrary to Defendants' assertion, federal labor laws do not preclude civil RICO claims against unions and union officers, even when the claims arise in the context of a labor dispute and involve allegations of unfair labor practices. *See, e.g., Gregory v. American Guild of Musical Artists*, 1993 WL 179110, *5 (S.D.N.Y. May 24, 1993).[2] Indeed, as stated by the court in *A. Terzi*, "this Court is aware of no case in this Circuit dismissing a RICO claim against a union or its officials on *Garmon* preemption grounds." *A. Terzi*, 2 F.Supp.2d at 507.

**E.    Cintas Has Sufficiently Pleaded Predicate Acts Under the Travel Act and the Ohio Extortion Statute.**

In addition to its Hobbs Act claim, Cintas has pleaded two separate and distinct categories of predicate acts: (1) Defendants' use of the facilities of interstate commerce to commit extortion (under both federal and state law) in violation of the federal Travel Act; and (3) extortion and attempted extortion under Ohio law. [Cplt., ¶¶ 1, 264-65, 268, 271, 276]. Defendants seek to dismiss these predicate acts on the sole ground that they do not "meet the

---

[2]    *See also A. Terzi*, 2 F.Supp.2d at 507 (finding that Hobbs Act and Travel Act claims are not preempted and may be predicate acts in civil RICO case against union); *United States v. International Bhd. of Teamsters*, 708 F. Supp. 1388, 1395 (S.D.N.Y. 1989) (there is "no doubt that Congress did not intend that RICO be given limited application in the labor context, notwithstanding the labor statutes cited by the [defendant]"); *Rodonich v. House Wreckers Union Local 95 of Laborers' Int'l Union of North Am.*, 624 F. Supp. 678, 686 (S.D.N.Y. 1985); *National Electrical Benefit Fund v. Heary Bros. Lightning Protection Co., Inc.*, 931 F. Supp. 169 (W.D.N.Y. 1995) (allowing RICO claim against union and its officials predicated on Hobbs Act and LMRA violations); *Amendolare v. Schenkers Int'l Forwarders, Inc.*, 747 F.Supp. 162 (E.D.N.Y. 1990) (allowing RICO claim against union locals and officials predicated on Hobbs Act and Travel Act violations).

Hobbs Act's 'wrongful[ness]' requirement." [Def. Br. at 22-23]. Defendants' argument is without merit.

First, Defendants' argument is based upon the faulty premise that the Hobbs Act's "wrongfulness requirement" applies with equal force to Cintas's Travel Act and state law extortion claims. As discussed above, however, the so-called wrongfulness requirement is derived from the Supreme Court's decision in *United States v. Enmons*, 410 U.S. 396 (1973). Contrary to Defendants' assertion, courts have uniformly held that the holding in *Enmons* is limited to a single federal statute – the Hobbs Act – and has no application to state extortion laws, the Travel Act, or any other state or federal laws. *See, e.g., United States v. Traitz*, 871 F.2d 368, 389 (3d Cir. 1989) (holding that *Enmons* does not apply to the interpretation of "any statute other than the Hobbs Act"); *United States v. Zappola*, 677 F.2d 264, 269 (2d Cir. 1982).

In *Enmons*, the Court based its decision on the specific language contained in the text of the Hobbs Act and its unique legislative history. *Enmons*, 410 U.S. at 398-99; *Zappola*, 677 F.2d at 269. More specifically, the Court reasoned that the term "wrongful" contained in the Hobbs Act limits the statute's coverage "to those instances where the obtaining of the property would itself be 'wrongful' because the alleged extortionist has no lawful claim to that property." *Id.* at 399-400. The RICO statute does not have comparable text or history. *See* 18 U.S.C. § 1961, *et seq.* Unlike the Hobbs Act, the RICO statute expressly incorporates state criminal laws, including state extortion laws, as predicate acts. Moreover, neither the Travel Act nor the Ohio extortion statute contains the "wrongfulness" language that was at issue in *Enmons*. *See* 18 U.S.C. § 1952(a)(3) and (b)(2); Ohio Rev. Code Ann. § 2905.11. To the contrary, those statutes are written in general terms and make the proscribed conduct criminal without regard to the status or ultimate objectives of the person engaging in it. *Id.*

Defendants' argument for extending the "wrongfulness" requirement beyond the Hobbs Act is based solely upon a mischaracterization of the Supreme Court's decision in *Scheidler*. [Def. Br. at 22]. In that case, the Supreme Court held that "where as here the Model Penal Code and a majority of States recognize the crime of extortion as requiring a party to obtain or seek to obtain property, as the Hobbs Act requires, the state extortion offense for purposes of RICO must have a similar requirement. Because petitioners did not obtain or attempt to obtain respondent's property," the state law extortion claims "were fatally flawed." 537 U.S. at 410. In other words, the Supreme Court extended the "obtaining property" requirement to state extortion offenses for purposes of RICO, but the Court did *not* extend the Hobbs Act's "wrongfulness" requirement to state law extortion or Travel Act claims. *Id.* To assert otherwise is to misrepresent the Supreme Court's holding.

Thus, even if this Court were to determine that Cintas has somehow failed to satisfy the Hobbs Act's wrongfulness requirement, and thus dismiss the Hobbs Act claim, Cintas still will have stated predicate acts under both the Travel Act and Ohio's extortion law. But, as discussed more fully above in connection with our discussion of the Hobbs Act, the "wrongfulness" requirement is easily satisfied in this case regardless of the claims to which it may apply.

## II.  CINTAS HAS STATED CLAIMS UNDER THE LANHAM ACT

### A.  Cintas Has Sufficiently Alleged That Defendants Have Made A "Commercial Use" Of The Cintas Mark.

Defendants seek to have this Court dismiss Cintas's claims for trademark infringement, trademark dilution, and unfair competition on the grounds that "a person's use of another's trademark is actionable only where the person has made a *commercial* use of the mark." [Def. Br. at 30 (emphasis in original)]. As discussed below, however, this "commercial use" requirement applies only to Cintas's claims for trademark dilution and unfair competition under

Section 1125 of the Lanham Act. Indeed, unlike a Section 1114 trademark infringement claim, Section 1125 claims are limited by Section 1125(c)(4)(B), which provides that "[n]oncommercial use of a mark" is not actionable under Section 1125. *See* 15 U.S.C. § 1125(c)(4)(B). Relying upon this Section, Defendants contend that their use of the CINTAS mark is "noncommercial," and thus not actionable, because the Cintas Exposed website "is devoted exclusively to criticism of Cintas and neither sells nor advertises goods or services." [Def. Br. at 30]. Defendants' contention is wrong for at least three reasons.

First, "[t]he mere fact that defendant seeks to criticize plaintiff cannot automatically immunize a use that is otherwise prohibited by the Lanham Act." *Planned Parenthood Federation of America, Inc. v. Bucci*, 1997 WL 133313, *6 (S.D.N.Y. Mar. 19, 1997), *aff'd*, 152 F.3d 920 (2d Cir. 1998).

Second, the Cintas Exposed website serves as a conduit to UNITE HERE's official website which solicits funds through the sale of merchandise. Indeed, the Cintas Exposed Website contains a hyperlink which takes the Internet user directly to the homepage of Defendant UNITE HERE's official website, <www.unitehere.org>. [Cplt., ¶ 241, Ex. 67]. In addition to union rhetoric, the UNITE HERE Homepage contains numerous hyperlinks by which an Internet user can navigate UNITE HERE's website. [Cplt., ¶ 242, Ex. 68]. One such hyperlink takes the Internet user to the "UNITE HERE Store" where users may set up an account for purchasing UNITE HERE merchandise. Such merchandise includes a wide range of items, including: baseball caps; tee-shirts; polo shirts; fleece jackets; flags; sweatshirts; denim shirts; dress shirts; attaché bags; fleece blankets; coffee mugs; varsity jackets; and numerous other items. The UNITE HERE Store has a wide selection of merchandise and, for the most part, is operated in the same manner as other online retailers. [Cplt., ¶ 242, Ex. 69]. Another hyperlink

provides the user with a list (in PDF format) of numerous "manufacturers of union-made uniforms" from whom the user may purchase union-made uniforms. [Cplt., ¶¶ 243-45, Ex. 70-73]. These providers of union-made uniforms are some of Cintas's competitors in the uniform industry. Thus, a website with a domain name containing the CINTAS mark is being used to steer Internet users to Cintas's competitors.

Under such circumstances, courts find that the defendants' use of a protected mark constitutes a "commercial use" under Section 1125. *See, e.g., OBH, Inc. v. Spotlight Magazine, Inc.*, 86 F.Supp.2d 176, 192 (W.D.N.Y. 2000) ("defendants' use of the mark as the domain name for the ... website constitutes a commercial use because ... that website contains a hyperlink that connects users to defendants' other web site, ... which defendants operate for commercial purposes"); *Jews for Jesus v. Brodky*, 993 F. Supp. 282, 307-08 (D.N.J. 1998), *aff'd*, 159 F.3d 1351 (3d Cir. 1998) (defendant's website devoted to criticizing the Jews for Jesus movement is commercial because it includes a hyperlink to another Internet website which sells certain merchandise); *Bihari v. Gross*, 119 F.Supp.2d 309, 318 (S.D.N.Y. 2000) (cited by Defendants in their motion) (finding commercial use where website contained hyperlinks to other websites which promote the services of the plaintiff's competitors; the "websites effectively act as a conduit, steering potential customers away from [the plaintiff] and toward its competitors, thereby transforming his otherwise protected speech into a commercial use").

Third, Defendants' use of the CINTAS mark constitutes a "commercial use" because their conduct is designed to harm Cintas commercially. In *Planned Parenthood*, for example, Chief Judge Wood explained:

> ***[D]efendant's use is commercial because of its effect on plaintiff's activities.*** First, defendant has appropriated plaintiff's mark in order to reach an audience of Internet users who want to reach plaintiff's services and viewpoint, intercepting them and misleading them in an attempt to offer his own political message.

Second, defendant's appropriation not only provides Internet users with competing and directly opposing information, but also prevents those users from reaching plaintiff and its services and message. In that way, defendant's use is classically competitive: he has taken plaintiff's mark as his own in order to purvey his Internet services – his website – to an audience intending to access plaintiff's services.

1997 WL 133313, *6 (emphasis added); *see also OBH, Inc.*, 86 F.Supp.2d at 192-93 (commercial use exists when defendant's use of the mark is likely to have a negative effect on plaintiff's business); *Jews for Jesus*, 993 F. Supp. at 307-08 (finding defendant's use of plaintiff's mark in domain name constituted commercial use because website was designed to harm plaintiff commercially by disparaging it).

In the instant case, Defendants admit that their Cintas Exposed website is designed and intended to harm Cintas commercially by disparaging and criticizing the company and its business practices. That alone is enough to establish a "commercial use" of the CINTAS mark actionable under the Lanham Act. *Id.* But even worse, prospective Cintas customers who mistakenly access the Cintas Exposed website may, instead of continuing to look for one of Cintas's officially sponsored websites, opt to select the hyperlink to UNITE HERE's homepage which, in turn, directs the users to union manufacturers who compete directly with Cintas. Thus, Defendants' conduct of appropriating the CINTAS mark is likely to have a negative effect on Cintas' commercial activities which, under applicable law, constitutes a "commercial use." *Id.*

**B.      A Trademark Infringement Claim Under Section 1114 Does Not Require A Showing Of "Commercial Use".**

Contrary to Defendants' assertion, a claim for trademark infringement under Section 1114 of the Lanham Act is different from a claim for trademark dilution or unfair competition under Section 1125. Indeed, unlike Section 1125 claims, a claim for trademark infringement under Section 1114 does *not* have a commercial activity requirement and there is no exemption from liability for noncommercial use of the protected mark. *See, e.g., MasterCard Int'l, Inc. v.*

*Nader 2000 Primary Committee, Inc.*, 2004 WL 434404 (S.D.N.Y. Mar. 8, 2004); *United We Stand America, Inc. v. United We Stand, America New York, Inc.*, 128 F.3d 86, 93 (2d Cir. 1997) (quoting with approval the decision in *Planned Parenthood*, 1997 WL 133313 at *4). Instead, a Section 1114 trademark infringement claim merely requires a showing that Defendants' use of the mark is: (1) "in commerce;" and (2) "in connection with goods and services." *Id.*; *see also SMJ Group, Inc. v. 417 Lafayette Restaurant LLC*, 439 F.Supp.2d 281, 287 (S.D.N.Y. 2006).[3] Cintas has sufficiently pleaded both elements.

1.    **Defendants' Use Constitutes A "Use In Commerce."**    The "use in commerce" requirement of Section 1114 is nothing more than a jurisdictional predicate to any law passed by Congress under the Commerce Clause.  The "history and text of the Lanham Act show that 'use in commerce' reflects Congress's intent to legislate to the limits of its authority under the Commerce Clause." *Buti v. Perosa, S.R.L.*, 139 F.3d 98, 102 (2d Cir. 1998).  The scope of the term "use in commerce" as a jurisdictional predicate is broad.  *SMJ Group*, 439 F.Supp.2d at 287; *Steele v. Bulova Watch Co.*, 344 U.S. 280 (1952).  The "use in commerce" requirement is met in this case for several reasons, including the fact that "the national, and even international, nature of the Internet itself makes defendants' use of plaintiffs' trademark as a domain name a 'use in commerce' for purposes of the Lanham Act." *OBH, Inc.*, 86 F.Supp.2d at 186.

2.    **"In Connection With" Goods and Services.**    Defendants contend that the "in connection with" requirement cannot be satisfied in this case because: (a) Defendants are *not* using the CINTAS mark in connection with the distribution or advertising of Defendants'

---

[3]    Defendants spill considerable ink desperately trying to convince this Court that: (1) a "commercial use" requirement is encompassed within Section 1114(a)'s "in connection with the sale ... of goods and services" clause. [Def.'s Br., at 30-38].  Although some courts have accepted such an argument, *see, e.g., Bosley Medical Institute, Inc. v. Kremer*, 403 F.3d 672 (9th Cir. 2005), courts in the Second Circuit have rejected it.  *See, e.g., MasterCard Int'l.*, 2004 WL 434404 at *8; *United We Stand*, 128 F.3d at 92-93.

*own* goods or services; and (b) Defendants are using the CINTAS mark solely in connection with Cintas's own goods and services (i.e., for criticism of Cintas's goods and services). [Def. Br. at 24-32]. Defendants are wrong on both counts.

    a.    **In Connection With *Defendants'* Goods and Services.**  As discussed above, the Cintas Exposed website contains a hyperlink that connects Internet users to the UNITE HERE website where Defendants sell merchandise and direct users to union manufacturers who compete directly with Cintas. "Thus, defendants are using plaintiffs' trademark, at least in part, to offer their own services over the Internet." *OBH, Inc.*, 86 F.Supp.2d at 186.

In addition, Defendants' dissemination of criticism and other information relating to Cintas also constitutes a "service" within the meaning of Section 1114 of the Lanham Act. Indeed, the term "services" has been interpreted broadly by the Second Circuit. *See United We Stand*, 128 F.3d at 89. Under this broad interpretation, the Lanham Act has been applied to defendants who were furnishing a wide variety of noncommercial public and civic benefits, including the "service" of communicating specific ideas and points of view. *Id.* at 90 (citing examples such as fraternities, the Special Olympics, purchasing gifts for orphans, community programs, and other community affairs). In *United We Stand*, for example, the defendant organization used a protected trademark in connection with its political activities, including the distribution of political literature. The Second Circuit stated that it had "no doubt" that these activities, "although not undertaken for profit, … unquestionably render a service." *Id.* at 89-90.

Similarly, in *SMJ Group, Inc. v. 417 Lafayette Restaurant LLC*, 439 F.Supp.2d 281 (S.D.N.Y. 2006), the defendant was a non-profit organization which, with the goal of improving conditions for the city's restaurant workers, distributed leaflets (which displayed the restaurants'

trademarks) containing information about the restaurant workers' purported struggle against unpaid overtime wages, race and gender discrimination, harsh working conditions, etc. *Id.* at 285. When the plaintiff restaurants brought suit against the organization for trademark dilution and infringement, the defendants contended that their circulation of leaflets was in furtherance of their mission to educate the public and, thus, no goods or services were being offered. *Id.* The court concluded, however, that the defendants' activities would generally be considered a public service in the normal sense of those words and, as such, would qualify as a "service" as defined by the Lanham Act. *Id.* The court further stated that "Defendants seek to educate the public, an admirable service, but an individual being educated should not be misled about the source of the education, just as an individual purchasing a can of peas should not be misled about the source of those peas." *Id.* (*citing Rogers v. Grimaldi*, 875 F.2d 994, 997 (2d Cir. 1989)).

The same is true here. Even if we assume for purposes of argument that Defendants actually sought to "educate" the public about Cintas and the purported struggles of Cintas's workers (rather than just extort valuable property and benefits), Defendants' public service would constitute a "service" within the meaning of the Lanham Act. *Id.* Like the restaurant goers in *SMJ, Inc.*, the individuals being "educated" by Defendants in this case (which would include Cintas's customers, potential customers and anyone else who happens to enter the Cintas Exposed website believing it is a Cintas-sponsored website), should not be misled as to the source of the purported "education."

b.    **In Connection With *Cintas's* Goods and Services.** The "in connection with" requirement "is not only met by use of the mark in connection with goods or services distributed or advertised by the alleged infringer; it may also be met by use in connection with the goods or services distributed by the trademark holder." *OBH, Inc.*, 86

31

F.Supp.2d at 186; *see also Jews for Jesus*, 993 F. Supp. at 309; *Planned Parenthood*, 1997 WL 133313, at *4. In this case, Defendants' use of the CINTAS mark is "in connection with" the distribution or advertising of services, because it is likely to prevent or hinder Internet users from accessing Cintas's services on Cintas's various websites. *Id.* Prospective or current users of Cintas's services who mistakenly access the Cintas Exposed website may fail to continue to search for Cintas's websites due to confusion or frustration. Indeed, that is the specific result intended by Defendants. [Cplt., at ¶¶ 252-260]. Such Internet users, who are presumably looking to purchase goods or services from Cintas by accessing a Cintas-sponsored website, may instead opt to select the hyperlink contained in the Cintas Exposed website which would lead the consumer to a union shop. This hyperlink will directly link the user to other companies and websites that are in direct competition with Cintas in providing uniforms, apparel, goods and services over the Internet. As such, Defendants' action in appropriating the CINTAS mark is "in connection with" the distribution of Cintas's services. *Id.; see also People for the Ethical Treatment of Animals v. Dougney*, 263 F.3d 359, 365 (4th Cir. 2001).[4]

---

[4]    The three "union" cases cited by Defendants are easily distinguishable. First, none of these cases included a Section 1114 trademark infringement claim which, as discussed herein, is different from Section 1125 claims. The second distinguishing factor is best explained by the court in *Cellco Partnership v. Communication Workers of Amer.*, 2003 U.S. Dist. LEXIS 26823 (D.N.J. Dec. 11, 2003). In *Cellco*, the court specifically rejected the approach taken in *United We Stand* (a case which is mandatory authority in this case) and *Jews for Jesus* and, instead, chose to "follow the approach taken in *WHS Entertainment Ventures v. United Paper Workers Int'l Union*, 997 F. Supp. 946 (M.D. Tenn. 1998), which is another case upon which Defendants rely. The *Cellco* court reasoned that in *United We Stand* and *Jews for Jesus*, the defendant used the protected mark not as a commentary on its owner, but as a source identifier. *Cellco*, 2003 U.S. Dist. LEXIS 268233, at *16. This "crucial difference" also exists in this case; that is, Cintas has alleged that Defendants are using the CINTAS mark as a source identifier. [Cplt., ¶¶ 252-260]. Finally, the third "union" case cited by Defendants, *Sodexho USA, Inc. v. HERE Local 217*, 989 F. Supp. 169 (D. Conn. 1997), pertains to a claim asserted under Section 1125(a)(1)(B), which contains language that is different from Cintas's Section 1125(a)(1)(A) claim.

C.    **Cintas Has Sufficiently Pleaded A Likelihood of Confusion**

Defendants maintain that Cintas's trademark infringement and unfair competition claims should be dismissed because Defendants' unauthorized use of the CINTAS mark does not create a "likelihood of confusion" as to the source or sponsorship of the Cintas Exposed website. [Def. Br. at 32]. Defendants are wrong for several reasons.

First, whether a likelihood of confusion exists must be determined on a case by case basis by application of a non-exhaustive list of factors established by the Second Circuit in *Polaroid Corp. v. Polarad Elecs. Corp.*, 287 F.2d 492 (2d Cir. 1961). Application of the *Polaroid* factors is a fact-intensive analysis that should not be conducted on a motion to dismiss. *See, e.g., Eliya, Inc. v. Kohl's Dep't Stores*, 2006 U.S. Dist. LEXIS 66637, at *10 n. 2 (S.D.N.Y. 2006); *Hearts on Fire Co., LLC v. L C Int'l Corp.*, 2004 U.S. Dist. Lexis 14828, at *12 (S.D.N.Y. 2004).

Second, the Second Circuit has determined that when a defendant intentionally copies a plaintiff's mark, a likelihood of confusion will be presumed as a matter of law. *See Mobil Oil Corp. v. Pegasus Petroleum Corp.*, 818 F.2d 254, 258 (2d Cir. 1987); *New York State Soc'y of Certified Pub. Accountants v. Eric Louis Assocs., Inc.*, 79 F.Supp.2d 331, 340 (S.D.N.Y. 1999). In this case, Cintas has alleged that Defendants intentionally used the CINTAS mark in the domain name of their website. [Cplt., at ¶¶ 252-260]. In other words, Defendants' use of the CINTAS mark was not an accident. As such, a presumption of a likelihood of confusion exists in this case. *Id.*

Third, the Cintas Exposed domain name is "confusingly similar" to the CINTAS mark. Contrary to Defendants' assertion, the addition of the word "exposed" does not immediately alert an Internet user that he or she is entering a website devoted to criticizing Cintas. In *Sunlight Saunas, Inc. v. Sundance Sauna, Inc.*, 427 F.Supp.2d 1032, 1064 (D. Kan. 2006), for example,

the defendants operated a website with the domain name "www.sunlightsaunas-exposed.com."

Much like the Cintas Exposed website is devoted to criticizing Cintas, the "sunlightsaunas-exposed" website was devoted to criticizing the plaintiff company and trademark holder, Sunlight Saunas. Once they were sued for trademark infringement and cybersquatting, defendants contended that, as a matter of law, the domain name "sunlightsaunas-exposed.com" was not confusingly similar to the plaintiff's mark, "sunlight saunas," because the domain name constituted a clear "anti" message which alerted any user that the website was critical of the plaintiff. The court rejected the defendants' argument finding that:

> This case presents a closer question than those presented in *Bally, Taubman* and *Lucent* because *the term "exposed" does not send the same unequivocal negative message as "sucks." See, e.g., Taubman*, 319 F.3d at 778 (addition of qualifying moniker "sucks" to domain name removes confusion as to source); *Lucent Techs., Inc.*, 95 F.Supp.2d at 535; *Bally*, 29 F.Supp.2d at 1164 (term "sucks" loaded with criticism). *The term "exposed" is not necessarily critical.* See Webster's Third New International Dictionary 802 (1993) ("exposed" defined as "open to view" or "not shielded or protected"). *Although the term "exposed" may involve critical treatment of a subject, it may not immediately alert an Internet user that he or she is entering a "gripe site."* The Court cannot conclude that as a matter of law, confusing similarity is absent.

427 F.Supp.2d at 1064 (emphasis added). The same can be said in the instant case. That is, although the term "exposed" may involve some critical treatment of the subject, use of that term in the "cintasexposed.com" domain name may not immediately alert an Internet user that he or she is entering a website devoted to criticizing Cintas.

Fourth, Cintas's trademark claims are based upon the idea that, by *intentionally* using a domain name that is confusingly similar to Cintas's official websites, Defendants are improperly creating "initial interest confusion" among Internet users regarding sponsorship of the website and improperly diverting Internet users to Defendants' website. In other words, Defendants have created a "bait and switch" scheme in which they trick Internet users into accessing what they think is a Cintas-affiliated website (the bait), and then bombard the user with anti-Cintas

information and commentary (the switch).   [Cplt., ¶¶ 251-262 (providing detailed allegations relating to Defendants' *intentional* conduct)].   This type of bait and switch routine is not protected by the First Amendment and is actionable under federal trademark law, even if the confusion is only temporary.   *See, e.g., Savin Corp. v. Savin Group*, 391 F.3d 439 (2d Cir. 2004); *SMJ Group*, 439 F.Supp.2d 281 (refusing to limit doctrine to cases in which parties are competitors); *OBH, Inc.*, 86 F.Supp.2d at 190.   Although Defendants insist that they have not engaged in any intentional deception, Def. Br. at 35, the detailed allegations in the Complaint state otherwise.   Moreover, the Second Circuit has determined that the issue of a defendants' intent in a Lanham Act case "is best left in the hands of the trier of fact."   *EMI Catalogue P'shp v. Hill, Holliday, Connors, Cosmopulos, Inc.*, 228 F.3d 56, 68 (2d Cir. 2000).

Fifth, contrary to Defendants' assertion, the mere inclusion of a disclaimer on their Cintas Exposed website is not sufficient to defeat Cintas's claims. *See, e.g., OBH, Inc.*, 86 F.Supp.2d at 190; *Planned Parenthood*, 1997 WL 133313, at *3, *12 (holding that a "defendant's appropriation of [a] plaintiff's mark as a domain name and home page address cannot adequately be remedied by a disclaimer.   [A d]efendant's domain name and home page address are external labels that, on their face, cause confusion among Internet users and may cause Internet users who seek plaintiff's web site to expend time and energy accessing defendant's web site"); *New York State Soc. of Certified Public Accountants v. Eric Louis Associates, Inc.*, 79 F.Supp.2d 331 (S.D.N.Y. 1999); *Australian Gold v. Hatfield*, 436 F.3d 1228, 1240 (10th Cir. 2006); *Paccar, Inc. v. Telescan Techs., LLC*, 319 F.3d 243, 253 (6th Cir. 2003) (holding that a disclaimer of affiliation with the targeted corporation occurs "too late" in consumers' browsing process because they have already reached the dubious website); *Caterpillar, Inc. v. Telescan Techs,*

*LLC*, 2002 U.S. Dist. LEXIS 344, at *10-11 (C.D. Ill.) (finding disclaimers are "ineffective" in general and fail to "cure" initial interest confusion because they appear "too late").

Finally, Defendants have misrepresented the importance of the Exhibits attached to the Complaint. Exhibit 78 is a printout of the results generated by a search for "cintas" on only *one* Internet search engine, which was attached to the Complaint merely as evidence that Defendants *intended* to increase traffic to their website by purchasing the CINTAS mark as a keyword on that particular search engine. [Cplt., ¶ 258, Ex. 78]. But because the official disclaimer contained on Defendants' website happens to also appear in the results of this one search engine, Defendants insist that initial interest confusion cannot possibly exist in this case; that is, Defendants maintain that all Internet users are put on notice before even entering the Defendants' website that it is not a Cintas-sponsored website. [Def. Br. at 34]. Attached as Exhibit 77, however, are numerous examples of search engine results for "cintas" in which Defendants' disclaimer does *not* appear. Thus, although it is possible that the text of Defendants' disclaimer can sometimes be retrieved by a search engine and then posted as part of that particular search engine's search results, such a posting is not routine or guaranteed. Indeed, there are hundreds of independent search engines on the Internet, each of which has its own search criteria, its own method for conducting searches, and its own way to organize information in search results – all of which are subject to change at the whim of the search engine operator. [Cplt., ¶ 257 and Ex. 77]. In other words, Defendants have no direct control over whether their disclaimer appears in any particular search engine's search results. Thus, while one search engine (Exhibit 78) may gratuitously display Defendants' disclaimer in its search results, many others do not (Exhibit 77).

Defendants also contend that the initial interest confusion doctrine does not apply here because, as demonstrated by the various search results attached to the Complaint, the official

"Cintas.com" website is "ranked" or "listed" higher than or before Defendants' "CintasExposed.org" website. [Def. Br. at 34]. But the initial interest doctrine is not so limited. Indeed, the doctrine is not based upon the ever-changing order of search engine results. Initial interest confusion is based upon the idea that Internet users may be initially confused about whether a particular website is sponsored by, or affiliated with, the owner of the mark. As set forth in the Complaint, Cintas maintains or approves of several Cintas-affiliated websites, including: cintas.com, cintas.ca, cintasracing.com, cintas-corp.com, and cintascenter.com. [Cplt., Ex. 77]. Thus, it is of no consequence that search engines often may list "CintasExposed.org" below "Cintas.com" in their rankings. As demonstrated by Exhibit 77, "CintasExposed.org" often appears *above* some of the other Cintas-affiliated websites, or right in the middle of the official Cintas-sponsored websites. Moreover, in at least one search engine's results (Alexa), the CintasExposed.org website appears twice; once ahead of CintasRacing.com, and once under the heading "Tools for Cintas Customers." [Cplt., Ex. 77]. Anyone viewing those search results could easily be confused about whether CintasExposed is a Cintas-affiliated website. *See Northern Light Tech., Inc. v. Northern Lights Club*, 97 F.Supp.2d 96, 115 (D. Mass. 2000) ("[E]ntering a website takes little effort – usually one click from a linked site or a search engine's list; thus Web surfers are more likely to be confused as to the ownership of a website than traditional patrons of a brick-and-mortar store would be of a store's ownership"). At bottom, this discussion of Exhibits 77 and 78 confirms that there are complicated factual issues that cannot be determined on a pre-discovery motion to dismiss.

**D.**    **Cintas Has Sufficiently Pleaded "Dilution" of its Mark**

Defendants seek to dismiss Cintas's Section 1125(c) trademark dilution claim on the ground that it "fails to meet that provision's dilution requirement." [Def. Br. at 35-36].

Defendants are wrong. The Second Circuit has determined that "where a plaintiff who owns a famous senior mark can show the commercial use of an identical junior mark, such a showing constitutes circumstantial evidence of the actual dilution element of an FTDA claim." *Savin Corp. v. Savin Group*, 391 F.3d 439, 452 (2d Cir. 2004).

In *Savin Group*, the court noted that the marks at issue in that case may have been identical in some contexts, but not others. But "*[w]here the senior and junior 'Savin' marks are both used in website addresses, the marks may be identical.* On the other hand, where the 'Savin' marks at issue appear in stylized graphics on webpages, the competing marks may be found merely to very similar." *Id.* at 454 (emphasis added). The court then remanded the case to the district court for clarification and specific findings as to whether the junior and senior marks were identical. In doing so, the court emphasized "that it is the identity of the marks themselves that is germane in the dilution context, and the modifying of the mark – by adding one or more generic descriptors to the mark in a website address, for example – will not necessarily defeat a showing that the marks themselves are identical in specific contexts." *Id. (citing A.C. Legg Packing Co. v. Olde Plantation Spice Co.*, 61 F.Supp.2d 426, 430-31 (D. Md. 1999) ("OPSC's OLDE PLANTATION SPICE mark is nearly identical in appearance to A.C. Legg's OLD PLANTATION mark, differing only in the spelling of 'olde' and the addition of the generic word 'spice.' " The marks are identical in sound and connotation." (emphasis added)); *cf. Golden Door, Inc. v. Odisho*, 646 F.2d 347, 350 (9th Cir. 1980) (focusing, in the infringement context, on identical portions of a junior and senior mark). Thus, based upon the foregoing, the identical *portions* of the "cintas.com," "cintas.ca," "cintas-corp.com," "cintasracing.com" Cplt., Ex. 77, and "cintasexposed.com" domain names are sufficient to find that the above uses of the CINTAS mark are identical for purposes of applying the presumption and establishing per se evidence of

38

actual dilution. In other words, Defendants' clever inclusion of the generic word "exposed" is not sufficient to destroy the presumption of dilution.

Moreover, claims of dilution must be assessed on a "case-by-case basis" based upon a list of ten nonexclusive factors established by the Second Circuit. *OBH, Inc.*, 86 F.Supp.2d at 186 (*citing Federal Express Corp. v. Federal Espresso, Inc.*, 201 F.3d 168, 174 (2d Cir. 2000)). In this case, Cintas has alleged that Defendants' unauthorized use of the CINTAS mark dilutes the distinctiveness of the famous mark by diminishing its "capacity to identify and distinguish Cintas's goods and services and causing the CINTAS marks to lose their ability to serve as a unique identifier of Cintas's goods and services." [Cplt., at ¶¶ 294-299]. This allegation is sufficient to state a dilution claim. *OBH, Inc.*, 86 F.Supp.2d at 186 (based upon similar facts, court found plaintiff had a likelihood of success on the merits of dilution claim); *see also Merck & Co., Inc. v. Mediplan Health Consulting, Inc.*, 425 F.Supp.2d 402 (S.D.N.Y. 2006) (denying motion to dismiss and finding pleadings sufficient where Merck alleged that "defendants' use of the ZOCOR mark combined with the word 'generic' has caused 'irreparable dilution of the distinctive qualities' of its ZOCOR mark").

### E.    <u>Cintas Has Stated a Claim Under the Anticybersquatting Statute</u>

Defendants maintain that Cintas has failed to plead two necessary elements of its anticybersquatting claim: (1) that the domain name is identical or confusingly similar to, or derivative of" the owner's mark; and (2) that Defendants registered the domain name in bad faith. [Def. Br. at 36]. Defendants' arguments are without merit. First, as demonstrated *infra* Part II.C, Cintas has sufficiently pleaded that the CintasExposed website is confusingly similar to the CINTAS mark. *See, e.g., Sunlight Saunas*, 427 F.Supp.2d at 1064 (denying summary

judgment to defendant who operated sunlightsaunasexposed.com website; refusing to find as a matter of law that domain name was not confusingly similar).

Second, Cintas has sufficiently pleaded that Defendants acted in bad faith. [Cplt., ¶¶ 251-262, 308-311 (providing detailed allegations relating to Defendants' *intentional* conduct and bad faith intent to profit)]. At a minimum, Cintas has sufficiently pleaded that Defendants knew they were using the CINTAS mark (i.e., that the use was no accident). That knowledge alone can support a finding of bad faith. *See New York State Soc'y of Certified Pub. Accountants*, 79 F.Supp.2d at 349-50; *see also Nalpac, Ltd. v. Corning Glass Works*, 784 F.2d 752, 755-56 (6th Cir. 1986) (exploitation of another's mark after knowledge of its existence suggests bad faith); *OBH, Inc.*, 86 F.Supp.2d at 189 (*citing Official Airline Guides, Inc. v. Goss*, 6 F.3d 1385, 1394 (9th Cir. 1993) ("When an alleged infringer knowingly adopts a mark similar to another's, courts will presume an intent to deceive the public.")); *Jews for Jesus*, 993 F. Supp. at 30. Moreover, the existence of the corporate campaign itself, as well as the many statements made by Defendants about "breaking Cintas's back" and "taking this company down," serves as sufficient evidence of Defendants' bad faith; that is, Defendants had a motive to hurt Cintas. [Cplt., ¶ 94]. *See, e.g., OBH, Inc.*, 86 F.Supp.2d at 189 (finding that defendant-infringers had a running business dispute with plaintiffs and, therefore, had a motive to harm them).

Finally, although Defendants vigorously contend that they have not acted with a bad faith intent to profit, that issue is a factual one that must be decided by a trier of fact. *See, e.g., PGC Property, LLC v. Wainscott/Sagaponack Property Owners, Inc.*, 250 F.Supp.2d 136, 143 (E.D.N.Y. 2003) (denying defendants' motion for summary judgment on issue of bad faith) (*citing Lang v. Retirement Living Pub. Co.*, 949 F.2d 576, 583 (2d Cir. 1991) ("issues of good faith are generally ill-suited for disposition on summary judgment").

Respectfully submitted,


By: ___s/ Gregory M. Utter_____
Gregory M. Utter (*admitted pro hac vice*)
Jamie M. Ramsey (*admitted pro hac vice*)
Patricia B. Hogan (*admitted pro hac vice*)
Christy M. Nageleisen (*admitted pro hac vice*)
Drew M. Hicks (*admitted pro hac vice*)
KEATING MUETHING & KLEKAMP PLL
One East Fourth Street, Suite 1400
Cincinnati, Ohio 45202
Tel: (513) 579-6540
Fax: (513) 579-6457
gmutter@kmklaw.com
jramsey@kmklaw.com

-and-

G. Robert Blakey
(*motion for admission pro hac vice pending*)
326 Law School
Notre Dame, Indiana 46556
Tel: (574) 631-5717
Fax: (574) 631-6197
G.R.Blakey.1@nd.edu

-and-

Harold P. Weinberger
Jonathan M. Wagner
KRAMER LEVIN NAFTALIS & FRANKEL LLP
1177 Avenue of the Americas
New York, New York 10036
Tel: (212) 715-9100
Fax: (212) 715-8000
hweinberger@kramerlevin.com
jwagner@kramerlevin.com

ATTORNEYS FOR PLAINTIFFS

**CERTIFICATE OF SERVICE**

I hereby certify that a true and exact copy of the foregoing was served upon Robert Weinberg and Andrew D. Roth, Bredhoff & Kaiser, PLLC, 805 Fifteenth Street, N.W., Suite 1000, Washington, DC 20005 and Irwin Rochman, Tesser, Ryan & Rochman, LLP, 509 Madison Avenue, New York, New York 10022, via electronic mail this 8th day of August, 2008.


s/ Jamie M. Ramsey
Jamie M. Ramsey


2573385.2

42