IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| Cintas Corporation, Cintas Corporation No. 2, Cintas Corporation No. 3 and Cintas Holdings LLC, | ) ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) | Case No.: 08 cv 2185 (WHP) |
| | ) | |
| UNITE HERE, Change to Win, International Brotherhood of Teamsters, Bruce Raynor, Ahmer Qadeer, Keith Mestrich, Elizabeth Gres, Peter Demay, Katie Unger, Stefan Antonowicz, And Does 1 Through 100, | ) ) ) ) ) ) | |
| Defendants. | ) ) | |

**REPLY MEMORANDUM OF LAW IN SUPPORT OF ALL
DEFENDANTS' JOINT RULE 12(b)(6) MOTION TO DISMISS**

Irwin Rochman (SDNY Bar No. SS7573)
Tesser, Ryan & Rochman, LLP
509 Madison Avenue
New York, New York 10022
Phone: (212) 754-9000
Fax: (212) 754-5906

Attorney for Defendants UNITE HERE, Bruce Raynor, Ahmer Qadeer, Keith Mestrich, Elizabeth Gres, Peter DeMay, Katie Unger and Stefan Antonowitz

Robert M. Weinberg *(pro hac vice)*
Andrew D. Roth *(pro hac vice)*
Leon Dayan *(pro hac vice)*
Bredhoff & Kaiser, PLLC
805 Fifteenth Street, N.W., Suite 1000
Washington, DC 20005
Phone: (202) 842-2600
Fax: (202) 842-1888

Attorneys for Defendants International Brotherhood of Teamsters and Change to Win

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................................ ii

ARGUMENT ...................................................................................................................... 1

   I.     CINTAS HAS FAILED TO STATE A RICO CLAIM ............................................ 1

       A.    Cintas' Hobbs Act Claim Does Not Meet The Act's "Wrongfulness" Requirement Or Its Separate "Obtaining" Requirement ........................................................................................... 3

           1.    The "Wrongfulness" Requirement ................................................... 3

           2.    The "Obtaining" Requirement ......................................................... 6

       B.    Cintas' Hobbs Act Claim Also Fails On Independent First Amendment And Federal Labor Law Grounds ......................................... 8

           1.    The First Amendment ..................................................................... 8

           2.    The Federal Labor Laws ............................................................... 11

       C.    Cintas' Travel Act and "State Law Extortion" Allegations Cannot Salvage Its Rico Claims ............................................................... 11

   II.    CINTAS HAS FAILED TO STATE A LANHAM ACT CLAIM ........................ 12

       A.    Counts 6, 7 and 8 Do Not Satisfy the "Commercial Use" Requirement .................................................................................. 12

       B.    Counts 6 and 8 Fail to Allege the Requisite Likelihood of Confusion ...................................................................................... 18

       C.    Count 7 Fails Adequately To Allege "Dilution" ........................................ 19

       D.    Count 9 Fails to Allege Actionable "Cybersquatting" ............................... 20

CONCLUSION ................................................................................................................. 20

# TABLE OF AUTHORITIES

## CASES

*A. Terzi Productions v. Theatrical Protective Union*, 2 F. Supp. 2d 485 (S.D.N.Y. 1998) ......3, 11

*Asbestos & Lead Removal Corp. v. Severino*, 2007 WL 925485
(E.D.N.Y. Mar. 23, 2007) ....................................................................................................5

*Beverly Hills Foodland v. UFCW, Local 655*, 39 F.3d 191 (8th Cir. 1994)...................................9

*Bosley Medical Institute, Inc. v. Kremer*, 403 F.3d 672 (9th Cir. 2005) ................................14, 17

*Brokerage Concepts, Inc. v. U.S. Healthcare, Inc.*, 140 F.3d 494 (3d Cir. 1998)..........................4

*Cellco P'ship v. Communications Workers of Am.*, 2003 U.S. Dist. LEXIS 26823
(D.N.J. Dec. 11, 2003) .................................................................................13, 15, 17

*Christopher D. Smithers Foundation v. St. Lukes-Roosevelt Hospital Center*,
2001 WL 761076 (S.D.N.Y. July 6, 2001) ...............................................................17

*Dooley v. Crab Boat Owner's Ass'n*, 271 F. Supp. 2d 1207 (N.D. Cal. 2003) ..............................8

*Eastern Railroad Presidents Conference v. Noerr Motor Freight*, 365 U.S. 127 (1961) ............10

*FTC v. Superior Court Trial Lawyers*, 493 U.S. 411 (1990)........................................................10

*Fur Information & Fashion Council, Inc. v. E.F. Timme & Son, Inc.*,
501 F.2d 1048 (2d Cir. 1974)...................................................................................15

*George Lussier Enters., Inc. v. Subaru of New Eng., Inc.*, 393 F.3d 36 (1st Cir. 2004) ................4

*Gmurzynska v. Hutton*, 355 F.3d 206 (2d Cir. 2004)...................................................................15

*HERE, Local 2 v. Marriott Corp.*, 961 F.2d 1464 (9th Cir. 1992) ..................................................2

*HERE, Local 57 v. Sage Hosp. Res.*, 390 F.3d 206 (3d Cir. 2004) ................................................7

*HERE, Local 217 v. J.P. Morgan Hotel*, 996 F.2d 561 (2d Cir. 1993) ..........................................7

*Machinists v. Wisconsin Empl. Rel. Comm'n*, 427 US 132 (1976) ..............................................11

*Mastercard Int'l v. Nader 2000 Primary Committee*, 2004 WL 434404
(S.D.N.Y. Mar. 8, 2004) ......................................................................................16, 18

*Mattel, Inc. v. MCA Records*, 296 F.3d 894 (9th Cir. 2002)........................................................19

*Metropolitan Opera Ass'n v. Local 100, HERE*, 239 F.3d 172 (2d Cir. 2001)..........................1, 2

*NOW v. Scheidler*, 510 U.S. 249 (1994) ....................................................................................8

*Planned Parenthood v. Bucci*, 1997 WL 133313 (S.D.N.Y. Mar. 24, 1997),
  *aff'd mem.,* 152 F.3d 920 (2d Cir. 1998)...............................................................................13

*San Diego Bldg. Trades Council v. Garmon*, 359 U.S. 236 (1959)..........................................11

*Savin Corp. v. Savin Group*, 391 F.3d 439 (2d Cir. 2004) .........................................................18

*Scheidler v. NOW, Inc.*, 537 U.S. 393 (2003).....................................................................6, 8, 12

*Smithfield Foods v. UFCW*, 2008 WL 2233979 (E.D. Va. May 30, 2008) ...............................5, 6

*Sodexho v. HERE Local 217*, 989 F. Supp. 169 (D. Conn. 1997) ..............................................13

*Sunlight Saunas, Inc. v. Sundance Sauna, Inc.*, 427 F. Supp. 2d 1032 (D. Kan. 2006) ..........18, 20

*Teamsters Union v. Morton*, 377 U.S. 252 (1964)....................................................................11

*United States v. Clemente*, 640 F.2d 1069 (2d Cir. 1981) .........................................................3, 4

*United States v. Enmons*, 410 U.S. 396 (1973).......................................................................3, 10

*United States v. Gotti*, 459 F.3d 296 (2d Cir. 2006) ..................................................................6, 7

*United States v. Hutson*, 843 F.2d 1232 (4th Cir. 1988).............................................................10

*United States v. Jacobs*, 543 F.2d 18 (7th Cir. 1976) ...................................................................5

*United States v. Mulder*, 273 F.3d 91 (2d Cir. 2001)...................................................................3

*United States v. Quinn*, 514 F.2d 1250 (5th Cir. 1975) ...............................................................10

*United States v. Robilotto*, 828 F.2d 940 (2d Cir. 1987) ..............................................................3

*United States v. Slavin*, 1990 WL 71479 (S.D.N.Y. May 23, 1990) ............................................10

*United States v. Tropiano*, 418 F.2d 1069 (2d Cir 1969) ..............................................................7

*United States v. Virgil*, 523 F.3d 1258 (10th Cir. 2008)................................................................8

*United States v. Zappola*, 677 F.2d 264 (2d Cir. 1982) ................................................................3

iv

*United We Stand America, Inc. v. United We Stand America, N.Y. Inc.*,
128 F.3d 86 (2d Cir. 1996)........................................................................16, 17

*Utah Lighthouse Ministry v. Foundation for Apologetic Information*,
527 F.3d 1045 (10th Cir. 2008) .................................................................14, 15

*Viacom International v. Icahn*, 747 F. Supp. 205 (S.D.N.Y. 1990) ...............................4

*WHS Entm't Ventures v. United Paperworkers Int'l Union*,
997 F. Supp. 946 (M.D. Tenn. 1998) ..................................................................13

## STATUTES

15 U.S.C. § 1125(c)(3)(A)(ii) .........................................................................19

**ARGUMENT**

**I.    CINTAS HAS FAILED TO STATE A RICO CLAIM.**

Cintas' RICO claims rest on the proposition of law that Defendants are committing the RICO predicate act of Hobbs Act "attempted extortion"—as well as the RICO predicate acts of Travel Act "attempted extortion" and Ohio law "attempted extortion"—by engaging in a negative publicity and boycott campaign—comprised of disparaging commentary on Cintas and peaceful persuasion of independent third parties not to deal with Cintas—that puts pressure on Cintas, through fear of economic loss, to enter into a lawful card check and neutrality agreement with Defendants UNITE HERE and the Teamsters.  *See* Memorandum of Law in Support of All Defendants' Joint Rule 12(b)(6) Motion to Dismiss ("Def. Mem.") at 2-5.

We showed in our Motion to Dismiss that these cognate RICO extortion claims alleging the use of non-violent economic pressure to achieve a lawful objective fail under the controlling Supreme Court and Second Circuit case law.  Cintas responds in its opposition brief by:  (i) misstating what an employer/union card check and neutrality agreement is; and (ii) arguing, on the basis of that misstatement, that "denial" of our Motion to Dismiss is "compel[led]" by several "directly on-point union-related extortion cases."  *See* Plaintiffs' Memorandum in Opposition to Defendants' Joint Rule 12(b)(6) Motion to Dismiss ("Pl. Opp.") at 4.

Specifically, Cintas contends in its brief that the employer/union agreement its Complaint states is the objective of Defendants' campaign—a card check and neutrality agreement—is tantamount *either* to "a collective bargaining agreement" setting the terms and conditions of employment of the employer's employees, Pl. Opp. at 1, *or* to an agreement "to recognize a union that lacks any indicia of majority support by [the employer's] employees," *id.* at 2.  That contention is belied by the Second Circuit's decision in *Metropolitan Opera Ass'n v. Local 100,*

- 2 -

*HERE*, 239 F.3d 172 (2d Cir. 2001), which recognizes and succinctly describes what a card check and neutrality agreement is:  in the *Metropolitan Opera* court's words, an agreement under which the employer agrees to a "process"

> [that] permits a Union seeking to organize [the employer's] workers to bypass the traditional NLRB election process, and instead to collect cards from individual workers voting in favor of unionization.  When [and if] a majority of the workers has checked its cards, the Union can represent the workers.  During this process the employer promises to remain neutral by not hiring "union busters" or speaking against the Union.  [*Id.* at 174.][1]

Given that a card check and neutrality agreement is a lawful agreement that establishes a "process" for determining whether the employer's employees choose to unionize, *see* Def. Mem. at 4-5—and *not* an unlawful "collective bargaining agreement" with a non-majority union or an unlawful agreement "to recognize a union that lacks any indicia of majority [employee] support"—Cintas' so-called "union-related extortion cases" are *not* "directly on-point" at all.  As we elaborate below, *none* of those cases involved—much less decided—a claim that a union negative publicity and boycott campaign that puts economic pressure on an employer to enter into a lawful card check and neutrality agreement (or some other type of lawful agreement) is "extortionate."  Indeed, there is *no* "extortion case" arising in *any* context, union or otherwise, that supports Cintas' legal theory here that the use of non-violent economic pressure to achieve a lawful objective is "extortionate."  Rather, as we have shown, and as we also elaborate below, that legal theory fails under the controlling Supreme Court and Second Circuit case law.

---

[1] *See also e.g. HERE, Local 2 v. Marriott Corp.*, 961 F.2d 1464, 1466 n.1 (9th Cir. 1992) ("In a card check procedure, . . . [i]f a majority of the employees sign and return the cards, the union becomes the employees' exclusive bargaining representative."); Cintas Complaint, Exhibit 9, at 24 (card check and neutrality agreement between UNITE HERE and Angelica Corporation providing that Angelica will *not* recognize UNITE HERE as the employees' representative if the union "does not secure majority status by the end of the Organizing Campaign Period").

- 3 -

**A.    Cintas' Hobbs Act Claim Does Not Meet The Act's "Wrongfulness" Requirement Or Its Separate "Obtaining" Requirement.**

1.    The "Wrongfulness" Requirement.  Cintas contends that there is no merit in our argument—which, according to Cintas, rests "upon a broad and sweeping application of" *United States v. Enmons*, 410 U.S. 396 (1973), *see* Pl. Opp. at 7—that a negative publicity and boycott campaign that puts economic pressure on an employer to enter into a lawful card check and neutrality agreement is not "wrongful"—and thus not extortionate—under the Hobbs Act. The fatal flaw in Cintas' contention is that our "wrongfulness" argument does not rest on a "broad and sweeping application" of *Enmons* and its so-called "labor exception" to the law of extortion, but on a straightforward application of the directly-on-point line of extortion law authority stemming from *United States v. Clemente*, 640 F.2d 1069 (2d Cir. 1981).

*Enmons* involved the use of *force* to achieve the lawful union collective bargaining objective of higher wages for the employer's unionized employees.  The *Enmons* Court held that the use of force to achieve such a lawful collective bargaining objective was not "wrongful"—and thus not extortionate—under the Hobbs Act.  This holding carved out what the Second Circuit has called "a labor exception to the traditional law of extortion codified in the Hobbs Act" under which the Act "does not apply to the use of force to achieve legitimate labor ends." *United States v. Robilotto*, 828 F.2d 940, 945 (2d Cir. 1987) (internal quotations omitted).[2]

As we noted in Def. Mem. at 6 n.3, some courts—including the court in *A. Terzi Productions v. Theatrical Protective Union*, 2 F. Supp. 2d 485 (S.D.N.Y. 1998)—have chafed at applying the *Enmons*' "labor exception" in cases where the defendant has used *force* to achieve a legitimate labor objective other than a lawful collective bargaining agreement.  But as we were

_____

[2] *See also United States v. Mulder*, 273 F.3d 91, 104 (2d Cir. 2001); *United States v. Zappola*, 677 F.2d 264, 269 (2d Cir. 1982).

- 4 -

quick to add, there is no reason for this Court, in resolving the instant Motion to Dismiss, to

consider and decide the full scope of application of the *Enmons*' "labor exception."

That is so because this case does *not* involve any allegation that *force* is being used to

achieve a legitimate labor objective, but rather the allegation that *fear of economic loss* is being

used to achieve a legitimate labor objective; and because *Clemente* and its progeny establish a

principle of extortion law that applies uniformly to *all* fear of economic loss cases without regard

to whether the case is a labor case or a non-labor case.

That principle of extortion law is that it is not "wrongful" under the Hobbs Act—and thus

not Hobbs Act "extortion"—for party "X" to use *fear of economic loss* to induce party "Y" to

agree to a demand that is lawful or legitimate in the sense that "Y" has no "pre-existing statutory

right to be free from [X's] demand." *George Lussier Enters., Inc. v. Subaru of New Eng., Inc.*,

393 F.3d 36, 50 (1st Cir. 2004). (Contrary to Cintas' suggestion, Pl. Opp. at 6, the union's

bargaining demand in *Enmons* for higher wages was "legitimate," not because the union

employees had some legal *entitlement* to higher wages, but because obtaining higher wages for

the employees was a legitimate union "*objective*[]," 410 U.S. 400 (emphasis added).)

As *Clemente* holds, the "wrongfulness" requirement of Hobbs Act extortion is satisfied

only when fear of economic loss is used "to achieve a *wrongful* purpose," and *not* when fear of

economic loss is used "'to obtain *legitimate* economic ends.'" 640 F.2d at 1077 (emphasis

added) (quoting the trial court's jury instruction with approval). Both the Third Circuit's

decision in *Brokerage Concepts, Inc. v. U.S. Healthcare, Inc.*, 140 F.3d 494, 524 (3d Cir. 1998)

expressly "adopt[ing]" the *Clemente* court's holding—and Judge Patterson's decision in *Viacom

International v. Icahn*, 747 F. Supp. 205, 210-14 (S.D.N.Y. 1990) applying *Clemente—*are to the

same effect. *See* Def. Mem. at 8.

For its part, Cintas does not even cite *Clemente*, *Brokerage Concepts* or *Viacom International* in its discussion of the "wrongfulness" requirement—or anywhere in its brief for that matter—much less make any effort to show that our reliance on these cases is misplaced.

Of equal moment, the "union-related extortion cases," Pl. Opp. at 4, that Cintas does cite are not "on-point" at all.  In *Terzi, supra*; *Asbestos & Lead Removal Corp. v. Severino*, 2007 WL 925485 (E.D.N.Y. Mar. 23, 2007); and *United States v. Jacobs*, 543 F.2d 18 (7th Cir. 1976), the Hobbs Act extortion claims rested on the allegation that the defendants used *force* to achieve a "union-related" objective.  None of these cases has anything to say about whether Cintas' Hobbs Act extortion claim—which rests on the allegation that Defendants are using *fear of economic loss* to achieve a "union-related" objective—meets the Act's "wrongfulness" requirement.

*Terzi* and *Jacobs*, moreover, are readily distinguishable from this case on a second ground:  in both cases, the Hobbs Act extortion claims rested on the allegation that the defendant's "union-related" objectives were *unlawful.*  Cintas' own lengthy block quote from *Terzi, see* Pl. Opp. at 9, and its own description of *Jacobs, see id.* at 10, make this point explicitly.  Here, as we have shown, the alleged objective of Defendants' "Cintas" campaign—an employer/union card check and neutrality agreement—is *an entirely lawful* objective under controlling Second Circuit authority (and like authority from other circuits).  Def. Mem. at 4-5.

Nor is the decision in *Smithfield Foods v. UFCW*, 2008 WL 2233979 (E.D. Va. May 30, 2008), "on-point" here.  Although *Smithfield* is a "use of fear of economic loss" case rather than a "use of force" case, the allegation there, as in *Terzi* and *Jacobs*, was that the defendants used fear of economic loss to achieve an *unlawful* objective—employer recognition of the defendant union absent demonstrated majority employee support for the union.  Given that allegation, the defendants in *Smithfield* did not argue in their motion to dismiss that the employer's RICO

- 6 -

Complaint failed to meet the "wrongfulness" requirement as explicated in the *Clemente* line of cases, and the court's ruling on that motion, on its face, does not address that issue.[3]

        2.  <u>The "Obtaining" Requirement</u>.  Cintas also seeks to press the *Smithfield* court's motion-to-dismiss ruling into service to defeat Defendants' argument that Cintas' allegations fail to satisfy the separate "obtaining" requirement of Hobbs Act extortion.  *See* Pl. Mem. at 12-13.  That effort is equally unavailing.

        To begin with, as just noted, the *Smithfield* ruling addresses the allegation that the defendant union was seeking *a recognition agreement* from the employer under which the union would attain *the status of a collective bargaining representative*, whereas the allegation in this case is that the defendant Unions are seeking *a card check and neutrality agreement* from Cintas under which the Unions would *not* attain that status unless and until—under the "process" established by the agreement—*the employees themselves* chose to confer that status on the Unions.  This is a fundamental distinction.  *See* Def. Mem. at 13-14.

        Moreover, the *Smithfield* court rested its ruling on the ground that an employer's right "not to recognize" a union qualifies as an "intangible property right" and that such rights as a class are "susceptible to extortion."  *See* 2008 WL 2233979, at **5-7.  The *Smithfield* court did not address, much less opine on, the ultimate "obtaining" requirement question of whether— under the standard established by the Supreme Court in *Scheidler v. NOW, Inc.*, 537 U.S. 393 (2003) and by the Second Circuit in *United States v. Gotti*, 459 F.3d 296 (2d Cir. 2006), *see* Def.

---

[3] Apart from *Food Lion v. UFCW*, the additional union cases cited by Cintas in a footnote, *see* Pl. Opp. at 5 n.1, were all "use of force" cases rather than "use of fear of economic loss" cases; they are thus not "on-point" here for the reasons stated in text.  And, *Food Lion v. UFCW* is not a precedent at all on any of the issues presented here—much less an "on-point" precedent— because there the employer pled various RICO predicate acts in addition to extortion, and the court denied the defendants' motion to dismiss in an oral ruling that did not specify which of those various RICO predicate acts the court deemed adequately pled and on what basis.  A copy of that oral ruling—to which Cintas' opposition brief supplies no reference—is attached hereto.

- 7 -

Mem. at 9-11—a union would *obtain* an employer's asserted property right "not to recognize" a union if the union were successful in inducing the employer to relinquish that right.[4]

Aside from its misplaced invocation of *Smithfield*, Cintas offers no response to our showing, in Def. Mem. at 11-14, that a straightforward application of the *Scheidler/Gotti* standard to Cintas' allegations compels the conclusion that those allegations do *not* meet the "obtaining" requirement of RICO extortion. Most notably, Cintas has nothing to say in response to our analysis of the Second Circuit's decision in *HERE, Local 217 v. J.P. Morgan Hotel,* 996 F.2d 561 (2d Cir. 1993), or our analysis of the decision in *HERE, Local 57 v. Sage Hosp. Res.*, 390 F.3d 206 (3d Cir. 2004)—both of which belie the notion that under a card check and neutrality agreement a union *obtains* any property from the employer, tangible or intangible.

Rather than confront our showing, Cintas resorts to irrelevancies. Cintas' point that *United States v. Tropiano*, 418 F.2d 1069 (2d Cir 1969) "expressly survived" *Scheidler*, Pl. Opp. at 13, is of no help to Cintas. We acknowledged in our opening brief that *Scheidler* did not overrule *Tropiano*'s "broad interpretation of the Hobbs Act's reference to 'property,'" *Gotti*, 459 F.3d at 323, and thus assumed *arguendo* that the employer rights affected by a card check and neutrality agreement qualify as "property." Def. Mem. at 10, 11. The problem for Cintas is that Defendants would not *obtain* any Cintas "property" if such an agreement were consummated.

Nor does Cintas advance its position by citing two post-*Scheidler* cases from outside this Circuit for the proposition that an allegation that a defendant is "pressur[ing]" a company "to

---

[4] Cintas asserts that the "holding" in *Jacobs*, *supra*, is in accord with the S*mithfield* ruling, Pl. Opp. at 15-16, but the "obtaining" requirement issue was not even raised in *Jacobs*, and *Jacobs* was a pre-*Scheidler* case in any event. The other cases cited by Cintas on the "obtaining" requirement issue all involved union efforts to secure *a collective bargaining agreement*. The defendants do not appear to have argued in these cases that the plaintiff failed to meet the "obtaining" requirement, which is unsurprising, because a collective bargaining agreement plainly affects a transfer of tangible property from the employer to the union members in the form of wages and benefits.

- 8 -

make [a] business decision[ ]" the company does not wish to make is sufficient, standing alone, to satisfy the "obtaining" requirement.[5]  To the extent that these cases do stand for that proposition—and the opinions are opaque in this regard—both are directly at odds with *Scheidler* and *Gotti*.  *See* Def. Mem. at 9-11.  Indeed, in *Scheidler*, what the defendant anti-abortion protestors sought to do—and to a large extent succeeded in doing—was "pressure" the plaintiff abortion clinics into "mak[ing] [a] business decision[ ]" the clinics did not wish to make (*i.e.*, the decision to stop performing abortions).  *Scheidler* holds in the plainest of terms that such conduct with that result does *not* meet the "obtaining" requirement.  537 U.S. at 404-06.

There likewise is no merit in Cintas last-ditch argument that *Scheidler* is distinguishable because the defendant anti-abortion protestors there were "seeking only some sort of moral victory" from changing the plaintiff abortion clinics' behavior, whereas Defendants here "have a direct financial stake in changing Cintas's behavior."  Pl. Opp. at 15.  In the first *Scheidler* case, the Supreme Court reversed a lower court ruling that the RICO extortion provision did not cover the anti-abortion protestors' conduct because their use of force was in pursuit of noneconomic objectives.  *See NOW v. Scheidler*, 510 U.S. 249 (1994).  Against that backdrop, Cintas' contention that the Supreme Court's subsequent decision in favor of the anti-abortion protestors on the RICO extortion issue rests on the point that the protestors were "seeking only some sort of moral victory" from changing the abortion clinics' behavior—rather than on the point that the protestors "did not acquire any [of the clinics'] property," 537 U.S. at 405—is disingenuous.

**B.    Cintas' Hobbs Act Claim Also Fails On Independent First Amendment And Federal Labor Law Grounds.**

1.    The First Amendment.  In Def. Mem. at 14-18, we showed that Defendants have *a First Amendment right* to conduct a negative publicity and boycott campaign—consisting

---

[5]  *See* Pl. Opp. at 14-15, citing *Dooley v. Crab Boat Owner's Ass'n*, 271 F. Supp. 2d 1207 (N.D. Cal. 2003) and *United States v. Virgil*, 523 F.3d 1258 (10th Cir. 2008).

- 9 -

of disparaging commentary on Cintas and peaceful persuasion of independent third parties not to deal with Cintas—that puts pressure on Cintas to change its labor relations practices.

In its response to that showing, Cintas makes, and then belabors, the point that its RICO claims are not based on any conduct "that could fairly fall within the scope of the [First Amendment's] Petition Clause." *Id.* at 18.  But that point is no response at all, for our contention is that Defendants' conduct that forms the basis for Cintas' RICO extortion claims is protected by the First Amendment's *Free Speech* Clause, and not by its Petition Clause.

The Second Circuit's *Metropolitan Opera* decision stands as controlling authority for our contention.  That is so because *Metropolitan Opera* holds that a union "campaign of public criticism" and associated "boycott" activities in aid of its effort to secure a card check and neutrality agreement is "constitutionally protected" under "settled First Amendment principles," although "the Union's [campaign] methods may be harassing, upsetting, or coercive."  *See* Def. Mem. at 15-16.  *Beverly Hills Foodland v. UFCW, Local 655*, 39 F.3d 191, 197 (8th Cir. 1994)—holding that "the prime directive in the Union [organizing] campaign, a boycott of [the target employer], is . . . constitutionally safeguarded," as is the accompanying "activity of peaceful pamphleteering"—is in accord with *Metropolitan Opera*.  *See* Def. Mem. at 16.

Cintas seeks to avoid the controlling force of *Metropolitan Opera* (Cintas ignores *Beverly Hills Foodland* entirely) by urging that, "[c]ontrary to Defendants' assertion," the court in that case "did not determine that labor unions have a First Amendment right to engage in any and all corporate campaign activities with impunity."  Pl. Opp. at 20.  But that is not "Defendants' assertion" at all.  To the contrary, as we acknowledged in Def. Mem. at 21, Cintas has a tort remedy to the extent, if any, that Defendants defamed Cintas or engaged in other wrongful conduct in the course of their negative publicity and boycott campaign.  We went on to show,

- 10 -

however, that under the Supreme Court's seminal decision in *Eastern Railroad Presidents Conference v. Noerr Motor Freight*, 365 U.S. 127, 140-41 (1961), the fact that a defendant may have engaged in certain "decept[ive]" or "unethical" practices during the course of a constitutionally protected "publicity campaign" cannot somehow transmute that campaign *taken as a whole* into an unlawful campaign—much less into an "extortionate" campaign violative of the Hobbs Act and RICO. Tellingly, Cintas offers no response to that showing.

Finally, contrary to Cintas' assertion, neither *United States v. Quinn*, 514 F.2d 1250 (5th Cir. 1975), nor *FTC v. Superior Court Trial Lawyers*, 493 U.S. 411 (1990), defeats our First Amendment argument. Cintas cites *Quinn* for the truism that "extortionate speech is *not* protected by the First Amendment," Pl. Opp. at 17 (emphasis in original), but *Quinn* is far afield. The extortion conviction there was upheld on the ground that the defendant picketed or threatened to picket certain businesses to further an unlawful objective (personal payoffs). That unexceptional ruling provides no basis for extending the law of extortion to the conduct here, consisting of pure speech directed at independent third parties to further a lawful objective (an employer/union card check and neutrality agreement).[6] *Superior Court Trial Lawyers*, cited in Pl. Opp. at 22, is even further removed. The "boycott" there consisted of a "classic" unlawful "restraint of trade" among attorneys "in competition with one another," 493 U.S. at 422, whereas the "boycott" alleged here consists of peaceful pure speech efforts to persuade independent third parties to exercise their lawful right not to deal with Cintas.

---

[6] The other cases cited by Cintas for this proposition likewise deal with verbal acts for an unlawful objective. *See United States v. Hutson*, 843 F.2d 1232 (4th Cir. 1988) (threat of exposure to exact personal payoff); *United States v. Slavin*, 1990 WL 71479 (S.D.N.Y. May 23, 1990) (threat of force to exact personal payoff). *See also generally Enmons*, 410 U.S. at 400 (contrasting the unlawful objective of obtaining "personal payoffs" with the lawful objective of obtaining higher wages in return for genuine services).

- 11 -

2.  <u>The Federal Labor Laws</u>.  Cintas' one-paragraph response to the federal labor law argument set out in Def. Mem. at 18-20 is a classic strawman.  It is *not* our argument that Cintas' RICO claims are precluded "'on *Garmon*[7] preemption grounds'" because they "arise in the context of a labor dispute and involve allegations of *unfair labor practices*."  Pl. Opp. at 23 (citing *Terzi*, 2 F. Supp. 2d at 507) (emphasis added).  Rather, our argument is that Cintas' RICO claims are precluded on the rationale of *Teamsters Union v. Morton*, 377 U.S. 252 (1964) and *Machinists v. Wisconsin Empl. Rel. Comm'n*, 427 U.S. 132 (1976), because those claims arise in the context of a labor dispute and involve allegations of conduct—derogatory speech about the primary employer in the labor dispute and peaceful pure speech persuasion of independent third parties not to deal with that employer—"which Congress focused upon *but did not proscribe* when it enacted" the federal labor laws.  *Morton*, 377 U.S. at 259-60 (emphasis added).  Thus, once again, Cintas makes only an empty show of responding to our argument.

**C.    Cintas' Travel Act and "State Law Extortion" Allegations Cannot Salvage Its Rico Claims.**

In Def. Mem. at 22-23, we showed that Cintas' failure adequately to allege the essential requirements of the RICO predicate act of Hobbs Act "attempted extortion"—the "wrongfulness" requirement and the "obtaining" requirement—compels the conclusion that Cintas has failed adequately to allege the essential requirements of the RICO predicate acts of Travel Act "attempted extortion" and Ohio law "attempted extortion."

Contrary to Cintas' response, Defendants do not "seek to dismiss these [additional] predicate acts on the sole ground that they do not 'meet the Hobbs Act's "wrongfulness" requirement,'" Pl. Opp. at 23-24 (quoting Def. Mem. at 23), as opposed to the broader ground that they do not meet *both* the Hobbs Act "wrongfulness" requirement *and* the Hobbs Act

---

[7] *San Diego Bldg. Trades Council v. Garmon*, 359 U.S. 236 (1959).

- 12 -

"obtaining" requirement.  We did in our opening brief, *see* Def. Mem. at 22-23, and we do in this reply brief, seek dismissal of these additional predicate acts on this broader ground.

Cintas does nothing in its brief to negate our argument for dismissal on this broader ground.  That is unsurprising, because our argument rests on *Scheidler* and its holding that in determining whether a RICO plaintiff has adequately alleged the RICO predicate acts of Travel Act "attempted extortion" and state law "attempted extortion," a court is to apply the following "generic" definition of extortion:  "*obtaining* something of value from another with his consent induced by the *wrongful* use of force, fear, or threats."  537 U.S. at 410 (emphasis added).  Given that this "generic" definition imposes the same "obtaining" and "wrongfulness" requirements as the Hobbs Act, our showing that Cintas has failed adequately to allege *both* of these essential requirements of the RICO predicate act of Hobbs Act "attempted extortion" is, at the same time, a showing that Cintas has failed adequately to allege *both* of these essential requirements of the RICO predicate acts of Travel Act "attempted extortion" and state law "attempted extortion."

## II.    CINTAS HAS FAILED TO STATE A LANHAM ACT CLAIM.

### A.    Counts 6, 7 and 8 Do Not Satisfy the "Commercial Use" Requirement

1.    Cintas concedes, as it must, that its *§ 1125* trademark dilution and unfair competition claims (Counts 7 and 8, respectively) are subject to a "commercial use" requirement.  Pl. Opp. at 25-26.  That concession is fatal to these § 1125 claims at the outset.

The case law is abundantly clear that the "commercial use" requirement is *not* satisfied by Cintas' allegation that UNITE HERE is using Cintas' mark to criticize and disparage Cintas and thereby put pressure on Cintas in a labor dispute between the parties.  *See* Def. Mem. at 24-32.  That case law includes three Rule 12(b)(6) cases dismissing Lanham Act claims resting on

allegations of the very same kind.[8]  In a footnote, Cintas tries to slough off the adverse rulings in these three cases on the ground that, in contrast to this case, none included a trademark infringement claim based on § 1114—which, according to Cintas, does not contain a "commercial use" requirement.  *See* Pl. Opp. at 32 n.4.  Cintas could not be more wrong about § 1114, as we show *infra* at pp. 16-18.  For present purposes, however, it suffices to note that these three cases stand as square authority against Cintas' *§ 1125* claims.

Cintas makes three "commercial use" counterarguments, none of which is availing.  First, Cintas cites *Planned Parenthood v. Bucci*, 1997 WL 133313, *6 (S.D.N.Y. Mar. 24, 1997), *aff'd mem.,* 152 F.3d 920 (2d Cir. 1998), for the proposition that "[t]he mere fact that defendant seeks to criticize plaintiff does not automatically immunize a [commercial] use that is otherwise prohibited by the Lanham Act."  Pl. Opp. at 26.  We do not dispute this proposition, which is unremarkable on its face.  But as we noted in Def. Mem. at 32 n.5, the *holding* in *Planned Parenthood*—as contrasted with a *dictum* that Cintas zealously embraces, *see infra* pp. 14-15—is that the defendant *did* engage in an "otherwise prohibited" commercial use of the plaintiff's mark (*i.e.,* use of the mark to "plug" the sale of a book).  Thus, in its holding, *Planned Parenthood* is entirely consistent with the case law set out in our opening brief showing that Cintas' allegations here fail to meet the "commercial use" requirement.

Second, Cintas cites three cases finding the requisite "commercial use" based on the fact that the website incorporating the plaintiff's mark—which the defendant was using solely for the *noncommercial* purpose of criticizing the plaintiff—contained a "hyperlink" to another site being used for commercial purposes.  *See* Pl. Opp. at 26-27.  The problem for Cintas is that in each of

---

[8] *See Sodexho v. HERE Local 217,* 989 F. Supp. 169 (D. Conn. 1997); *WHS Entm't Ventures v. United Paperworkers Int'l Union*, 997 F. Supp. 946 (M.D. Tenn. 1998); *Cellco P'ship v. Communications Workers of Am.*, 2003 U.S. Dist. LEXIS 26823 (D.N.J. Dec. 11, 2003).

- 14 -

these cases the "hyperlink" between the defendant's noncommercial website and the commercial

site was—as the Tenth Circuit put it in *Utah Lighthouse Ministry v. Foundation for Apologetic*

*Information*, 527 F.3d 1045 (10th Cir. 2008)—a "*direct* link[]." *See id.* at 1052 (emphasis

added) (internal quotations omitted).  As the *Utah Lighthouse* court went on to explain, relying

on *Bosley Medical Institute, Inc. v. Kremer*, 403 F.3d 672 (9th Cir. 2005), a "'roundabout path'"

from a noncommercial website to another site that is itself "overwhelmingly noncommercial in

nature" to a third site being used for commercial purposes "is simply 'too attenuated'" to permit

the conclusion that the defendant is making a commercial use of the plaintiff's mark.  527 F.3d at

1053 (quoting *Bosley Medical,* 403 F.3d at 679).  Cintas does not allege any "*direct* link"

between UNITE HERE's noncommercial CintasExposed.com website and any other site being

operated by UNITE HERE for commercial purposes.  Rather, Cintas' allegation is that

CintasExposed.com links to the homepage of UNITE HERE's main website—which Cintas itself

states "primarily consists of inflammatory union rhetoric"—and that homepage, in turn, contains

dozens of hyperlinks, two of which entail commercial uses.  *See* Def. Mem. at 30.  Cintas'

"hyperlink" argument is thus "too attenuated" to support a § 1125 claim.

Finally, as it did in its pre-motion letter, Cintas invokes *dictum* in *Planned Parenthood*—

picked up in two other cases cited by Cintas—for the proposition that use of a mark "to harm [a

company] commercially by disparaging and criticizing the company and its business practices"

constitutes a "commercial use" proscribed by the Lanham Act.  *See* Pl. Opp. at 27-28.  It would

be enough for us to say, as we did in Def. Mem. at 31-32, that this proposition cannot be squared

with the case law construing the Lanham Act and with the Act's well-documented history.  As

the Tenth Circuit explained in *Utah Lighthouse Ministry*, acceptance of that proposition would

ignore "the purpose of the Lanham Act to protect the ability of consumers to distinguish among

competing producers" and would "place most critical, otherwise protected consumer commentary under the restrictions of the Lanham Act."  527 F.3d at 1053 (internal quotations omitted).  Given Cintas' persistence, however, two additional points are in order.

First, in pressing its argument along these lines, Cintas ignores *Fur Information & Fashion Council, Inc. v. E.F. Timme & Son, Inc.*, 501 F.2d 1048 (2d Cir. 1974), cited in Def. Mem. at 27, where the Second Circuit interpreted the unfair competition provision in the original 1946 Lanham Act to "apply only to misrepresentations relating to the inherent qualities of defendant's own goods [or services]," and hence *not* to apply to misrepresentations that disparage another person's goods or services.  *Id.* at 1051.  *Fur Information* is directly on-point here.  As explained in Def. Mem. at 27-29, in amending the Lanham Act in 1988 to authorize the new "false . . . advertising" cause of action that now appears in subparagraph (B) of § 1125(a)(1), Congress intended to carry forward the original unfair competition cause of action without substantive change in subparagraph (A) of § 1125(a)(1).  And, Cintas concedes in its brief that its unfair competition claim rests solely on subparagraph (A).  *See* Pl. Opp. at 32 n.4.

Second, if the Lanham Act were construed in the manner urged by Cintas, it would infringe on Defendants' "*First Amendment* right" to "comment[ ] on its employer adversary through using the latter's [mark] during a labor dispute."  *Cellco*, *supra*, 2003 U.S. Dist. LEXIS, 26823 at * 24 n.6 (emphasis in original).  That being so, as the court in *Cellco* held, the doctrine of constitutional avoidance provides a further ground for rejecting Cintas' construction.  *See id.* at ** 24-25; *see also Gmurzynska v. Hutton*, 355 F.3d 206, 211 (2d Cir. 2004) ("As always with the public expression of opinion, we have been careful not to permit overextension of the Lanham Act to intrude on First Amendment values.") (internal quotations omitted).

2.   In an effort to salvage its trademark infringement claim under *§ 1114* of the Lanham Act (Count 6), Cintas goes on to argue that—whatever may be the case with respect to § 1125 claims—§ 1114 claims are *not* subject to a "commercial use" requirement in any event. Pl. Opp. at 28-32.  Cintas is badly mistaken.

In advancing this argument, Cintas acknowledges in a footnote the Ninth Circuit's decision in *Bosley Medical* squarely holding that § 1114 claims *are* subject to a "commercial use" requirement—without making any effort to refute the Ninth Circuit's reasoning or to deal with the trademark law history supporting that reasoning.  *See* Pl. Opp. at 29 n.3.  Instead, Cintas' footnote chides us for "spill[ing] considerable ink" on this subject in Def. Mem. at 24-29, asserting that our ink has been wasted because "courts in the Second Circuit have rejected" the proposition that a "commercial use" requirement "is encompassed within Section 1114(a)'s 'in connection with the sale . . . of goods and services' clause."  In support Cintas' footnote cites two cases in this order:  *Mastercard Int'l v. Nader 2000 Primary Committee*, 2004 WL 434404 (S.D.N.Y. Mar. 8, 2004); and *United We Stand America, Inc. v. United We Stand America, N.Y. Inc.*, 128 F.3d 86 (2d Cir. 1996).  But neither case supports Cintas' assertion.

We take the Second Circuit's decision in *United We Stand* first for obvious reasons.  The plaintiff there was a political party operating under the registered trademark "United We Stand America," and the defendant was a breakaway organization engaging in the same political activity under the same name.  The defendant argued that nonprofit organizations do not provide "services" within the meaning of § 1114(1)(a), and that use of its rival's trademark to identify itself was therefore outside § 1114's reach.  The Second Circuit rejected this argument, holding that nonprofit organizations *do* provide "services" within the meaning of § 1114(1)(a).

That holding has no application here, because UNITE HERE does not argue that

§ 1114 applies only to for-profit enterprises; and, indeed, has disavowed any such argument.  *See*

Def. Mem. at 30 n.4.  UNITE HERE's argument is that the use of a mark to express criticism of,

rather than to compete with, the mark owner is not a use "in connection with the sale, . . .

distribution, or advertising of any goods or services" under § 1114(1)(a)—without regard to

whether that criticism comes from a for-profit enterprise or a non-profit organization.  The

*United We Stand* court, far from "reject[ing]" that argument, *see* Pl. Opp. at 29 n.3, took care to

explain that, under its interpretation of § 1114(1)(a), a party that uses an organization's

trademarked logo to disseminate a negative message about that organization has "a perfect right

to disseminate that message notwithstanding use of the [organization's] logo in doing so."  128

F.3d at 92 n.3.  And, the court was quick to add that such an *expressive* use of a trademark "is

fundamentally different from" the situation in *United We Stand* itself, where the defendant

nonprofit organization was using its rival's trademark to offer *competing services*.  *Id.*

It is unsurprising, therefore, that the Ninth Circuit in *Bosley Medical* found that *United*

*We Stand*, while sound on its own terms, is inapposite in cases where, as in *Bosley Medical* and

here, "[the defendant] is not [the plaintiff's] competitor; he is their critic."  403 F.3d at 679.

And, it is equally unsurprising that in *Christopher D. Smithers Foundation v. St. Lukes-Roosevelt*

*Hospital Center*, 2001 WL 761076 (S.D.N.Y. July 6, 2001) (Pauley, J.), cited in Def. Mem. at 30

n.4, this Court read *United We Stand* to stand only for the proposition that "non-profit entities

may sue *competitors* for trademark infringement."  *Id.* at *4 (emphasis added).  Tellingly, Cintas

ignores *Smithers Foundation* altogether.[9]

---

[9] In another footnote, Cintas asserts that in *Cellco*, *supra*, the court "specifically rejected the
approach taken in *United We Stand*."  Pl. Opp. at 32 n.4.  That assertion is false.  Far from
"reject[ing]" any aspect of *United We Stand*, the *Cellco* court expressly stated that *United We*
*Stand* was "distinguishable" on the ground that the defendant there did not use the plaintiff's
trademark "as a commentary on its owner."  2003 U.S. Dist. LEXIS 26823, at * 16.

Cintas' reliance on *Mastercard* fails for a different reason. There, the plaintiff did not even assert a § 1114 claim, and the *Mastercard* court rejected each Lanham Act claim the plaintiff did assert. In so doing, the court stated in *dictum*, and without engaging in any analysis, that § 1114(1)(a) "does not have a commercial activity requirement." 2004 WL 434404, at * 8. This *ipse dixit* cannot stand up to the Ninth Circuit's well-reasoned and well-supported *Bosley Medical* decision holding that § 1114(1)(a) *does* "have a commercial activity requirement."

### B.    Counts 6 and 8 Fail to Allege the Requisite Likelihood of Confusion

A further requirement for § 1114 infringement claims and § 1125 unfair competition claims is that defendant's use of the mark creates a "likelihood of confusion" as to the source or sponsorship of defendant's goods or services. To borrow Cintas' phrase, Cintas "spill[s] considerable ink" on this issue in its brief, but in the end concedes that its position is "based upon the idea" that "Defendants are improperly creating 'initial interest confusion' among Internet users." Pl. Opp. at 34. That concession is fatal to Cintas, because as *Savin Corp. v. Savin Group*, 391 F.3d 439 (2d Cir. 2004) holds, "Internet initial interest confusion requires a showing of *intentional* deception," *id.* at 462 n.13 (emphasis added), and Cintas' own allegations belie even the possibility of any "*intentional* deception" here. *See* Def. Mem. at 33-35.

Cintas' own allegation that UNITE HERE gave its website the title CintasExposed.com is dispositive on this point, we submit, because the choice of the word "Exposed," standing alone, negates any reasonable inference that UNITE HERE was intending to deceive the public into believing that Cintas itself was the source or sponsor of the CintasExposed.com site. *Sunlight Saunas, Inc. v. Sundance Sauna, Inc.*, 427 F. Supp. 2d 1032 (D. Kan. 2006), cited by Cintas in Pl. Opp. at 33, is not to the contrary. While that case holds that use of the word "Exposed" in a web domain address does not "necessarily" negate a finding of *actual* deception or confusion, *id.* at 1065, it does not address the issue of "*intentional* deception" presented here.

- 19 -

Indeed, Cintas' claim of "*intentional* deception" borders on the frivolous given that, *in addition* to naming its website CintasExposed.com, UNITE HERE "metatagged" the web domain address so as clearly to identify "the labor union UNITE" as the site sponsor.  Def. Mem. at 33-34.  Cintas' retort—that whether any individual search engine displays the "metatag" at any particular time is subject to "the whim of the search engine operator," Pl. Opp. at 36 —is baseless.  Needless to say, it is the *defendant's* intent that determines whether "*intentional* deception" has occurred, not the "whim[sical]" decisions of individual search engine operators.

### C.    Count 7 Fails Adequately To Allege "Dilution"

We showed in Def. Mem. at 35-36 that "dilution" occurs only in situation "X" where a person uses a company's trade name to market a good or service different from the goods or services the company is associated with, and *not* in situation "Y" where, *as here*, a person criticizes a company's goods or services using the company's trade name to identify the object of that criticism.[10]  Cintas' response—that courts in situation "X" treat the "dilution" issue as a factual issue unsuitable for resolution on a motion to dismiss, Pl. Opp. at 37-39, is no response at all, because our showing is that the very concept of "dilution" has no application in our situation "Y."  And, lest there be any doubt that our showing is correct, we note that Congress, as part of a 2006 overhaul of § 1125's anti-dilution provision, clarified that "[t]he following shall not be actionable as dilution … under this subsection:  (A) Any fair use … of a famous mark by another person other than as a designation of source for the person's own goods or services, including use in connection with—…(ii) … *criticizing*, or commenting upon the famous mark owner or the goods or services of the famous mark owner."  15 U.S.C. § 1125(c)(3)(A)(ii) (emphasis added).

---

[10] Thus, for example, while it *is* "dilution by tarnishment" to create a chain of "Netscape sex shops" that creates an association between Netscape and a disreputable service, *see Mattel, Inc. v. MCA Records*, 296 F.3d 894, 903 (9th Cir. 2002), it would *not* be "dilution by tarnishment" to criticize, even harshly or unfairly, the quality of Netscape's internet browsers.

### D.    Count 9 Fails to Allege Actionable "Cybersquatting"

Following a pattern that runs throughout its brief, Cintas only makes a feint at responding to our showing that its Complaint fails adequately to allege two separate requirements of an Anticybersquatting Consumer Protection Act (ACPA) claim.  With regard to the ACPA "confusing similarity" requirement, Cintas cites *Sunlight Saunas*, *supra*, 427 F. Supp. 2d at 1064, for the proposition that adding the word "exposed" to a company's trade name on a web domain address does not necessarily preclude a finding of "confusing similarity," Pl. Opp. at 39-40, but ignores our showing that *additional* factors *do* preclude such a finding here, *see* Def. Mem. at 37. And, with regard to the ACPA "bad faith intent to profit" requirement, Cintas ignores our showing that the words "intent to profit" in that statutory phrase have a precise meaning under the ACPA and that Cintas has failed adequately to allege such an "intent to profit."  *See id.* at 37-38.  Instead, Cintas proceeds as if the ACPA requires a showing of "bad faith" in the abstract, untethered to any "intent to profit" requirement.  *See* Pl. Opp. at 40 ("Cintas has sufficiently pleaded that Defendants acted in bad faith.").  The ACPA plainly does not read that way.  And even if it did, we would add, it is not "bad faith" for a union to criticize a company in the context of a labor dispute, but rather the exercise of a "*First Amendment* right."  *Supra* p. 15.

### CONCLUSION

Defendants' Motion to Dismiss should be granted.

Respectfully submitted,

/s/ Irwin Rochman                          /s/ Robert M. Weinberg
Irwin Rochman (SDNY Bar No. SS7573)    Robert M. Weinberg *(pro hac vice)*
Tesser, Ryan & Rochman, LLP            Andrew D. Roth *(pro hac vice)*
509 Madison Avenue                     Leon Dayan *(pro hac vice)*
New York, New York  10022              Bredhoff & Kaiser, PLLC
Phone:  (212) 754-9000                 805 Fifteenth Street, N.W., Suite 1000
Fax:  (212) 754-5906                   Washington, DC  20005
                                       Phone:  (202) 842-2600
                                       Fax:  (202) 842-1888

Attorney for Defendants UNITE HERE, Bruce Raynor, Ahmer Qadeer, Keith Mestrich, Elizabeth Gres, Peter DeMay, Katie Unger and Stefan Antonowitz

Attorneys for Defendants International Brotherhood of Teamsters and Change to Win

# Attachment

## (Excerpt of Food Lion Oral Ruling)

Page 1

```
 1              IN THE DISTRICT COURT OF THE UNITED STATES
                     DISTRICT OF SOUTH CAROLINA
 2                      CHARLESTON DIVISION
 3
 4  FOOD LION, INC.,              *           2:96-CV-0687
                                  *
 5              Plaintiff         *            Charleston,
                                  *           South Carolina
 6                                *         September 10, 2003
    VS                            *             2:30 p.m.
 7                                *
    UNITED FOOD AND COMMERCIAL,   *
 8  WORKERS, INTERNATIONAL AFL-CIO *
    et al.,                       *
 9              Defendant         *
                                  *
10  ********************************
11                 TRANSCRIPT OF MOTION HEARING
              BEFORE THE HONORABLE C. WESTON HOUCK,
12                UNITED STATES DISTRICT JUDGE
13  APPEARANCES:
14  For the Plaintiff:       McNair Law Firm
                             BY:  JANE W. TRINKLEY, ESQ.
15                           P.O. Box 11390
                             Columbia, South Carolina 29211
16
                             Akin, Gump, Strauss, Hauer and
17                           Feld
                             BY:  RICHARD L. WYATT, JR., ESQ.
18                                MICHAEL JOHN MUELLER, ESQ.
                                  LARRY E. TANENBAUM, ESQ.
19                           1333 New Hampshire Avenue, NW
                             Suite 400
20                           Washington, D.C. 20036-1511
21                           Akin, Gump, Strauss, Haver & Feld
                             BY:  CHARLES E. BIGGIO, ESQ.
22                           590 Madison Avenue
                             New York, New York 10022
23
    For the Defendants:      Rosen, Rosen and Hagood
24                           BY:  MORRIS D. ROSEN, ESQ.
                                  ALICE FOUNTAIN PAYLOR, ESQ.
25                           P.O. Box 893
                             Charleston, South Carolina 29402
```

Page 76

1                MS. CLARK:  The last argument --

2                THE COURT:  I've really heard enough.

3                MS. CLARK:  Sir?

4                THE COURT:  I've really heard enough.

5                MS. CLARK:  Okay.  Thank you, Your Honor.

6           (Pause.)

7                THE COURT:  I don't think there's any need for me

8      to go into any great detail as to the focus of my inquiry,

9      because all of us admit that -- that any motion to dismiss

10     such as this, we look at the Complaint; not the underlying

11     facts, not what a party can prove, but what they allege in

12     their Complaint in an attempt to determine therefrom whether

13     or not the Plaintiff can prove a set of facts in support of

14     his claim which will entitle him, or it, to relief.

15                And I think that when we do that in this case, we

16     find that the allegations of the Complaint are broad enough

17     to withstand the motion to dismiss.

18                The Plaintiffs clearly plead a pattern of

19     racketeering activity.  They plead predicate acts of

20     extortion, mail fraud, obstruction of justice, the use of

21     frivolous and malicious lawsuit to harm the Plaintiff.

22                Now, I can't say that all of these allegations are

23     appropriate, I can't say that all of them will fly, but I can

24     say that there are some predicate acts alleged in the

25     Complaint which would support a claim under RICO.

1          I'm a little more concerned about the antitrust

2     claim, about the monopoly claim and the restraint-of-trade

3     claim.  I'm -- I feel like the Plaintiff is on a little

4     thinner ice as far as those two claims are concerned, but at

5     least at this stage of the proceeding, I think that I would

6     be wrong to dismiss those claims.

7          I'm going to let discovery go forward and we'll

8     address those claims at some later date by a motion for

9     summary judgment, if such a motion is filed.

10          But, at this time, I think that the Plaintiff has

11     set forth allegations that, if proven, make out a RICO claim,

12     and that I would make a mistake to dismiss the claims.

13          And so the motion of the Defendants to dismiss the

14     claims in this Complaint is denied.

15          Now, the Defendants filed this motion in lieu of

16     an answer, and so I need to give you some time to answer it.

17          Is 30 days enough?

18       (No response.)

19          THE COURT:  I will give you 30 days, and then if

20     you need some more time, I'll be glad to give it to you.

21          How much time do you need for discovery in this

22     case?  I have a term in March.  Can you be ready in March?

23          MS. PAYLOR:  We were hoping that we could confer

24     and maybe come up with a proposed scheduling order if you

25     denied our motion, and we have not had the opportunity to do